**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

JACQUES CHELDER, WILLIAMS PETION,
SMITH GANTHIER, ANGIE LAZARD,
JEAN MARY JEAN MISERE,
MARGARETTE DOMINIQUE,                                    CASE NO.:
ERNST PAUL, PHUCIEN BAPTISTE,
GARRY SYLVAIN (On behalf of themselves
and similarly situated members of the Seventh
Day Adventist Church and Investors of                    **CLASS ACTION COMPLAINT**
Eminifx).                                                **FOR MONEY DAMAGES**

                             Plaintiffs,

GENERAL CONFERENCE CORPORATION,
NORTHEASTERN CONFERENCE,
TEXAS CONFERENCE,
NORTH AMERICAN DIVISION,
SOUTHERN NEW ENGLAND CONFERENCE,
ALLEGHENY EAST CONFERENCE,
FLORIDA CONFERENCE,
SOUTHEASTERN CONFERENCE,
THEORDORE NORMAN CLAIR WILSON
(CEO of the Seventh-Day Adventist Church)
FRANTZ D'HAITI, SMITH OLIVIER
YVELANDE D'HAITI,                                        **JURY TRIAL DEMANDED**
JOHN EDVARD MAISONNEUVE,
PHILIP MONPREMIER,
WILLIAM JEAN CHARLES, AGUY CALERBE,
ESTEB PIERRE, MOISE BERTRESSE,
JEAN PARISIEN, JOSEPH DORIVAL,
JEAN CLAUDE LOUIS JEUNE,
FREDO IGNACE, CARL BEHRMAN,
PAUL DONALD, SOPHIA MAISONNEUVE,
KELNY HYPOLITE, EDDY ALEXANDRE,
VIRGO BELIZAIRE, LEE MAYORS MEZIL,
WILNICK PRINCIVIL, RACHELLE O. PRINCIVIL,
CLARELLE DIEUVEUIL a/k/a MARIE DIEUVEUIL
a/k/a CLARELLE ALEXANDRE, and EMILE DUVIVIER.

                             Defendants
_____/

# CLASS ACTION LAWSUIT FOR MONEY DAMAGES

1

## CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, J. Wil Morris, Esquire of Morris Legal, LLC, hereby sue the Defendants for money damages and allege as follows:

## PRELIMINARY STATEMENT

This class action complaint is filed on behalf of over fifteen thousand members of the Seventh Day Adventist Church ("SDA") and investors of Eminifx. Members of the class lost over two hundred million dollars in a massive Ponzi Scheme orchestrated by Seven-day Adventist pastors and other executives of the church between January 2020 and May 2022 (The "Class Period"). Seven Day Adventist pastors with the consent of their regional conferences and the General Conference Corporation of the Seven Day Adventist Church used their churches each Saturday between 2020-2022 to promote the Eminifx Ponzi Scheme.

Plaintiffs bring a class action lawsuit alleging civil violations of the Federal Racketeer and Corrupt Organizations Act (18 U.S.C §§1961 & 1964 ("Federal RICO"), breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, conversion, theft, embezzlement, fraud, intentional misrepresentation, civil conspiracy, civil violations of the New York Racketeer Influenced and Corrupt Organizations Act (New York RICO Act), aiding and abetting fraud, negligent hiring training and supervision, intentional infliction of emotional distress, negligent infliction of emotional distress, exemplary punitive damages, fraudulent conversion, injunctive relief, and for an accounting against the named Defendants.

## NATURE OF CASE

1. This class action lawsuit arises from a massive Ponzi scheme developed inside the Church, and operated by pastors of the church to defraud the Plaintiffs and other similarly situated individuals. The pastors and religious leaders of the Seventh Day Adventist Church

used their positions to lure their parishioners into investing in a Ponzi scheme (the "EminiFX Enterprise Ponzi Scheme"). The pastors made hundreds of millions of dollars, while over 15,000 investors loss over two hundred million dollars. The conspiracy and the fraud were made possible with the express and/or tacit knowledge of the Regional and local Conferences, the North American Division, and the General Conference Corporation.

2. On May 22, 2022, Eddy Alexandre, was arrested by the Federal Bureau of Investigation ("FBI") in the Southern District of New York and pled guilty to commodities fraud on February 12, 2023.

3. The EminiFX Enterprise Ponzi Scheme was formed in January of 2020 by Eddy Alexandre and many co-conspirators John Edvard Maisonneuve, (Pennsylvania) Williams Jean Charles, (Texas and Florida); Phillips Monpremier, (Florida); Sophia Maisonneuve (New York); Paul Donald (New York); Kelny P. Hypolite (Massachusetts and New York), Frantz D'Haiti (Massachusetts and New York); Smith Olivier (New York). These individuals recruited other pastors to convince their parishioners to invest in the Eminifx Enterprise Ponzi Scheme knowing it was a fraud.

4. Alexandre and his co-conspirators launched a website (Eminifx.com) and, through it the Defendants told members of the church that they had developed a special robot-assisted trade secret that allows Eminifx to conduct trading in crypto currency. They guaranteed members of the Class a return on their investment of five percent (5%) each week, about a two-hundred- forty two percent (242%) per year. They did not invest any of the money they collected. Instead, they used prior investors' money to pay later investors.

5. The Defendants acting together, in concert, and on behalf of each other, developed a pyramid scheme where each one of them was responsible for recruiting investors, and for each investor they recruited, they received ten percent (10%) of the money invested as compensation. Each recruited investor was then asked to recruit three other investors.

6. Between January 2020 and May 2022, the Defendants collected over $300,000,000,00 from thousands of investors inside and outside the church.

## JURISDICTION AND VENUE

7. This Court has original subject-matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1961, 1962 and 1964 (c), and 28 U.S.C § 1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").

8. This Court has personal jurisdiction over the Defendants pursuant to18 U.S.C. §§ 1965 (b)(d). This Court has jurisdiction over the Plaintiffs' related State and common law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) and 18 U.S.C. § 1965(a).

## THE PARTIES

**A.    The Plaintiffs**

9. **JACQUES CHELDER** is a resident of Allentown, Pennsylvania, and is employed as a police detective with the Allentown Police Department.  He is a lifelong member of the Shekinah Seventh Day Adventist Church in Allentown, where he regularly attended services, financial seminars, and other church activities.  Between December 2021 and January 2022, Mr. Chelder invested $500,000 in the EminiFX Ponzi Scheme based on specific misrepresentations made to him by Pastor John Edvard Maisonneuve, Eddy Alexandre, and Lydie Bastien.  As a result, he suffered a direct financial loss of $500,000 and significant emotional distress, discovering only in June 2022 that the church's endorsement had been fraudulent and that EminiFX was in fact a Ponzi scheme.

10. WILLIAM PETION is a resident of Allentown, Pennsylvania, where he works as a mechanic.  He is a lifelong member of the Shekinah Seventh Day Adventist Church in Allentown and was closely affiliated with Pastor John Edvard Maisonneuve, for whom he also served as a private mechanic.  Mr. Petion regularly attended Sabbath services, Bible studies,

and church-hosted financial workshops, and was actively involved in the congregation when EminiFX was being promoted within the church. Relying on specific misrepresentations made to him by Pastor Maisonneuve, Eddy Alexandre, and Lydie Bastien, Mr. Petion invested $150,000 in December 2021, entrusting the funds to Pastor Maisonneuve. He later encouraged family members to invest based on those same promises. Mr. Petion suffered a total loss of his $150,000 investment and significant emotional and financial distress upon learning in June 2022 that EminiFX was a fraudulent Ponzi scheme.

11. MARGARETTE DOMINIQUE is a resident of Orlando, Florida, and is a disabled member of the community. She is a lifelong member of the Beracah II French Seventh Day Adventist Church, where she regularly participated in Sabbath services, Bible studies, and financial workshops. Between December 2021 and January 2022, Ms. Dominique invested $25,000 in the EminiFX Ponzi Scheme (a significant portion of a settlement check she had received following a debilitating injury) based on specific misrepresentations made to her by Pastor William Jean Charles and Eddy Alexandre. Ms. Dominique ultimately suffered a total financial loss of $25,000 and experienced serious emotional distress after learning in June 2022 that the promises made to her were false.

12. ANGIE LAZARD is a resident of Houston, Texas and work as a caregiver. She is a longtime member of the Bethany Seventh Day Adventist Church in Houston, Texas and regularly attended services and financial seminars at both the Bethany and Salem French SDA Churches. In December 2021, she invested $ 50,000 in the EminFx Ponzi scheme based on specific misrepresentations made to her by Pastor William Jean Charles, Pastor Jean Charles and Eddy Alexandre. Relying on their specific misrepresentations, she also encouraged her family to do the same. In June 2022, Ms. Lazard discovered EminiFX was a Ponzi scheme, resulting in a total financial loss of $50,000 and substantial emotional distress.

13. JEAN MARY JEAN MISERE is a resident of Pennsylvania and a lifelongg member of the Temple Salem Seventh Day Adventist Church in Dorchester, Massachusetts. She regularly attended Sabbath services, Bible studies, and church-sponsored financial seminars at Temple Salem, where EminiFX was actively promoted. Between March and April 2022, Ms. Mizere invested $45,000 in the EminiFX Ponzi scheme based on specific misrepresentations made to her by Pastors Frantz D'Haiti and John Edvard Maisonneuve, Eddy Alexandre, and other church-affiliated individuals. Relying on these representations, she also encouraged her family to invest. In June 2022, Ms. Mizere discovered that EminiFX was a Ponzi scheme, resulting in a total loss of her $45,000 investment and causing her significant financial and emotional distress.

14. SMITH GANTHIER, upon information and belief is a resident of New York City and a citizen of the United States. At all times hereinafter mentioned Plaintiff was a member and parishioner of the Seven Day Adventist Church and invested approximately One Hundred thousand dollars in the Ponzi Scheme between 2021-2022. Mr. Ganther suffered a total financial loss of approximately $100,000 and experienced serious emotional distress after learning in June 2022 that the promises made to him were false.

15. PHUCIEN JEAN BAPTISTE, is a resident of Atlanta Georgia. At all times hereinafter mentioned, JEAN BAPTISTE was and still a member of the Seven Day Adventist Church. Between 2021 and 2022 JEAN BAPTISTE invested one hundred thousand dollars in the Ponzi Scheme. Mr. Baptiste suffered a total financial loss of $100,000 and experienced serious emotional distress after learning in June 2022 that the promises made to him were false.

16. ERNST PAUL, upon information and belief is a resident of New York. At all times hereinafter mentioned, PAUL was a member of the Seven Day Adventist Church. Between 2021 and 2022 PAUL invested over one hundred thousand dollars in the Ponzi Scheme. Mr.

Paul suffered a total financial loss of over $100,000 and experienced serious emotional distress after learning in June 2022 that the promises made to him were false.

17. GARRY SYLVAIN, upon information and belief is a resident of Long Island, New York. At all times hereinafter mentioned, Sylvain was an investor of Eminifx and is named herein as a Plaintiff representing the subclass of non-church member investors.

**B.**     **Individual Pastor/Defendants**

18. Upon information and belief FRANTZ D'HAITI is an individual residing in North Babylon, New York. During the class period, D'HAITI under the supervision of the Northeastern Conference pastored two churches: Capernaum Seventh-Day Adventist Church, located at 190 Dodge Street, Rochester, New York 14606; and Mahanaim Seventh-Day Adventist Church located at 277 Hempstead Turnpike, Elmont, NY 11003. During the period of January 2020 and May 2022 D'HAITI used his churches each Saturday and other days as well to recruit parishioners to invest in the Ponzi Scheme. D'HAITI and his wife YVELANDE D'HAITI have recruited thousands of parishioners to invest in the Ponzi Scheme. During the class period D'HAITI made several false promises to the parishioners as described below. D'HAITI is currently a pastor at Temple Salem Seventh-Day Adventist Church located at 222 Woodrow Avenue, Dorchester, Massachusetts.

19. Upon information and belief, JOHN EDVARD MAISONNEUVE is an individual residing in Howell, New Jersey. During the class period, MAISONNEUVE was working as a pastor under the supervision of the Allegheny East Conference in Allegheny Pennsylvania, pastoring the Bethlehem French Adventist Church, located at 1240 Colton St, Reading, PA. During the period of January 10, 2020, and June 2022, MAISONNEUVE, with the consent and knowledge of the Allegheny East Conference used his church each Saturday between January 10, 2020, to June 30, 2022, to recruit parishioners to invest in the Ponzi Scheme. He and his wife SOPHIA MAISONNEUVE recruited thousands of people to invest in the Ponzi Scheme.

During the class period MAISONNEUVE made several false promises to the parishioners as described below. MAISONNEUVE is currently pastoring the New Eden Adventist Church located in Neptune, New Jersey.

20.   Upon information and belief, SMITH OLIVIER is an individual residing in Maplewood, New Jersey. At all times hereinafter mentioned and during the Class period, (January 2020 to May 2022), OLIVIER has been a pastor at the Seventh Day Adventist Church pastoring the Sinai Seventh Day Adventist Church located at 7 Johnson Street, Spring Valley, New York.   During the period of January 1, 2020, and June 30, 2022, OLIVIER used the church during services each Saturday to promote and recruit investors to the Ponzi Scheme. During the class period OLIVIER made several false promises to the parishioners as described below. OLIVIER is currently a pastor at Maranatha Seventh Day Adventist Church in Jamaica, New York.

21. Upon information and belief, PHILIP MONPREMIER is an individual residing in Apopka, Florida, and during the class period, he served as a pastor of the seventh day Adventist church under the supervision of the Florida Conference and the Southeastern Conference. Between January 1, 2020, and May 2022, MONPREMIER who is the cousin of Alexandre's wife Clarelle Dieuveuil used his church Elim Haitian Seventh Day Adventist Church located at 4445 17th Court SW, Naples, FL each Saturday to recruit parishioners to invest in the Ponzi Scheme. MONPREMIER, recruited thousands of parishioners who invested millions of dollars in the Ponzi Scheme. During the class period MONPREMIER made several false promises to the parishioners as described below.

22. Upon information and belief, LYDIE BASTIEN is an individual residing in Atlanta, Georgia. At all times hereinafter mentioned, she has been an influential member of the Seventh Day Adventist Church and the sister of Eddy Alexandre. During the class period, between 2020 and 2022 BASTIEN serve as the customer service who collected money from members

8

of the Adventist church. During the class period BASTIEN made several false promises to the parishioners as described below.

23. Upon information and belief, WILLIAM JEAN CHARLES is an individual residing in Richmond, Texas. At all times hereinafter mentioned, JEAN CHARLES has been a pastor at the Seven Day Adventist Church pastoring a church in Texas (Houston Haitian Bethany Seventh Day Adventist Church) in Houston. During the class period, JEAN CHARLES pastored two churches one in Orlando, Florida and in Houston, Texas. During the class period between January 1, 2020 and June 2022, JEAN CHARLES used his church every Saturday between 2020 and 2022 to recruit parishioners to invest in the Ponzi Scheme. JEAN CHARLES work under the supervision of the TEXAS CONFERENCE and the SOUTHEASTERN CONFERENCE in Florida. During the class period JEAN CHARLES made several false promises to the parishioners as described below. He is currently a pastor at Bon Samaritan French Seventh-Day Adventist Church in Fort Lauderdale, Florida.

24. Upon information and belief, CALERBE AGUY is an individual residing in Leominster in Massachusetts. At all times during the class period of January 2020 to May 2022, AGUY was a pastor at the Seven Day Adventist Church, pastoring at the Gethsemane Eglise Haitienne located at 583 Main St, Leominster, MA 01453 under the supervision of the Northeastern conference. During the period of January 2020 to May 2022, AGUY used his church each Saturday during that period to recruit parishioners to invest in the Ponzi Scheme. During the class period AGUY made several false promises to the parishioners as described below. AGUY is currently a pastor at several Adventist church in Connecticut.

25. Upon information and belief, ESTEB PIERRE is an individual residing in Aurora, Colorado. At all times during the class period of January 2020 to May 2022, PIERRE was a pastor at a Seventh Day Adventist Church, pastoring at the Agape Seventh Day Adventist Church located in Aurora, Colorado. During the class period commencing on or about January

2020 to May 2022, PIERRE used his church to recruit parishioners each Saturday during services. During the class period PIERRE made several false promises to the parishioners as described below.    PIERRE recruited hundreds of parishioners to invest in the Ponzi Scheme.

26. Upon information and belief, MOISE F. BERTRESSE is an individual residing in Homestead, Florida. At all times during the class period of January 2020 to May 2022 BERTRESSE was a pastor at the Seven Day Adventist Church, pastoring at the Trinite French Seventh at 890 SWE 4th Street, Homestead, Florida.  During the class period January 2020 and May 2022, with the consent of the Florida Conference, the Southeastern Conference, BERTRESSE used his church each Saturday during and after the service to recruit parishioners to invest in the Ponzi Scheme and made many false promises to the parishioners.

27. Upon information and belief, JEAN PARISIEN is an individual residing in Cumberland, Rhode Islands.  At all times hereinafter mentioned, PARISIEN was and has been a pastor at the Seventh Day Adventist Church working under the supervision of the Northeastern Conference.  During the class period January 2020 to May 2022, PARISIEN was a pastor at Shekinah Haitian Seventh Day Adventist Church in New London, Connecticut. During that period PARISIEN used his church to recruit parishioners.  Between November 2021 and May 2022, during each Saturday church service, PARISIEN would recruit parishioners to invest in the Ponzi Scheme and made several false promises to the parishioners.

28. Upon information and belief, JOSEPH DORIVAL is an individual residing in Seaford, Delaware.  At all times hereinafter mentioned, DORIVAL was and has been a pastor at the Seventh Day Adventist Church pastoring several churches in Delaware and Maryland. During the class Period January 2020 to May 2022, DORIVAL, with the consent of the Northeastern Conference, used his churches each Saturday to recruit parishioners to invest in the Ponzi Scheme and made several false promises to the parishioners/investors.

29. Upon information and belief, JEAN CLAUDE LOUIS JEUNE is an individual residing in West Palm, Beach, Floria.  At all times hereinafter mentioned, LOUIS JEUNE was and has been a pastor at the Seven Day Adventist church under the supervision of the Florida Conference and the Southeastern conference pastoring an Adventist Church to wit:  Jerusalem Haitian Seventh Day Adventist Church located at 229 N 14th Street Haines City, Florida. During the class period between January 2020 and May 2022, LOUIS JEUNE use his church during each Saturday service to recruit parishioners to invest in the Ponzi Scheme.

30. Upon information and belief, FREDO IGNACE is an individual residing in Worcester, Massachusetts.  At all times hereinafter mentioned IGNACE was and has been a pastor of the Adventist church during the class period 2020-2022.  Between January 2020 and May 2022, IGNACE was the pastor at Bethel Haitian Seventh Day Adventist Church located in Clinton, Massachusetts.  During that time, IGNACE used his church every Saturday between January 2020 and May 2022 to recruit parishioners to invest in the Ponzi Scheme.

31. Upon information and belief, CARL BEHRMANN is an individual residing in Lancaster, Massachusetts.  At all times hereinafter mentioned BEHRMANN was and has been a pastor of the Adventist church during the class period 2020-2022.  Between January 2020 and May 2022, BEHRMANN was the pastor at Bethel Haitian Seventh Day Adventist Church located in Clinton, Massachusetts.  During that time, with the consent of the Northeastern Conference, he used his church every Saturday to recruit parishioners to invest in the Ponzi Scheme.

32. Upon information and belief, DONALD PAUL is an individual residing in Longwood, Florida.  At all times hereinafter mentioned PAUL was and has been a pastor of the Seventh Day Adventist church located in Orlando Florida.  Between January 2020 and May 2022, PAUL was the pastor at Guilgal French Adventist Church in Orlando, Florida.  During

that time, with the consent of the Northeastern Conference, PAUL used his church every Saturday to recruit parishioners to invest in the Ponzi Scheme.

33. Upon information and belief, SOPHIA MAISONNEUVE is an individual residing in New Jersey with her husband JOHN EDVARD MAISONNEUVE. During the class period January 2020 to May 2022, SOPHIA served as a customer service representative for Eminifx. During that time, she recruited, collected and made several false promises to the parishioners in order to get them to invest in the Ponzi Scheme.

34. Upon information and belief, VIRGO BELIZAIRE is an individual residing in Mandeville, LA. At all times hereinafter mentioned, BELIZAIRE has been a pastor at the Seventh Day Adventist Church. During the class period, BELIZAIRE was a pastor at the Eben-Ezer of Greater New Orleans, and during the class period, BELIZAIRE used his church to recruit parishioners to invest in the Ponzi Scheme. Each Saturday he would use his service to tell parishioners about the miracle of Eminifx.

35. Upon information and belief, LEE MAYORS MEZIL is an individual residing in Pennsylvania and has been a pastor at the Seventh Day Adventist church in Pennsylvania. During the class period January 2020 to May 2022, MEZIL was the pastor at Shekinah Seventh Day Adventist church located in Reading, PA. During the class period, MEZIL used his church to recruit parishioners to invest in the Ponzi Scheme and made several false promises to the parishioners as described below.

36. Upon information and belief, EDDY ALEXANDRE is an individual residing in Allentown, Pennsylvania. At all times hereinafter mentioned, ALEXANDRE was a Deacon at the Seventh Day Adventist Church located in Jamaica, New York. During the class period ALEXANDRE made several false promises to the parishioners of his church assisted by his pastor SMITH OLIVIER.

37. Upon information and belief, CLARELLE DIEUVEUIL is the wife of EDDY ALEXANDRE and the Chief Financial Officer of Eminifx.  DIEUVEUIL is a resident of Nassau County, New York.  At all times hereinafter mentioned, and during the Class period DIEVEUIL was the person in charge of maintaining the book for Eminifx.

38. Upon information and belief, EMILE DUVIVIER is an individual residing in Allentown, Pennsylvania.  At all times hereinafter mentioned and during the class period, DUVIVIER was and is currently a pastor at the Seventh-Day Adventist Church in Allentown, PA.  Between January 1, 2020, and to present, DUVIVIER has been the pastor at Jerusalem French Adventist Church under the supervision of the Allegheny East Conference and the General Conference Corporation.  Between January 2020 and May 2022, DUVIVIER used his church to promote the Eminifx PONZI SCHEME.  He convinced many parishioners to invest their life savings in a Ponzi Scheme

39. Upon information and belief KELNY HYPOLITE is an individual residing in Naples, Florida.  At all times hereinafter mentioned, HYPOLITE has been a pastor at the Adventist church.  During the class period January 2020 and May 2022, HYPOLITE pastored the Mahanaim French Seventh-Day Adventist Church under the supervision of the Florida Conference, and the Southeastern Conference.    During the class period commencing on or about January 10, 2021, and ending May 30, 2022, HYPOLITE used his church each Saturday during service to recruit parishioners to invest in the Ponzi Scheme.

C.    **Corporate Defendants**

40. Upon information and belief, GENERAL CONFERENCE CORPORATION hereinafter ("GCC") is the governing entity of the Seventh-Day Adventist Church with its principal address in the State of Maryland.

41. Upon information and belief, the NORTH AMERICAN DIVISION is the administrative arm of the Seventh Day Adventist Church, in charge of all the pastors and churches located in North America which is, in turn, controlled by the GCC.

42. Upon information and belief, TEXAS CONFERENCE of the Seventh Day Adventist church is a corporation affiliated with the GCC.

43. Upon information and belief, the ALLEGHENY EAST CONFERENCE of the Seventh Day Adventist Church is an affiliate with the GCC and covers Pennsylvania where Defendant Maisonneuve was/is a pastor.

44. Upon information and belief, TEXAS CONFERENCE, of the Seventh Day Adventist Church is an affiliate of the GCC and reports to the AMERICAN DIVISION. The Texas Conference covers the state of Texas where WILLIAM JEAN CHARLES was or is a pastor.

45. Upon information and belief, the SOUTHEASTERN CONFERENCE, is an affiliate of the GCC and report to the AMERICAN DIVISION. The Southeastern Conference covers part of Florida and supervised defendants MONPREMIER and others named herein.

46. Upon information and belief, the FLORIDA CONFERENCE is an affiliate of GCC and report to the NORTH AMERICAN DIVISION of the Seventh-Day Adventist Church. During the class period, Defendant failed in its duty to properly supervise the pastors who work for the Seventh Day Adventist Church.

47. Upon information and belief, the SOUTHERN NEW ENGLAND CONFERENCE, is an affiliate of the GCC and reports to the NORTH AMERICAN DIVISION of the Seventh-Day Adventist Church. During the class period, this Defendant failed in its duty to properly supervise the pastors under its supervision.

48. Upon information and belief, the NORTHEASTERN CONFERENCE, is an affiliate of the GCC and reports to the NORTH AMERICAN DIVISION of the Seventh-Day

Adventist Church.   During the class period, Defendant was aware of the Ponzi scheme conducted by Defendants Smith Olivier, Frantz D'Haiti, and others.   This Defendants, as a supervisor, failed in its duty to properly supervise the pastors under its supervision.

## FACTUAL ALLEGATIONS COMMON TO ALL DEFENDANTS

### A.   General Allegations

49. The EminiFX Enterprise Ponzi Scheme was intentionally designed to defraud investors—most of whom were parishioners from churches affiliated with the Defendants.

50. The widespread success of the EminiFX Enterprise Ponzi Scheme was made possible only through the Defendants' active endorsement, aggressive promotion, and coercive efforts to pressure church members into investing in the fraudulent scheme.

51.    The Eminifx Enterprise Ponzi Scheme is an association in fact comprise of Eminifx and the named corporate defendants including unnamed individual and corporate entities such as  Bethsaida Haitian SDA, New York Conference SDA, Florida Conference SDA, Texas Conference, SDA,  Northeastern Conference SDA, Beracah Haitian SDA, Beracah First Haitian SDA, Beth Union Haitian SDA, Salem Haitian SDA,  Bethel Haitian SDA,  Ebenezer Haitian SDA,  Ephesus Haitian SDA, Gethsemane Haitian SDA, Jerusalem Haitian SDA, Smyrthe Haitian SDA, Jerusalem SDA, Maranatha Haitian, Maranatha II Haitian SDA, Mistpa Haitian SDA, Morija Haitian SDA, Mount Olive Haitian SDA, Nouvelle Arche Haitian, Novato Horeb SDA, Peniel Haitian SDA,  Pregame Haitian SDA,  Shekinah Haitian SDA, Springfield Nouvelle Jerusalem SDA, Tampa Haitian SDA, Southeastern Conference SDA, Bahacca Haitian SDA, Philadelphia French SDA, Beracah II SDA.

52. The Defendants, acting in concert, leveraged the authority and influence of the religious-based Defendants over their respective congregations to: (1) recruit members to attend weekly investor meetings; (2) pressure individuals within their congregations to invest

15

in and help facilitate the EminiFX Enterprise Ponzi Scheme; and (3) persuade their family members, friends, and associates to do the same.

53. The Defendants, acting jointly and in concert, used the EminiFX Enterprise Ponzi Scheme to launch a cryptocurrency platform through which investors were induced to contribute funds to the fraudulent enterprise.

54. The Defendants, acting jointly and in concert, conducted virtual weekly investor meetings every Thursday from November 18, 2021, through May 12, 2022, with the intent to solicit new investments and persuade existing investors to remain invested in the scheme.

55. The Defendants, acting jointly and in concert, met regularly to coordinate recruitment strategies and align on false messaging designed to persuade as many parishioners and community members as possible to invest in EminiFX.

56. The Defendants, acting jointly and in concert, used false and material misrepresentations to carry out their scheme and to conceal the ongoing nature of their fraudulent conduct.

57. The Defendants, acting jointly and in concert, operated a website to disseminate false and materially misleading representations about the EminiFX Enterprise Ponzi Scheme.

58. Each Defendant joined the EminiFX Enterprise Ponzi Scheme with the knowledge that the representations made to investors and potential investors concerning the EminiFX Enterprise Ponzi Scheme were false.

59. Each Defendant played an important role in the EminiFX Enterprise Ponzi Scheme. The Pastors-Defendants who had access to members of the class via their churches, convinced the members of the class to invest in the EminiFX Enterprise Ponzi Scheme.

60. Each individual pastor received 10% of the investment they brought in.

61. Each individual efendant pastor received thousands of dollars for their participation in the EminiFX Ponzi Scheme.

62.    The pastors of these churches intentionally participated in the EminiFX Enterprise Ponzi Scheme knowing it was a fraud and were paid by Alexandre for their facilitation of the fraudulent scheme.

63.    With the assistance of the individual pastors, Alexandre was able to recruit and convinced over 62,000 people to wire their money into his personal bank accounts in several banks (Bank of America, TD Bank) for the purpose of investment. In reality, none of the money collected was actually invested.

64.    Though the EminiFX Enterprise Ponzi Scheme started within the Seventh Day Adventist Church, it quickly spread to other religious domination and non-Christian believers in the Haitian-American community.

65.    The reach of the EminiFX Enterprise Ponzi Scheme was so strong that the class members included Haitian investors from France, Haiti, Chile, Brazil, Dominican Republic, Canada, and Belgium.

66.    Each member of the class invested significant amounts of money in the EminiFX Enterprise Ponzi Scheme upon the advice and coercions of their respective pastors appointed by and under the control of the Regional Conferences and the GCC.

**B.    Nature of the EminiFX Ponzi Scheme**

67.    The EminiFX Enterprise Ponzi Scheme was created as a pyramid, where those who came first and invest recruited others to invest.

68.    For example, Person A invested a sum money and was told by the Defendants to recruit three people who would also invest under them as a pyramid as shown below:



69.    Once these three people invested their money, Person A received 10% of the money invested. As more people signed up and became investors, the initial investors or head of the team made more money at the expenses of later investors.

70.    Each Plaintiff, and each similarly situated investor (the members of the class), were promised a percentage of the funds invested by individuals they personally recruited, as well as a share of the funds invested by subsequent recruits in their downline.  The structure of the scheme required that participants actively promote and expand their personal networks in order to realize profits.  Plaintiffs' anticipated returns were therefore directly tied to their own efforts and individual success in recruiting others.  The Plaintiff's individualized efforts were the motivating factor for each Plaintiff's decision to participate in the scheme and formed a material part of the expected opportunity.

71.    Each investor had an online crypto account through which was designed to lead them to believe that their investment returns were growing on a daily basis.  However, each account depicted false earnings.

72.    Members of the class complained to their respective Regional Conference and the GCC about the strong-arm tactics employed by the individual pastors to collect money from the parishioners  - but to no avail.

73.    The investments made by the Plaintiff and the class were never actually invested as represented and the fraudulent scheme continued until EminiFX Enterprise Ponzi Scheme

was publicly exposed following the arrest of Alexandre by the FBI - at which time the investors began to realize that had been scammed.

C.   **False Material Representations Regarding EminiFX Enterprise Ponzi Scheme**

74.   Each individual pastor falsely represented, in materially identical fashion, and/or conspired to willfully and knowingly assist other members of the EminiFX Enterprise Ponzi Scheme to falsely represent that (1) EminiFX had dedicated trading desks, computers and strategies that gave investors access to investment returns they would not otherwise have access to; (2) EminiFX's uses a "robo-assisted advisor account" - a "trade secret" technology only available to EminiFX investors; (3) investor moneys would be invested in cryptocurrency through an automated investment trading platform; (4) potential investors would earn a 5% to 9.8% weekly return on their investment and would double their money within five months using the "Robo-Advisor Assisted account" to conduct trading; (5) EminiFX would guarantee 5% weekly return on their investments; (6) actual investors had earned, and were continuing to earn, at least 5% each week on their investments; and (7) the Seventh Day Adventist Church would guarantee their investment to insure any losses they may sustain on their investment.

D.   **Material Omissions Regarding the EminiFX Enterprise Ponzi Scheme**

75.   Each Defendant materially omitted in materially identical fashion and/or conspired to willfully and knowingly assist other members of the EminiFX Enterprise Ponzi Scheme to materially omit, when they had a duty to disclose, that (1) the vast majority of the investors' funds were not invested as represented but instead diverted for the personal use and benefit of the defendants; (2) each investors had not earned, and were not earning, 5% each week on their investments as promised; (3) EminiFX did not have a robot-assisted advisor account or "trade-secret" technology; (4) the limited funds that were invested had actually sustained large losses, and (5) returns that some investors received were not from returns on

their investments but instead from fraudulent disbursements from investments that subsequent investors made under the pyramid style EminiFX Enterprise Ponzi Scheme.

## DEFENDANT-SPECIFIC FACTUAL ALLEGATIONS

### A.    Defendant John Edvard Maisonneuve- Church in Reading, PA

76.    Defendant John Edvard Maisonneuve, a long-standing pastor of the Seventh Day Adventist Church and cousin of EminiFX founder Eddy Alexandre, held significant influence within the Haitian Seventh Day Adventist community in Allentown, Pennsylvania.

77.    Defendant Maisonneuve was one of the architects of the EminiFX Enterprise Ponzi Scheme.  In or around 2020, Defendant Eddie Alexandre and Pastor Maisonneuve, acting in concert with the other defendants (collectively "the Defendants), and on each other's behalf, conceived and implemented the criminal enterprise known as the EminiFX Ponzi Scheme.

78.    Maisonneuve knowingly joined the EminiFX Enterprise Ponzi Scheme, fully aware that the representations being made to investors and potential investors were false and misleading.

79.    As a trusted religious leader at the Shekinah Seventh Day Adventist Church, Maisonneuve leveraged his pastoral authority to solicit, endorse, and facilitate investments in the fraudulent EminiFX Ponzi scheme, including directly targeting class members such as Plaintiffs William Petion and Jacques Chelder.

80.    Both Plaintiffs are lifelong members of the Shekinah Seventh Day Adventist Church and were actively involved in church activities. They relied on Maisonneuve not just as a religious figure but as a moral and financial guide, particularly as he hosted financial workshops, seminars, and Sabbath presentations dedicated to promoting EminiFX as a church-approved investment.

81.     Between January 1, 2020, and June 30, 2022 ("the class Period"), Maisonneuve held service each Saturday at his church Bethlehem French Adventist Church, located at 1240 Colton St, Reading, PA, and used the church services to recruit investors for Eminifx.

82.     In multiple Saturday services during the class Period, Maisonneuve told the congregation, including Petion and Chelder:

- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."
  At additional financial seminars held at the church, Maisonneuve, joined by Eddy

83.     Defendant Alexandre and others, reinforced these representations.    On Thursday December 9, 2021, during a zoom meeting with Eddy Alexandre and other pastors of the Seventh Day Adventist Church, Maisonneuve told parishioners:

- "This investment is completely secure—if anything were to go wrong, the church will intervene to ensure that no one loses money."

- "You should feel confident investing your savings because EminiFX is church-approved and a divine opportunity."

84.     Following these presentations, both Petion and Chelder had one-on-one conversations with Maisonneuve in his office, during which he repeated his assurances that their investments were "completely secure," "insured," and backed by the church, and that "no one would lose money."

85.     Relying on these representations—and on Maisonneuve's spiritual leadership and longstanding personal relationships with them—Petion invested $150,000, and Chelder invested $500,000 into EminiFX between December 2021 and January 2022.

86.     At the time of investment, neither Petion nor Chelder were told by Maisonneuve that he was receiving commissions or other financial benefits for recruiting investors. In fact,

they later learned that Maisonneuve received a new Mercedes-Benz vehicle and weekly withdrawals from EminiFX funded by new investor money—including theirs.

87.    Plaintiffs' reliance on Maisonneuve's misrepresentations was reasonable given his role as their pastor and the religious setting in which the fraudulent scheme was promoted. The specific promises that the investment was "risk-free," "insured," "approved by the church," and "vetted by leadership" were material to their decision to invest.

88.    Both Plaintiffs suffered catastrophic losses—$150,000 and $500,000, respectively—and experienced severe financial and emotional distress as a result. They only discovered the fraud in mid-2022, when they realized that returns were fabricated and their funds were neither invested nor accessible.

89.    Had Plaintiffs known that EminiFX was not insured, not backed by the church, and that returns were fictitious, they would not have invested. Likewise, had they known that Maisonneuve was personally profiting from their investments, they would have viewed his promotion of EminiFX as self-serving rather than trustworthy.

90.    The injuries suffered by Petion and Chelder, like hundreds of others recruited through Maisonneuve's church, were a direct result of his material misrepresentations, omissions, and abuse of pastoral authority. These acts further demonstrate Maisonneuve's central role in the EminiFX Enterprise and his personal participation in the scheme with scienter and intent to defraud.

91.    Between November 10, 2021, and May 22, 2022, Maisonneuve regularly withdrew funds from his EminiFX account, fully aware that the money he was receiving each week was not derived from legitimate investment returns, but rather from the contributions of new investors—many of whom were members of his own church.

92.    Maisonneuve knowingly made numerous fraudulent statements while fully aware that EminiFX was a Ponzi scheme.  Notably, even as he advised church members to

keep their funds invested and refrain from withdrawing their so-called returns each Friday, Maisonneuve himself was regularly withdrawing money every Friday—aware that the scheme would inevitably collapse.

93.     During the class period, while Maisonneuve was actively recruiting parishioners to invest in EminiFX, the Allegheny Conference was aware of his conduct but failed to take any action to stop him or intervene.

94.     Several church members reported to the Allegheny Conference that Maisonneuve was using aggressive and coercive tactics to pressure parishioners into investing in EminiFX. Despite these complaints, the Allegheny Conference took no action to intervene or prevent the resulting financial losses.  And Despite being notified by Petion, Children and others about Maisonneuve's fraudulent conduct following Alexandre's arrest, the Allegheny Conference and other church governing bodies failed to act, and failed to return their funds, despite their requests for help and demands that their funds be returned, further enabling Maisonneuve to continue harming additional class members.

95.     Maisonneuve personally received millions of dollars for his role in the EminiFX Ponzi Scheme, while each of the other participating pastors received thousands of dollars in compensation for their involvement in promoting and facilitating the fraud.

96.     Defendant Maisonneuve's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, Plaintiffs Petion and Childer and others would not have invested in EminiFX.

**B.      Defendant Frantz D'Haiti - New York Church**

97.     During the class period from January 2020 through May 2022, Defendant Frantz D'Haiti served as a pastor at multiple Seventh-day Adventist churches, including the Capernaum Seventh-day Adventist Church in Rochester, New York, the Mahanaim Seventh-day Adventist Church in Elmont, New York, and Salem Seventh-day Adventist Church in Dorchester Center, Massachusetts.

98.     These churches operated under the supervision of Defendant Northeastern Conference of the Seventh-day Adventist Church. D'Haiti was not only a local church pastor but also an influential leader within the Northeastern Conference, entrusted with spiritual and administrative leadership over multiple congregations.

99.     In this capacity, D'Haiti leveraged his pastoral position, reputation, and access to hundreds of congregants to orchestrate and promote the EminiFX Enterprise Ponzi Scheme.

100.    Specifically, from November 6, 2021, through May 30, 2022, and on numerous other Saturdays during the class period, D'Haiti used the pulpit at his churches to deliver sermons and make presentations encouraging congregants to invest in EminiFX.

101.    The forum for these representations included regular Sabbath worship services, Bible study meetings, and special financial seminars held in church sanctuaries.

102.    D'Haiti made numerous materially false representations from the pulpit, including:

- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."
- "This investment is completely secure—if anything were to go wrong, the church would intervene to ensure no one loses money."
- "You should feel confident investing your savings because EminiFX is church-approved and a divine opportunity."

24

103.    D'Haiti also invited guest speakers to special financial seminars, including Eddy Alexandre and Pastor Phillip Monpremier, further reinforcing the legitimacy of EminiFX.

104.    During one such seminar in early 2022, held at Temple Salem Seventh-Day Adventist Church in Dorchester, Massachusetts, both D'Haiti and Alexandre presented EminiFX as a "God-given opportunity" and a vehicle for "faith-based financial freedom." Alexandre described EminiFX as "a once-in-a-lifetime blessing," urging immediate investment to secure "generational wealth."

105.    Plaintiff Jean Mary Jean Mizere, a lifelong member of Temple Salem Seventh-Day Adventist Church, was present during several of these church services and financial workshops.

106.    Mizere personally heard D'Haiti, his wife Yvelande D'Haiti, and Defendant Philip Mompremier, promote EminiFX as a safe, insured, and church-backed investment.

107.    Mizere reasonably relied on these repeated assurances, including one-on-one follow-up conversations as well as special financial seminars they conducted, and invested $45,000 between March and April 2022.

108.    These funds were given directly to Pastor John Edvard Maisonneuve, acting in concert with D'Haiti, for investment in the scheme.

109.    Mizere encouraged family members to invest as well, further entrenching the financial harm caused by these misrepresentations.

110.    At no time did D'Haiti disclose that he was personally profiting from the scheme by receiving commissions of ten percent (10%) of the funds he collected from parishioners.

111.    Nor did he reveal that he was receiving weekly payouts derived from new investors' contributions rather than any legitimate trading or investment activities.

112.    D'Haiti was associated with more than a thousand investor accounts in the EminiFX system, collected money from these individuals directly, and funneled it into the scheme.

113.    The internal EminiFX system falsely credited investors with returns, creating the illusion of profitability while D'Haiti and others received commissions and cash rewards for recruiting new victims.

114.    Mizere's financial and emotional injuries were significant. As a result of relying on D'Haiti's, his wife's, and Defendant Mompremier combined false and material statements, she lost $45,000—money she would never have parted with had she known that the scheme was not legitimate, not backed by the church, and not producing any real investment returns.

115.    She suffered severe emotional distress, particularly upon learning that her spiritual leaders were profiting while she and other congregants were left destitute.

116.    Despite being notified by Mizere and others about D'Haiti's, his wife's and Defendant Mompremier's fraudulent conduct following Alexandre's arrest, the Northeastern Conference and other church governing bodies failed to act, and failed to return her funds, despite her requests for help and demands that her funds be returned, further enabling D'Haiti, hi wife and Defendant Mompremier to continue harming additional class members.

117.    Defendant D'Haiti's actions, in conjunction with co-defendants, demonstrate a calculated intent to defraud his congregants.

118.    His use of church authority, religious credibility, and spiritual trust to advance a Ponzi scheme constitutes not only fraud but an egregious abuse of pastoral power.

119.    The representations he made were material to the Plaintiffs' decision to invest, were relied upon in good faith, and caused real and foreseeable financial injury.

120.    D'Haiti personally received tens of thousands of dollars for his role in the EminiFX Ponzi Scheme, while each of the other participating pastors received thousands of dollars in compensation for their involvement in promoting and facilitating the fraud.

121.    Defendant D'Haiti's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his, his wife's and Defendant Mompremier's misrepresentations, Plaintiff Mizere and others would not have invested in EminiFX.

## C.    Defendant Philip Monpremier – Naples, Florida

122.    Defendant Philip Monpremier is the cousin of Clarelle Dieuveuil, the wife of EminiFX's founder, Defendant Eddy Alexandre. Dieuveuil was also the Chief Financial Officer of EminiFX.

123.    This close familial relationship granted Monpremier credibility and access to insider knowledge about the Ponzi scheme, positioning him as a central figure in its expansion within the Seventh-day Adventist Church community.

124.    From January 2020 to May 2022 (the "Class Period"), Pastor Monpremier pastored two churches in Naples, Florida, each with approximately 500 members—predominantly Haitian immigrants.

125.    As a longtime pastor, former president of the Florida and Southeastern Conferences, and a respected leader within the Adventist community, Monpremier wielded considerable influence among both parishioners and fellow pastors.  According to Plaintiff Jean Mary Jean Mizare, "When he speaks, it is like God himself spoke."

126.    Throughout the Class Period, Monpremier used his church services every Saturday to recruit investors into EminiFX.

127.    He described EminiFX from the pulpit as "a blessing from God" and repeatedly promoted the investment as church-backed, secure, and capable of delivering divine wealth to investors.

128.    In his sermons, Monpremier made materially false representations, including but not limited to:

- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."
- "You should feel confident investing your savings because EminiFX is church-approved and a divine opportunity."

129.    Monpremier collected hundreds of thousands of dollars from over 300 members of his congregation to invest on their behalf.

130.    He received a 10% commission from these investments.

131.    Despite knowing that no legitimate investment activities were taking place and that "returns" were merely recycled funds from new investors, Monpremier continued to make false assurances and urged congregants to remain invested, causing them to incur greater losses.

132.    During the Class Period, Monpremier attended training sessions led by Eddy Alexandre in New York—including one on or about January 19, 2022—where Alexandre instructed participating pastors, including Monpremier, on how to market the fraudulent investment, what specific phrases to use to build trust, and how to dissuade parishioners from withdrawing their funds, all while the pastors themselves were quietly withdrawing so-called profits each week.

133.   In addition to promoting EminiFX during Sabbath services at his home churches, Monpremier conducted financial seminars at Seventh-day Adventist churches across the country—including one at a congregation attended by Plaintiff Jean Mary Jean Mizere.

134.   Mizere was not a member of Monpremier's congregation, but she was present at one of these financial seminars in early 2022 when Monpremier made the same materially false claims outlined above.

135.   During that seminar, held at a Seventh-day Adventist Church in Queens, New York, Monpremier reiterated that the investment was "safe," "approved by the church," and "divinely inspired."  He emphasized that "the church stands behind this," and told attendees that they were missing a God-given opportunity if they did not invest.

136.   Relying on Defendant Frants D'Haiti's and Defendant Monpremier's status as Adventist pastors, and believing their representations to be endorsed by the Church, Mizere subsequently invested $45,000 into EminiFX.  This sum constituted the entirety of her savings. She would never have entrusted her funds to EminiFX had it not been for the assurances of trusted religious leaders like Defendant Monpremier and Defendant Frantz D'Haiti.

137.   Mizere received no return on her investment and ultimately lost her entire $45,000.

138.   The misrepresentations made by Monpremier and D'Haiti were material to her decision to invest, and she relied on them as truthful because they were delivered in a religious setting by a person she believed to be a representative of the Seventh-day Adventist Church and, by extension, of God.

139.   Like other participating pastors, Monpremier was fully aware that EminiFX was a fraudulent scheme and that the profits were fictitious.  Nonetheless, he knowingly participated in deceiving hundreds of congregants, resulting in devastating financial losses to class members, including Plaintiff Mizere.

140.    Monpremier personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him—like Mizere—were left financially ruined.

141.    Plaintiff Mizere's injury was a direct result of the fraudulent misrepresentations made by Monpremier, which were both material and intentionally deceptive.  But for those false assurances, she and others would not have invested her savings in the EminiFX scheme.

142.    Defendant Monpremier's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law.

**D.    Defendant William Jean Charles – Houston, Texas, and Orlando, Florida**

143.    Defendant William Jean Charles, a senior Seventh-day Adventist pastor, served congregations in both Houston, Texas, and Orlando, Florida, during the class period of January 2020 through June 2022.

144.    At all times relevant, he held spiritual authority over hundreds of parishioners who trusted and relied upon his religious counsel and financial guidance.

141. Jean Charles played a central role in the design and implementation of the EminiFX Enterprise Ponzi Scheme.

145.    In coordination with Defendant Eddy Alexandre, Jean Charles personally designed the EminiFX platform's computer interface to display a false daily return of 5% on so-called investments. This digital misrepresentation created the illusion of consistent profits, even though no legitimate trading or investment activity was occurring.

146.    Each Saturday during Sabbath services, from January 2020 through at least May 2022, Jean Charles used his pulpit and his pastoral office at his churches in both Orlando and

Houston to promote EminiFX to his congregants.  He also held one-on-one conversations after services to encourage investment.

147.    During these church-based promotions, Jean Charles made materially false representations, including:

- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."
- "You should feel confident investing your savings because EminiFX is church-approved and a divine opportunity."

148.    Jean Charles also made similar representations publicly outside his church. On or about March 10, 2022, during a Zoom meeting with prospective investors, he stated: "There are two things I'm most proud of—marrying my wife and joining EminiFX."  He repeated that the scheme was "blessed by God" and assured listeners that "this is your chance to become a millionaire."

149.    Plaintiff Margarette Dominique, a member of Jean Charles' Orlando church, attended his Sabbath sermon on or about December 19, 2021, during which he made the representations quoted above.  Relying on those representations, and trusting him as her pastor, Dominique invested $25,000—part of a workers' compensation settlement she had received after being struck by a car while cleaning hotel rooms at a Marriott hotel.

150.    On or about December 21, 2021, Jean Charles personally received a certified check from Dominique for $25,000. He accepted the funds under the pretense of investing it in EminiFX, falsely assuring her that it was secure, insured, and blessed by the Church.

151.    Plaintiff Angie Lazard attended financial seminars held by Jean Charles during special church events between December 2021 and April 2022 at Salem French Seventh-day

Adventist churches led by Jean Charles and Eddie Alexandre. At those events, Jean Charles delivered sermons and workshops in which he repeated the same core misrepresentations: that EminiFX was a risk-free investment backed by the Seventh-Day Adventist Church, that the funds were insured, and that guaranteed returns of 5% weekly were generated by automated crypto trading.

152.    Based on Jean Charles' representations and his prominent role as a pastor in the Adventist Church—bolstered by the spiritual setting of his presentations and the representations of Eddie Alexandre—Lazard believed the Church's endorsement gave the investment credibility.  Relying on these statements, she invested over $50,000 in EminiFX in November 2021. She was not told that Jean Charles was personally profiting from her investment.

153.    Jean Charles also made house calls to collect money.  In one instance in 2021, he visited the Texas residence of Madgala Pierre, collected a $25,000 bank check, and prayed with her for God to bless the investment—knowing that the funds were going into a fraudulent scheme.

154.    Jean Charles actively discouraged investors from withdrawing their "returns," urging them instead to "let it grow" so that they could "become millionaires in less than three years." At the same time, he was withdrawing his own weekly profits—fully aware that these payments were made using the contributions of newer investors.

155.    Jean Charles never disclosed to investors that he was receiving a 10% commission on the funds he raised.  He also never told investors that the returns displayed on their EminiFX dashboards were fabricated by the platform he himself helped build.

156.    In addition to promoting EminiFX in his own churches, Jean Charles recruited other pastors in New York, Massachusetts, Connecticut, and Florida into the scheme.  He provided them with his account number and instructed them to either deposit money directly

32

into his account or bring him cash. In some instances, he personally collected funds at church or at his home and promised to open accounts on behalf of investors—though it is unclear whether such accounts were ever created.

157.    Hundreds of individuals invested their life savings based on Jean Charles' misrepresentations, including Dominique and Lazard.  They reasonably relied on his statements, materially influenced by his status as a trusted pastor.  Their losses were direct and substantial—Dominique lost her entire $25,000 investment, and Lazard lost over $50,000.

158.    Jean Charles continued promoting the fraudulent scheme despite knowing its illegality.  His actions were motivated by personal gain, and he made significant sums from his recruitment efforts.  He acted with actual knowledge of the fraud and with specific intent to defraud his congregants and other class members.

159.    Jean Charles personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him—like Lizard and Dominique- were left financially ruined.

160.    Defendant Jean Charles' conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, Plaintiffs Dominique, Lazard, and others would not have invested in EminiFX.

**E.    Defendant Emile Duvivier – South Orange, New Jersey**

161.    At all relevant times, Defendant Emile Duvivier was, and remains, a pastor employed and trained by the Seventh-day Adventist Church.  During the class period (January 2020 to May 2022), Duvivier led the Jerusalem French Adventist Church located at 135 High Street, West Orange, New Jersey 07052.

162.    The congregation of Duvivier's church included approximately 600 members who regularly attended Sabbath services each Saturday throughout the class period.

163.    During the class period, Duvivier held a leadership position within the Allegheny East Conference, where he oversaw and mentored numerous pastors—many of whom he encouraged or influenced to participate in promoting the Ponzi scheme.

164.    From January 2020 through May 2022, Duvivier used his Saturday church services at Jerusalem French Adventist Church to actively recruit parishioners to invest in EminiFX.

165.    During the class period, Duvivier held a leadership role within the Allegheny East Conference, where he oversaw numerous pastors and played a key role in encouraging or grooming several of them to participate in promoting the EminiFX Ponzi Scheme.

166.    Between January 2020 and May 2022, Duvivier regularly used his Saturday church services to recruit parishioners at his South Orange, New Jersey church to invest in EminiFX

167.    During that same period, both during and after Sabbath services, Duvivier made the following statements and promises to members of his congregation in an effort to promote and encourage investment in the EminiFX scheme:

- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."

168.    Duvivier knew that EminiFX was a Ponzi scheme, yet he failed to inform his parishioners of the risks or probability that when the Ponzi scheme collapsed, they could/would likely lose their money.  While making the above promises, he withheld the fact that he was

personally receiving a 10% commission on all investments and was being paid every Friday—not from legitimate returns, but from the contributions of new investors.

169.    Duvivier was fully aware that the funds entrusted by parishioners were not being invested as represented. He also knew that the purported returns on investment were entirely fabricated.

170.    Duvivier was among a group of approximately 30 pastors who met regularly to coordinate recruitment strategies and align on false messaging designed to persuade as many parishioners and community members as possible to invest in EminiFX.

171.    This group of Seventh-day Adventist pastors included all of the named pastor-defendants as well as additional pastors who are not specifically named in this Complaint.

172.    As a direct result of the false promises made by Duvivier, hundreds of parishioners were persuaded to invest in the Ponzi Scheme, believing they would earn significant returns. Many entrusted their entire life savings—including individuals like Sister Marie Joseph, who liquidated her 401(k) and handed the proceeds to Pastor Duvivier to invest on her behalf.

173.    Duvivier acted knowingly and out of personal greed, enriching himself by hundreds of thousands of dollars. His actions left thousands of parishioners financially devastated—many now facing destitution and homelessness as a result.

180.    Defendant Duvivier's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

**F.    Defendant Smith Olivier**

181.    At all relevant times, Defendant Smith Olivier was employed and trained by the Seventh-day Adventist Church.  He is currently serving as pastor at Maranatha French Seventh-day Adventist Church, located at 17304 Linden Boulevard, Jamaica, New York, under the oversight of the Northeastern Conference headquartered in Long Island, New York.

181.    From January 2020 through June 2022, Olivier also served as pastor of Sinai Seventh-day Adventist Church in Spring Valley, New York.

182.    During the class period, Olivier used his position at the Sinai Seventh-day Adventist Church in Spring Valley to recruit parishioners to invest in EminiFX.

183.    Each Saturday, from January 2020 through June 2022, Olivier used his Sabbath sermons to preach about investment opportunities, promoting EminiFX to his congregation.

184.    In January 2022, Olivier invited Eddy Alexandre and Defendant William Jean Charles to speak at his church, where they addressed the congregation about EminiFX.

185.    During that service, Olivier—joined and supported by Alexandre and Jean Charles—made the following promises to the congregation in an effort to persuade them to invest in EminiFX:

- "We are blessed to have brother Eddy Alexandre and Rev. William Jean Charle with us today to talk about the blessing of God"
- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."

186.    Each Saturday, from January 2020 through June 2022, Olivier used his Sabbath sermons to repeatedly make the above statements and promises about EminiFX, actively promoting the scheme and encouraging members of his congregation to invest.

187.    Olivier knew that EminiFX was a Ponzi scheme and that no legitimate investments were being made.  Despite this knowledge, he continued to make false promises to his parishioners, fully aware that they would ultimately lose their money.

188.    Between December 2021 and March 2022, hundreds of parishioners entrusted Olivier with their life savings—emptying their bank accounts, cashing out their 401(k)s, and turning over whatever funds they had—for him to invest in EminiFX on their behalf.

189.    Hundreds of parishioners entrusted their hard-earned money to EminiFX based on Olivier's assurances that it was a sound investment endorsed and supported by the Seventh-day Adventist Church.

190.    To further the scheme, Olivier—like the other pastors— opened an EminiFX account, placing the individuals he recruited under his referral line to track their investments.

191.    Together with his co-conspirators, Olivier solicited and raised millions of dollars from parishioners at his Spring Valley church, from members of other congregations, and from individuals outside the church community.

192.    On Thursday, February 10, 2022, during a weekly Zoom meeting, Olivier told participants that if they "want to be a millionaire," as God intended, they must keep "their money invested for the long term."

193.    In doing so, Olivier was actively encouraging those who had already invested not to withdraw their supposed weekly profits, knowing that widespread withdrawals would cause the Ponzi scheme to collapse.

194.    As a result of Olivier's involvement and promotion of the scheme, hundreds of individuals lost their life savings, while Pastor Olivier personally profited by making millions of dollars.

195.    Oliver personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.

196.    Defendant Oliver's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

**G.    Defendant Esteb Pierre – Aurora CO**

197.    At all relevant times, Defendant Esteb Pierre was an Adventist pastor, hired, trained, and retained by the Seventh Day Adventist Church.  During the class period, Pierre served as pastor of the Agape French Seventh Day Adventist Church, located at 14190 E. Jewell Avenue in Aurora, Colorado, under the employment and supervision of the Seventh Day Adventist Church.

198.    The congregation at Pierre's church was composed almost entirely of Haitian immigrants, most of whom spoke little or no English.  As a result, Pierre conducted his Sabbath services primarily in Creole.

199.    Throughout the class period (January 2020 to May 2022), Pierre held Sabbath services every Saturday from approximately 9:00 a.m. to 3:00 p.m.

200.    During these services—and in one-on-one conversations with congregants after services—Pierre regularly promoted EminiFX.

201.    Each Saturday throughout the class period, Pierre made the following promises to his congregants:

- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."

202.    Pierre knowingly made false promises to his congregants, motivated by the fact that he was receiving a ten percent commission on the funds they invested.

203.    Like the other pastors, Pierre opened an account with EminiFX and began actively recruiting investors.  Many congregants entrusted him directly with their money to invest on their behalf, as most lacked the computer literacy or access needed to navigate the EminiFX platform themselves.

204.    After collecting cash from his congregants, Pierre created accounts for them under his referral line and performed internal transfers from his own EminiFX account, falsely showing hundreds of thousands of dollars as the source.  These intra-account transfers were fraudulent, as they were based on fictitious returns.

205.    The congregants, seeing their names and investment amounts reflected on the EminiFX platform, were led to believe their funds had been properly invested.  In reality, Pierre retained the cash for himself while perpetuating the illusion of a legitimate investment.

206.    Hundreds of individuals were persuaded to invest in the Ponzi Scheme based on Pierre's false assurances that it was a sound and reliable opportunity.

207.    Pierre never disclosed that he was personally benefiting from their investments—receiving not just a percentage, but in many cases the full amount of the money they entrusted to him—by making fictitious intra-account transfers from his own EminiFX account to theirs.

208.    As a direct result of Pierre's role in promoting and facilitating the scheme, hundreds of parishioners suffered significant financial losses.

209.    Hundreds of people invested in the Ponzi Scheme because Pierre told them it was a good investment.

210.    Pierre did not tell them that he was part of the deal and that he was receiving a percentage of their money – Pierre received a hundred percent of their money because of the intra transfer from his account to theirs.

211.    Pierre personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.

212.    After Eddy Alexandre was arrested, Judge Caprini, of this Court appointed David Castleman as Receiver to marshal and return whatever money he collected to the class members, however, several thousands of people who gave money to Pastors like Pierre or third parties to invest for them will never see part of their money returned to them because of the intra transfer.

213.    As a result of Pierre's involvement in the Ponzi Scheme members of his church lost hundreds of thousands of dollars.

214.    Defendant Pierre's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial

interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

**H.**    **Defendant Calerbe Aguy – Leominster MA**

215.    At all times hereinafter mentioned, Defendant Calerbe Aguy was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church.

216.    During the class period, Aguy was employed by the Seventh day Adventist church, pastoring at Gethsemane Eglise Haitienne of the Seventh Day Adventist church located at 583 Main Street, Leominster, MA.

217.    The Gethsemane Eglise Haitienne comprised only of Haitian Immigrants. The church had approximately 300 congregants.

218.    Each Saturday between January 2020 and May 2022, Aguy would hold Sabbath services normally between the hours of 9:am and 4pm. During these services, Aguy would used his summons to casually talk about Eminifx.

219.    He would preach about financial freedom and the financial benediction of God.

220.    On Saturday January 22, 2022, Aguy invited Eddy Alexandre to visit his church to address the congregants about Eminifx.  During this meeting, Aguy accompanied by Eddy Alexandre made the following statement to the Gethsemane church members:

- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."
- "I have invested because I believe this is a gift from God."

221.    Aguy made these promises to the congregants knowing that Eminifx was a Ponzi Scheme.

222.    Aguy intentionally misled the congregants because of his own financial interest.

223.    While he recruited many people to join the Ponzi Scheme, he never once told them that he was receiving ten percent of the money invested.  He never once told them that none of the money would be invested, and that whatever money or profit received would be from other investors' money, not from profits.

224.    During the class period Aguy would often attend the weekly Eminfx Zoom meeting where all the other pastors would attend to encourage people to invest and remain invested.

225.    During these sessions attended by thousands of people from inside and outside the church, Aguy and others would encourage the participants to remain invested while Aguy would withdraw money each week from Eminifx.

226.    Because of his involvement in convincing the congregants that Eminifx was a perfect investment backed by the Seventh Day Adventist church, many parishioners took heed to his advice and invested hundreds of thousands of dollars.

227.    Aguy personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life saving.

228.    Defendant Aguy's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts.  His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

I.    **Defendant Moise F. Bertress – Homestead, Florida**

229.    At all times hereinafter mentioned, Defendant Moise F. Bertress was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church.

230.    During the class period Bertress was employed by the Seventh Day Adventist Church as a pastor at the Trinite French Seventh Day Adventist Church located at 890 SW 4th Street, Homestead, Florida.

231.    During the class period, Bertress who pastored a church of approximately 400 people would hold sabbath service every Saturday at his church in Homestead, Florida between the hours of 9am to about 4pm.

232.    During these services and during these hours, Bertress would talk about Eminifx and the benediction of god. He would tell his parishioners that Eminifx was a gift from God, a way to financial freedom.

233.    On or about March 29, 2022, Bertress invited Defendant Monpremier to join him in convincing his churchgoers that Eminifx was a perfect investment.

234.    During the presentation accompanied by Defendant Monpremier, Bertress made the following promises to his church members:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."
- "This investment will bring financial freedom to you and your family"
- "You will never be broke again"

234.    Bertress and Monpremier did not disclose to the congregants that they were getting receiving a percentage of the money invested.

235.    They did not tell the congregants that Eminifx was a Ponzi Scheme, using new investors' money to pay old investors.

236. He did not tell them that they could lose all their money. Instead, he told them that it was a full proofed investment, and that if there was any problem, the Seventh Day Adventist Church would pay them back.

237. With sound guarantee and the credit of the Seventh Day Adventist church, hundreds of congregants invested hundreds of thousands of dollars and most all lost all of their investments when the Ponzi scheme collapsed.

238. Betress personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme. While he profited handsomely, his parishioners and those who trusted him were left financially ruined. Most if not all the investors lost their money, some of them invested their entire life savings.

239. Defendant Bertress's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his and Defendant Monpremier's misrepresentations, his parishioners would not have invested in EminiFX.

**J.      Defendant Edner Eloi – Petaluma California**

240. At all times hereinafter mentioned, Defendant Edner Eloi was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church.

241. During the class period Eloi was employed by the Seventh Day Adventist Church pastoring at the Novato Horeb Haitian Seventh-Day Adventist Church located at 1119 Industrial Avenue, Petaluma, California.

242. During the class period, Eloi would hold Sabbath services every Saturday in this 200 members church, and during the services Eloi would preach about financial freedom, and

god's blessing.  He would talk about Eminifx, and how this great company would lead all church members who invest to financial freedom.

243.    Many church members were skeptical about Eminifx and its investment strategy, but Eloi would use the same line that every Adventist pastor who was part of the scheme used. He told church members that:

- "This investment is risk-free because it is backed by the Seventh-Day Adventist Church."
- "Your money will be insured, and if anything happens, the church will reimburse you."
- "Investors will earn a guaranteed 5% to 9% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."
- "Many church elders and leaders have already invested and seen amazing returns."

244.    Convinced that Eminifx was indeed a great investment many of the congregants gave Eloi their money to invest for them hoping to make money.  All of them lost their money.

245.    During these conversations as promises were made to them by Eloi, he never reveals his own interest in promoting the Ponzi Scheme.  He did not tell the parishioners that he was receiving ten percent of the money invested.  He did not tell them that their money would not be invested, rather it will be used to pay prior investors, and that if they recruit others, their money would be used to pay them.

246.    Like the other pastors, Eloi encouraged them to share the good news with their friends and family. He told them that "god will bless you more when you share…" the good news with others.

247.    When one of the parishioners wanted to withdraw his money, Eloi encouraged her to remained invested as he explained "you will earn interest over other interests…" Eloi knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors.

248.    On or about February 2025, the appointed receiver, David Castleman sent out letters to all the pastors who received more money that they have invested to return the funds which they knew was not from return on investment.

249.    Eloi personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life savings.

250.    Defendant Eloi's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts.  His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law.  Absent his and Defendant Monpremier's misrepresentations, his parishioners would not have invested in EminiFX.

## K.    Defendant Jean Parisien – New London, MA

251.    At all times hereinafter mentioned, Pastor Jean Parisien ("Parisien") was an Adventist pastor, hired, trained and retained by the Seventh-Day Adventist Church, and a leader of the Southern New England Conference of the Church.

252.    During the class period Parisien was employed by the Seventh-Day Adventist Church pastoring at the Shekinah Haitian Seventh-Day Adventist Church, located at 62 Huntington St, New London, CT. Parisien's church made up of about two hundred Haitian Immigrants, some of them barely speak English.

253.    During the class period, Parisien would hold Sabbath services every Saturday in this and during the services he would preach about financial freedom, and god's blessing. He would talk about Eminifx, and how this great company would lead the church members who invest to financial freedom.

46

254.    During the class period Parisien would meet with members of his church either at the church or other places in Connecticut, and he would explained to them that Eminifx was a "blessing from God" and during these meetings which took place between Saturday January 15, 2022 to about April 30, 2022, he told church members that:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."

- "… Your money will be insured, and if anything happens, the church will reimburse you."

- "… Investors will earn a guaranteed 5% to 9% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by  church  leaders."

- "…Many church elders and leaders have already invested and seen amazing returns."

255.    Convinced that Eminifx was indeed a great investment many of the congregants gave their money to Parisien to invest for them hoping to make money. All of them lost their money.

256.    During these conversations as promises were made to them by Parisien, he never revealed his own interest in promoting the Ponzi Scheme. He did not tell the parishioners that he was receiving ten percent of the money invested. He did not tell them that their money would not be invested, rather it will be used to pay prior investors, and that if they recruit others, their money would be used to pay them.

257.    Like the other pastors, Parisien encouraged them to share the good news with their friends and family members. He told them that "god has more blessing for them" if they share the good news with others.

258.    When some of the parishioners decided to withdraw their money, Parisien encouraged them to remained invested as he explained "you have to be patient if you want to earn more money will earn interest over other interests with that you will be a millionaire within 18 months…"

259.    Parisien knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors. 194. On or about February 2025, the appointed receiver, David Castleman sent out letters to Parisien requesting that he returned all the money he received from the Ponzi Scheme.

260.    Parisien personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life savings.

261.    Defendant Parisien's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts.  His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his and Defendant Monpremier's misrepresentations, his parishioners would not have invested in EminiFX.

## L.    Defendant Joseph Dorival – Seaford, Delaware

262.    At all times hereinafter mentioned, Pastor Joseph Dorival ("Dorival") was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church under the supervision of the Allegheny East Conference.

263.    During the class period Dorival was employed by the Seventh-Day Adventist Church pastoring as a lay pastor at the following church beginning on 1 July 2021: Eben-Ezer Haitian Church at 26988 Bethel Concord Rd, Seaford, Delaware; Shekinah Eden Church at 635 Homer St, Salisbury, Maryland; and Mitspa Haitian Adventist Company, located at 109 E North Street, Smyrna, Delaware.

264.    During the class period, Dorival had access to thousands of parishioners within the churches he served as pastor.  Each Saturday between November 2021 and May 2022

Dorival held Sabbath services every Saturday and during the services he preached about financial freedom, and god's blessing. He promoted Eminifx, and spoke about how Eminifx is, and investing in Eminifx will lead the church members to financial freedom.

265.   During the class period Dorival met with members from the several churches either at the church or other places in Maryland and Delaware to promote Eminifx. He said Eminifx was a "blessing from God" and during these meetings which took place each Saturday beginning November 2021 to about April 30, 2022, Dorival told church members that:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."

- "… Your money will be insured, and if anything happens, the church will reimburse you."

- "… Investors will earn a guaranteed 5% to 9% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."

- "…Many church elders and leaders have already invested and seen amazing returns."

266.   Convinced that Eminifx was indeed a great investment many of the congregants gave their money to Dorival to invest for them hoping to make money. All of them lost their money.

267.   During these conversations as promises were made to them by Dorival, he never once revealed his own interest in promoting the Ponzi Scheme. He did not tell the parishioners that he was receiving ten percent of the money invested. He did not tell them that their money will not be invested, rather it will be used to pay prior investors, and that if they recruited others, their money would be used to pay them.

268.   Like the other pastors, Dorival encouraged them to share the good news with their friends and family members. He told them that "god will bless you more when you share…" the good news with others.

269.    When some of the parishioners wanted to withdraw their money, Dorival encouraged them to remained invested as he explained "be patient, to earn more money you have to remain invested…"

270.    Dorival knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors.

271.    On or about February 2025, the appointed receiver, David Castleman sent out a letter to Dorival requesting that he returned the money he received from the Ponzi Scheme.

272.    Dorival personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life savings.

273.    Defendant Dorival's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts.  His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his and Defendant Monpremier's misrepresentations, his parishioners would not have invested in EminiFX.

## M.    Defendant Jean Claude Louis Jeune, West Palm Beach, Florida

274.    At all times hereinafter mentioned, Pastor Jean Claude Louis Jeune was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church.

275.    During the class period Louis Jeune was employed by the Seventh-Day Adventist Church pastoring at Jerusalem Haitian, 229 N 14th St, Haines City, FL 33844 under the supervision of the Florida Conference.

276.    During the class period, Louis Jeune had access to hundreds of parishioners within his church.  Each Saturday between December 2021 and May 2022 Louis Jeune held

Sabbath services every Saturday and during the services he preached about financial freedom, and god's blessing.  He promoted Eminifx and spoke about how  Eminifx is and investing in Eminifx will lead the church members to financial freedom.

277.    During the class period Louis Jeune met with members from his Church inside and outside the church to promote Eminifx. He said Eminifx was a "blessing from God" and during these meetings which took place each Saturday beginning November 2021 to about April 30, 2022, Louis Jeune told church members that:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."

- "… Your money will be insured, and if anything happens, the church will reimburse you."

- "… Investors will earn a guaranteed 5% to 9% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by  church  leaders."

- "…Many church elders and leaders have already invested and seen amazing returns."

278.    Convinced that Eminifx was indeed a great investment many of the congregants gave their money to Louis Jeune to invest for them hoping to make money. All of them lost their money.

279.    During these conversations Louis Jeune made many promises similar to the other pastors, like the other pastors, Louis Jeune never once revealed his own interest in promoting the Ponzi Scheme. He did not tell the parishioners that he was receiving ten percent of the money invested. He did not tell them that their money will not be invested, rather it will be used to pay prior investors, and that if they recruited others, their money would be used to pay them.

280.    Like the other pastors, Louis Jeune encouraged them to share the good news with their friends and family members. He told them that "god will bless you more when you share…" the good news with others.

281.    When some of the parishioners wanted to withdraw their money, Louis Jeune like Dorival and other pastors encouraged them to remained invested as he explained "be patient, to earn more money you have to remain invested…"

282.    Louis Jeune knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors.

283.    Louis Jeune knew Eminifx was a Ponzi Scheme, he and the other pastors participated in several meetings with Eddy Alexandre to learn how to promote the Ponzi Scheme within the church.

284.    On or about February 2025, the appointed receiver, David Castleman sent out a letter to Dorival requesting that he returned the money he received from the Ponzi Scheme.

285.    Louis Jeune personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life savings.

286.    Defendant Louis Jeune's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts.   His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law.  Absent his and Defendant Monpremier's misrepresentations, his parishioners would not have invested in EminiFX.

## N.    Defendant Fredo Ignace

287.    At all times hereinafter mentioned, Pastor Fredo Ignace was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church.

288.    During the class period Ignace was employed by the Seventh-Day Adventist Church pastoring at Jerusalem Haitian, 229 N 14th St, Haines City, FL 33844 under the supervision of the Florida Conference.

289.    During the class period, Ignace had access to many parishioners within his church. Each Saturday between November 2021 and May 2022 Ignace held Sabbath services every Saturday and during the services he preached about financial freedom, and god's blessing. He promoted Eminifx and spoke about how Eminifx is and investing in Eminifx will lead the church members to financial freedom.

290.    During the class period Ignace met with members from his Church inside and outside the church to promote Eminifx. He said Eminifx was a "blessing from God" and during these meetings which took place each Saturday beginning November 2021 to about April 30, 2022, Ignace told church members that:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."

- "… Your money will be insured, and if anything happens, the church will reimburse you."

- "… Investors will earn a guaranteed 5% to 9% weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by church leaders."

- "…Many church elders and leaders have already invested and seen amazing returns."

291.    Convinced that Eminifx was indeed a great investment many of the congregants gave their money to Ignace to invest for them hoping to make money. All of them lost their money.

292.    During these conversations Ignace made many promises similar to the other pastors, like the other pastors, Ignace never once revealed his own interest in promoting the Ponzi Scheme. He did not tell the parishioners that he was receiving ten percent of the money

invested. He did not tell them that their money will not be invested, rather it will be used to pay prior investors, and that if they recruited others, their money would be used to pay them.

293.   Like the other pastors, Ignace encouraged them to share the good news with their friends and family members. He told them that "god will bless you more when you share…" the good news with others.

294.   When some of the parishioners wanted to withdraw their money, Ignace encouraged them to remained invested as he explained "be patient, to earn more money you have to remain invested…"

295.   Ignace knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors.

296.   Ignace knew Eminifx was a Ponzi Scheme, he and the other pastors participated in several meetings with Eddy Alexandre to learn how to promote the Ponzi Scheme within the church.

297.   On or about February 2025, the appointed receiver, David Castleman sent out a letter to Igance requesting that he returned the money he received from the Ponzi Scheme.

298.   Ignace personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life saving.

299.   Defendant Ignace's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

**O.**   **Defendant Carl Behrmans – Clinton MA**

300.    At all times hereinafter mentioned, Pastor Carl Behrmans was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church under the supervision of the corporate defendants.

301.    During the class period Behrmans was employed by the Seventh-Day Adventist Church pastoring at the Bethel Haitian Seventh-Day Adventist Church located at: 45 Flaggs Street Clinton, MA under the supervision of the Northeastern Conference.

302.    During the class period, Behrmans had access to thousands of parishioners within his church and other churches in Boston and New York City.  Each Saturday between December 2021 and May 2022 Behrmans  held Sabbath services every Saturday and during the services he preached about financial freedom, and god's blessing.  He promoted Eminifx and spoke about how investing in Eminifx will lead church members to financial freedom.

303.    During the class period Behrmans met with members from his Church inside and outside the church to promote Eminifx. He said Eminifx was "God's Blessing" and during these meetings which took place each Saturday beginning November 2021 to about May 2022, Behrmans told members of his church that:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."

- "… Your money will be insured, and if anything happens, the church will reimburse you."

- "… Investors will earn a guaranteed 5% to 9%  weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by  church  leaders."

- "…Many church elders and leaders have already invested and seen amazing returns."

304.    Convinced that Eminifx was indeed a great investment many of the congregants listened to Behrmans and invested their money in Eminifx hoping to make money. All of them lost their money.

305.    During these conversations Behrmans made many promises similar to the other pastors. But Behrmans never once revealed his own interest in promoting the Ponzi Scheme. He did not tell the parishioners that he was receiving ten percent of the money invested. He did not tell them that their money will not be invested, rather it will be used to pay prior investors, and that if they recruited others, their money would be used to pay them.

306.    Like the other pastors, Behrmans encouraged them to share the good news with their friends and family members.

307.    When some of the parishioners wanted to withdraw their money, Behrmans like Ignace encouraged the parishioners to remain invested as he explained "In order to earn money you have to remain invested…"

308.    Behrmans knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors.

309.    Behrmans knew Eminifx was a Ponzi Scheme, he and the other pastors participated in several meetings with Eddy Alexandre to learn how to promote the Ponzi Scheme within the church.

310.    Behrmans personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life saving.

311.    Defendant Behrmans' conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

**P.    Defendant Donald Paul – Orlando, Florida**

56

312.    At all times hereinafter mentioned, Pastor Donald Paul was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church.

313.    During the class period Paul. was employed by the Seventh-Day Adventist Church pastoring at the Guilgal French Seventh Day Adventist located at: 5668 N Pine Hills Road, Orlando, Florida under the supervision of the corporate defendants.

314.    During the class period, Paul had access to thousands of parishioners within his church and other churches in Orlando, Tampa, and Jacksonville, Florida.  Each Saturday between December 2021 and May 2022 Paul held Sabbath services every Saturday and during the services he preached about financial freedom, and Eminifx.  He promoted Eminifx and spoke about why the congregants should   invest in Eminifx.

315.    During the class period Paul met with members from his Church several times during the period of December 2021 to about May 2022 to promote Eminifx. He said Eminifx was a "Good Investment" and during these meetings which took place each Saturday Paul told members of his church that:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."

- "… Your money will be insured, and if anything happens, the church will reimburse you."

- "… Investors will earn a guaranteed 5% to 9%  weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by  church  leaders."

- "…Many church elders and leaders have already invested and seen amazing returns."

316.    Convinced that Eminifx was indeed a great investment many of the congregants gave Paul their money to   invest in Eminifx  hoping to earn 5-9 % each week.  All of them lost their money.

317.    During these conversations Paul made many promises similar to the other pastors. But he never once revealed his own interest in promoting the Ponzi Scheme. He never

told any of the parishioners that he was receiving ten percent of the money invested. He did not tell them that their money will not be invested, rather it will be used to pay prior investors, and that if they recruited others, their money would be used to pay them.

318.    Like the other pastors, Paul encouraged them to share the good news with their friends and family members.

319.    When some of the parishioners wanted to withdraw their money, Paul like Behrmans encouraged his parishioners to remain invested as he explained "the more money you invested the more money you will make" prompting one of the Congregants to invest an extra $30,000 in addition to a previous investment of $45,000.

320.    Paul knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors.

321.    Paul knew Eminifx was a Ponzi Scheme, he and the other pastors participated in several meetings with Eddy Alexandre to learn how to promote the Ponzi Scheme within the church.

322.    On or about February 2025, the appointed receiver, David Castleman sent out a letter to Paul requesting that he returned the money he received from the Ponzi Scheme.

323.    Paul personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life saving.

324.    Defendant Paul's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

**Q.**    **Defendant Kelny Pierre Hyppolite**

325.    At all times hereinafter mentioned, Pastor Kelny Pierre Hyppolite was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church.

326.    During the class period Hyppolite  was employed by the Seventh-Day Adventist Church pastoring at the   Mahanaim French Adventist Church located at: 770 Prospect Street, Jacksonville, Florida 3225 under the supervision of the Corporate Defendants.

327.    During the class period, Hyppolite  had access to thousands of parishioners within his church and other churches in Jacksonville, Orlando, Tampa and Napples.  Each Saturday between November 2021 and May 2022 Hyppolite  held Sabbath services every Saturday and during the services he preached about financial freedom, and  advised the congregants to invest in Eminifx.

328.    During the class period Hyppolite and pastor Donald Paul  met with members from of their Churches and worked together to promote Eminifx. They visited each other church, worked and supported each other in promoting Eminifx during the class period.  Each Saturday beginning November 2021 to about May 2022, Hyppolite told  members of his church that:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."

- "… Your money will be insured, and if anything happens, the church will  reimburse you."

- "… Investors will earn a guaranteed 5% to 9%  weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by  church  leaders."

- "…Many church elders and leaders have already invested and seen amazing returns."

329.    Convinced that Eminifx was indeed a great investment many of the congregants listened to Hyppolite and invested their money in Eminifx hoping to make money. All of them lost their money.

330.    During these conversations Hyppolite made many promises similar to the other pastors. Hyppolite never once revealed his own interest in promoting the Ponzi Scheme. He did not tell the parishioners that he was receiving ten percent of the money invested. He did not tell them that their money will not be invested, rather it will be used to pay prior investors, and that if they recruited others, their money would be used to pay them.

331.    Like the other pastors, Hyppolite encouraged them to share the good news with their friends and family members.

332.    When some of the parishioners wanted to withdraw their money, Hyppolite like Paul encouraged the parishioners to remain invested as he explained to them: "You will earn compounded interest if you don't take any of the money out.., so don't take it out… lets god bless you more each week."

333.    Hyppolite knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors. 268. Hyppolite knew Eminifx was a Ponzi Scheme, he and the other pastors participated in several meetings with Eddy Alexandre to learn how to promote the Ponzi Scheme within the church.

334.    On or about February 2025, the appointed receiver, David Castleman sent out a letter to Hyppolite requesting that he returned the money he received from the Ponzi Scheme.

335.    Hyppolite personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life saving.

336.    Defendant Hyppolite's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial

interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

**R.    Defendant Virgo Belizaire – Mandeville, Louisiana**

337.    At all times hereinafter mentioned, Pastor Virgo Belizaire was an Adventist pastor, hired, trained and retained by the Seventh Day Adventist Church.

338.    During the class period Belizaire was employed by the Seventh-Day Adventist Church pastoring at the Eben-Ezer of Greater New Orleans located at 202 Woodland Highway, Belle Chase, LA. under the supervision of the corporate defendants.

339.    During the class period, Belizaire had access to thousands of parishioners within his church and other churches in the greater New Orleans area.  Each Saturday between November 2021, and May 2022 Belizaire held Sabbath services and during these services he preached about financial freedom, and Eminifx being the new way to a better life.  He promoted Eminifx and spoke about how investing in Eminifx will lead all investors to financial freedom.

340.    During the class period Belizaire met with members from his Church and other churches to promote Eminifx. He said Eminifx was a "blessing approved by the Church leaders".  During these meetings which took place each Saturday beginning November 2021 to about May 2022, Belizaire told members of his church that:

- This investment is risk-free because it is backed by the Seventh-Day Adventist Church."

- "… Your money will be insured, and if anything happens, the church will reimburse you."

- "… Investors will earn a guaranteed 5% to 9%  weekly return through an automated cryptocurrency trading system, which has been blessed and vetted by  church  leaders."

- "…Many church elders and leaders have already invested and seen amazing returns."

341.    Convinced that Eminifx was indeed a great investment many of the congregants gave their lives saving to Belizaire. During a very short time, Belizaire raised hundreds of thousands dollars for Eminifx Ponzi Scheme.

342.    During these conversations Belizaire made many promises similar to the other pastors. Belizaire never once revealed his own interest in promoting the Ponzi Scheme. He did not tell the parishioners that he was receiving ten percent of the money invested. He did not tell them that their money will not be invested, rather it will be used to pay prior investors, and that if they recruited others, their money would be used to pay them.

343.    Like the other pastors, Belizaire encouraged them to share the good news with their friends and family members.

344.    When some of the parishioners wanted to withdraw their money, Belizaire encouraged the parishioners to remain invested as he explained " In order to earn money you have to remain invested…"

345.    Belizaire knew this was false because Eminifx did not invest any money, and that those who were withdrawing money each Friday were taking money of new investors.

346.    Belizaire knew Eminifx was a Ponzi Scheme, he and the other pastors participated in several meetings with Eddy Alexandre to learn how to promote the Ponzi Scheme within the church.

347.    On or about February 2025, the appointed receiver, David Castleman sent out a letter to Belizaire requesting that he returned the money he received from the Ponzi Scheme.

348.    Belizaire personally received hundreds of thousands of dollars for his role in promoting the Ponzi scheme.  While he profited handsomely, his parishioners and those who trusted him were left financially ruined.  Most if not all the investors lost their money, some of them invested their entire life saving.

349.    Defendant Belizaire's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. His systematic misrepresentations, abuse of pastoral authority, and concealment of his personal financial interest satisfy the elements of materiality, reliance, and causation under applicable law. Absent his misrepresentations, his parishioners would not have invested in EminiFX.

## S.    Defendant Sophia Maisonneuve (a/k/a Sophia Desrosiers)

350.    Defendant Sophia Desrosiers, also known as Sophia Maisonneuve, is the spouse of Defendant John Edvard Maisonneuve.

351.    Defendant Sophia Maisonneuve played a central and operational role in the EminiFX Enterprise Ponzi scheme, acting as a key organizer, promoter, and facilitator of investor onboarding and misinformation.

352.    Sophia Maisonneuve was in direct, regular contact with numerous investors— many of whom were parishioners of the churches pastored by her husband—guiding them through the process of opening EminiFX accounts, transferring funds, and navigating the platform.  Her role was instrumental in creating the illusion of legitimacy and technical sophistication.

353.    Defendant Sophia Maisonneuve misrepresented to investors that their funds were insured and risk-free, and that, in the unlikely event of any losses, the Seventh-day Adventist Church would guarantee full reimbursement with interest. These assurances were material and false and were designed to induce trust and encourage investment.

354.    Defendant Sophia Maisonneuve held herself out as the customer service representative for the EminiFX Enterprise, acting as the main point of contact for many investors and answering questions about the platform, returns, and withdrawal processes.  In this role, she perpetuated the false narrative that EminiFX was a safe, insured, and lucrative investment vehicle.

355.    In addition to her role in investor relations, Defendant Sophia Maisonneuve was responsible for managing EminiFX's internal computer systems.  These systems were used to post fictitious daily investment returns, which misled investors into believing their funds were generating substantial profits—even though no legitimate trading or investment activity was taking place.

356.    Defendant Sophia Maisonneuve also oversaw and maintained the fraudulent "robot" software that co-defendant Eddy Alexandre promoted as the proprietary technology responsible for the scheme's supposedly extraordinary returns. In reality, the robot system was a sham and served only to deceive investors.

357.    Sophia Maisonneuve took active steps to prevent investors from withdrawing their funds, frequently counseling them to keep their money in the system to maximize their supposed gains.  She reassured skeptical investors that EminiFX was backed by the Seventh-day Adventist Church and that there was no risk of loss.

358.    Witnesses reported that after Sabbath services at her husband's church, Defendant Sophia Maisonneuve would station herself to speak with interested parishioners and collect their investments, often receiving cash or directing wire transfers on the spot.  On Sundays, she returned to the church to continue recruitment efforts during non-service gatherings such as prayer groups and devotional meetings.

359.    When investors such as WP and MW (who requested anonymity out of fear of retaliation) asked questions or raised concerns about the legitimacy of the investment, Sophia Maisonneuve falsely stated that the Seventh-day Adventist Church, including Defendant General Conference Corporation ("GCC") and Defendant North American Division ("NAD"), would ensure that their money was safe and returned with interest if necessary.

360.    Numerous members of the proposed class reported visiting the Maisonneuve residence in Pennsylvania to personally deliver their investment funds, based on Sophia

Maisonneuve's instructions and reassurances. These victims were led to believe they were participating in a church-backed financial opportunity endorsed by a trusted pastoral couple.

361. Parishioners described Defendant Sophia Maisonneuve as an authoritative and trusted figure within the church community, whose assurances about the safety and profitability of the investment carried spiritual and moral weight. Her statements and conduct were reasonably relied upon by vulnerable and devout church members, many of whom were elderly or financially unsophisticated.

362. Several victims filed complaints with the Florida Conference of Seventh-day Adventists regarding the aggressive and coercive tactics employed by Sophia Maisonneuve and other affiliated pastors, including Defendant Phillips Montpremier. The Conference allegedly ignored these warnings and failed to take appropriate corrective action, further enabling the fraud.

363. Defendant Sophia Maisonneuve personally received hundreds of thousands of dollars for her role in promoting the Ponzi scheme. While she profited substantially, the parishioners and those who trusted her were left financially ruined. Most if not all the investors lost their money, some of them invested their entire life saving.

364. Defendant Sophia Maisonneuve's conduct constitutes fraud, wire fraud, and racketeering activity under RICO and various other state and common law torts. Her systematic misrepresentations and misleading acts and omissions satisfy the elements of materiality, reliance, and causation under applicable law. Absent her misrepresentations and misleading, the parishioners would not have invested in EminiFX.

**T.    Defendants Theodore Norman Clair and General Conference Corporation of Seventh-day Adventists**

365. Defendant Theodore Norman Clair is sued both in his individual capacity and in his official capacity as President of Defendant General Conference Corporation of Seventh-

day Adventists ("GCC"). In this leadership role, Defendant Clair exercises authority over the governance of the global Seventh-day Adventist Church, including oversight of its various divisions, affiliated regional entities, pastoral leadership, and doctrinal guidance.

366.    Defendant GCC is a nonprofit corporation organized under the laws of the State of Delaware, with its principal place of business located in Silver Spring, Maryland. GCC serves as the highest governing body of the worldwide Seventh-day Adventist Church and is responsible for the coordination and supervision of its religious, administrative, and financial affairs.

367.    Defendant GCC is the organizational entity through which the Seventh-day Adventist Church operates, and it exercises substantial control over the employment, training, supervision, and conduct of pastors and leaders within its affiliated conferences, divisions, and local congregations.

368.    Defendant GCC, through its administrative and ecclesiastical structures, hired, trained, and supervised each of the individual pastor defendants named in this Complaint, including those who participated in the promotion and operation of the fraudulent EminiFX Enterprise.

369.    As the central governing authority of the Church, Defendant GCC owed a legal and fiduciary duty to safeguard the welfare of its congregants, particularly by ensuring that pastors and church leaders under its authority did not engage in deceptive, fraudulent, or unlawful conduct targeting the very members they were entrusted to serve.

370.    Defendant Clair, acting on behalf of and through Defendant GCC, failed to implement reasonable oversight measures, policies, or disciplinary actions to prevent, detect, or halt the involvement of Seventh-day Adventist pastors and affiliated churches in the EminiFX Ponzi scheme. This failure constituted a breach of duty to both the Church and its members.

371.    Upon information and belief, Defendant Clair and Defendant GCC had actual or constructive knowledge of the participation of various pastors and affiliated church leaders in the EminiFX Enterprise.  Despite this knowledge, they took no meaningful action to investigate, discipline, or disassociate the Church from the fraudulent scheme. Instead, their inaction facilitated and prolonged the ongoing criminal enterprise by allowing trusted church leaders to continue defrauding parishioners under the guise of religious authority.

**U.    Defendant Allegheny East Conference**

372.    Defendant Allegheny East Conference of Seventh-day Adventists ("Allegheny East Conference") is a regional administrative unit of the Seventh-day Adventist Church, located in Pennsylvania.  It is responsible for overseeing the day-to-day operations, personnel decisions, and religious governance of local Seventh-day Adventist churches within its territorial jurisdiction.

373.    Defendant Allegheny East Conference exercises direct supervisory authority over all churches and pastors within its region, including Defendant John Edvard Maisonneuve and Defendant Sophia Maisonneuve, both of whom were affiliated with churches under the jurisdiction of the Conference during the relevant time period.

374.    Defendant Allegheny East Conference hired, trained, and supervised Defendants John Edvard Maisonneuve and Sophia Maisonneuve. It retained the authority to discipline, reassign, or remove pastors who violated church policy, engaged in misconduct, or placed congregants at risk.

375.    As the governing body responsible for overseeing church operations within its jurisdiction, Defendant Allegheny East Conference owed a duty of care to its congregants to ensure that pastors and church leaders did not engage in fraudulent or unlawful conduct—particularly schemes, such as the EminiFX Enterprise, that directly targeted church members for financial exploitation.

376.    Defendant Allegheny East Conference breached this duty by failing to adequately train, monitor, or supervise the actions of John and Sophia Maisonneuve, despite clear warning signs and complaints regarding their use of church platforms to promote a high-yield investment scheme to parishioners.

377.    Upon information and belief, Defendant Allegheny East Conference had actual or constructive knowledge of the Maisonneuves' involvement in the EminiFX Ponzi scheme, and of the broader use of church resources and authority to further the fraudulent enterprise. Yet it failed to take reasonable steps to investigate, discipline, or prevent the continuation of the misconduct.

378.    Defendant Allegheny East Conference's inaction not only enabled the fraudulent scheme to persist but also lent it an appearance of legitimacy, as church members were led to believe that the investment was sanctioned by their trusted religious leadership. This facilitation and tacit approval directly contributed to the harm suffered by Plaintiffs and other members of the putative class.

## V.    Defendant Northeastern Conference SDA

379.    Defendant Northeastern Conference of Seventh-day Adventists ("Northeastern Conference") is a regional administrative entity of the Seventh-day Adventist Church headquartered in the State of New York. It is responsible for the day-to-day oversight, supervision, and discipline of pastors and church leaders serving within its jurisdiction.

380.    Defendant Northeastern Conference exercises supervisory authority over its affiliated churches and clergy, including Defendant Frantz D'Haiti, who at all relevant times was under the direct supervision and control of the Northeastern Conference.

381.    Defendant Northeastern Conference was responsible for hiring, training, and supervising the pastors named herein, including those who used their ecclesiastical positions to promote and facilitate the fraudulent EminiFX investment scheme among church members.

382.    As the governing administrative body over its regional pastors, Defendant Northeastern Conference owed a legal and fiduciary duty to ensure that church leaders under its authority did not engage in fraudulent conduct, and particularly to prevent the use of church platforms to defraud vulnerable congregants through schemes like the EminiFX Enterprise.

383.    Defendant Northeastern Conference breached its duty of care by failing to adequately train, monitor, and supervise the conduct of the pastors and leaders within its jurisdiction who were involved in promoting the EminiFX Ponzi scheme to parishioners.

384.    Upon information and belief, Defendant Northeastern Conference had actual and/or constructive knowledge of the involvement of its pastors and affiliated churches in the EminiFX Enterprise. Despite this knowledge, it failed to take reasonable steps to investigate, intervene, or discipline those involved. Its inaction permitted the fraud to continue and gave the scheme the appearance of legitimacy in the eyes of congregants.

385.    Through its failure to act and its ongoing supervision of individuals engaged in fraudulent activity, Defendant Northeastern Conference facilitated, enabled, and materially contributed to the success and expansion of the EminiFX Enterprise, to the substantial harm of Plaintiffs and similarly situated class members.

**W.    Defendant Florida Conference of SDA**

386.    Defendant Florida Conference of Seventh-day Adventists ("Florida Conference") is a regional administrative body of the Seventh-day Adventist Church, headquartered in Miami, Florida. It is responsible for the oversight, management, and daily supervision of pastors and church operations within its jurisdiction.

387.    During the relevant time period, specifically from approximately January 2021 through January 2023, Defendant Florida Conference exercised supervisory authority over Defendant Pastor Phillip Montpremier and Defendant Pastor William Jean Charles, both of whom were employed by and served under the direction of the Florida Conference.

388.    Defendant Florida Conference was responsible for hiring, training, and supervising Pastors Montpremier and Jean Charles. As their ecclesiastical employer, the Conference maintained authority over their ministerial assignments, conduct, and discipline.

389.    As the governing entity responsible for regional church leadership, Defendant Florida Conference owed a legal and fiduciary duty to ensure that pastors under its control did not engage in fraudulent conduct or exploit their positions to defraud church members—particularly in connection with investment schemes such as the EminiFX Enterprise.

390.    Defendant Florida Conference breached its duties by failing to adequately train, monitor, or supervise Defendants Montpremier and Jean Charles, despite their active and ongoing promotion of the fraudulent EminiFX scheme to parishioners.

391.    Upon information and belief, Defendant Florida Conference had actual and/or constructive knowledge of the involvement of Pastors Montpremier and Jean Charles in the EminiFX Enterprise, and of the misuse of church services and events to solicit investments from congregants under false pretenses. Nevertheless, it failed to take corrective or preventive action.

392.    By ignoring clear red flags and complaints, Defendant Florida Conference enabled and facilitated the continued operation of the fraudulent scheme. Its inaction contributed to the harm suffered by Plaintiffs and other class members, who reasonably relied on the trust and authority conferred by the pastors' official church positions.

## X.    **Defendant Texas Conference SDA**

393.    Defendant Texas Conference of Seventh-day Adventists ("Texas Conference") is a regional administrative unit of the Seventh-day Adventist Church headquartered in Laredo, Texas. It is responsible for the daily oversight, supervision, and governance of pastors and church operations within its jurisdiction.

394. From approximately 2021 through 2023, Defendant Pastor William Jean Charles served under the supervision of the Texas Conference and was assigned to churches within its jurisdiction during his active promotion of the EminiFX Enterprise.

395. Defendant Texas Conference was responsible for the hiring, training, and supervision of Pastor William Jean Charles, and retained the authority to monitor his conduct, evaluate his performance, and discipline or remove him for misconduct or violations of church policy.

396. As the governing body for church operations in its region, Defendant Texas Conference owed a legal duty to ensure that pastors under its authority did not engage in fraud or use their pastoral roles to promote or facilitate fraudulent investment schemes, such as the EminiFX Ponzi operation that targeted vulnerable church members.

397. Defendant Texas Conference breached this duty by failing to properly train, supervise, and monitor Pastor Jean Charles, despite his active and sustained involvement in promoting the fraudulent EminiFX scheme to parishioners from within the church.

398. Upon information and belief, Defendant Texas Conference had actual and/or constructive knowledge of Pastor Jean Charles's participation in the EminiFX Enterprise and of his use of church resources and events to solicit investments under false pretenses. Nonetheless, it failed to take any meaningful action to investigate, intervene, or stop his misconduct.

399. By failing to act in the face of clear warning signs, Defendant Texas Conference enabled and facilitated the continuation of the fraudulent scheme. Its inaction conferred credibility on Pastor Jean Charles's solicitations and contributed directly to the harm suffered by Plaintiffs and members of the putative class, who relied on the apparent endorsement of the church and its leadership.

## Y.    **Defendant Southeastern Conference SDA**

400.    Defendant Southeastern Conference of Seventh-day Adventists ("Southeastern Conference") is a regional administrative division of the Seventh-day Adventist Church, headquartered in Mount Dora, Florida. It is responsible for the oversight, governance, and day-to-day supervision of churches and pastors within its designated territory.

401.    During the period from approximately 2021 through 2023, Defendant Pastors Phillip Montpremier and William Jean Charles were under the direct supervision of the Southeastern Conference and served congregations affiliated with the Conference during their active promotion of the EminiFX investment scheme.

402.    Defendant Southeastern Conference was responsible for hiring, training, and supervising the pastors named herein, including Defendants Montpremier and Jean Charles. It maintained authority over their ecclesiastical appointments, performance, and discipline.

403.    As the governing body with control over its regional clergy, Defendant Southeastern Conference owed a legal and fiduciary duty to protect church members from fraud and to ensure that its pastors did not use their religious positions to perpetrate or promote fraudulent schemes—such as the EminiFX Enterprise—which targeted congregants for financial exploitation.

404.    Defendant Southeastern Conference breached that duty by failing to properly train, monitor, and supervise the conduct of its pastors who used church platforms and their pastoral authority to solicit fraudulent investments from church members.

405.    Upon information and belief, Defendant Southeastern Conference had actual and/or constructive knowledge of the involvement of its pastors and churches in the EminiFX Enterprise, and of the misuse of religious influence to induce congregants into parting with substantial sums of money. Despite this knowledge, it failed to take action to investigate, discipline, or terminate the involvement of those under its supervision.

406.    By failing to act in the face of clear red flags and complaints, Defendant Southeastern Conference permitted the fraud to continue unchecked, thereby facilitating and legitimizing the scheme. As a result, Plaintiffs and members of the putative class suffered significant financial harm, having reasonably relied on the trust and credibility conferred by church leadership.

## CLASS ALLEGATIONS

407.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who invested in Eminifx between January 2019 and May 2022 the Class Period (the"Class"); and were financially damaged when the ponzi scheme collapsed.

408.    Excluded from the Class are Defendants herein, the officers and directors of Eminifx, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

409.    The members of the Class are so numerous that joinder of all members is impracticable.

410.    While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are at least between sixty thousand to one hundred thousand members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Eminifx currently in the possession of the receiver and member of the class will be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in similar class action lawsuit.

411.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal and state law that is complained of herein.

412.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation in volving such fraud. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

413.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

414.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION AND REQUEST FOR RELIEF

### COUNT 1
### Conduct or Participation in a RICO Enterprise
### through a Pattern of Racketeering Activity
### under 18 U.S.C. §§ 1961(5), 1962(c) & 1964(c)

415.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

416.    Each of the Defendants, at all times relevant, is and has been a "person" within the meaning of 18 U.S.C. §§ 1962(a)-(d) as defined by 18 U.S.C. § 1961(3)

417.    Each of the Defendants were employed by or associated with any enterprise engaged in or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs (specifically the EminiFX Enterprise Ponzi Scheme) through a pattern of racketeering activity, in violation of in violation of 18 U.S.C. §§ 1962(c) and 1964 (c).

418.    The RICO Defendants engaged in a pattern of racketeering activity and engaged in more than two incidents of racketeering or racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission, and that are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

### *A. The Enterprise ("the EminiFX Enterprise Ponzi Scheme")*

74

419. The EminiFX Enterprise Ponzi Scheme was formed on or about August 2020 and is an organization that functioned as a continuing unit.

420. The EminiFX Enterprise Ponzi Scheme constituted an illegal scheme that was organized for the purpose of inducing investors to invest moneys by means of untrue statements of material fact and the omission to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, including the false material representations as detailed supra.

421. The EminiFX Enterprise Ponzi Scheme was comprised of separate entities (the Corporate Defendants) associated with each other in fact, by shared personal and/or agreements, for the common of carrying out an ongoing criminal enterprise to defraud church members and their family and friends.

422. Each Defendant is a distinct person for the purposes of 18 U.S.C. § 1962(a)-(d) and distinct from the association in fact constituting the EminiFX Enterprise Ponzi Scheme.

423. The collective group of Corporate Defendants constitutes an entity distinct from each individual Corporate Defendant and is an "enterprise" within the meaning 18 U.S.C. §§ 1962(a)-(d) as defined by 18 U.S.C. § 1961(4).

424. The individual Corporate Defendants were incorporated in numerous different states, had different customer and/or membership bases and ongoing businesses or organizations, and could act independently to advance their own interests.

425. The individual Corporate Defendants performed different roles within the enterprise and/or used their separate legal incorporations to facilitate the racketeering activity.

426. For instance, Defendants working together and in concert utilized EminiFX, one of the EminiFX Enterprise Ponzi Scheme members, to:

- Launch a crypto platform that allowed investors to invest their money in the EminiFX Enterprise Ponzi Scheme, and

- Operate a website which made several claims and promises, among them that the investors would receive between 5.0 to 9.8 percent weekly on their investment.

427. Similarly, Defendants working together and in concert utilized the numerous distinct religious based Corporate Defendants to:

- Solicit church members from each respective congregation to participate in the weekly investor meetings,

- invest in the EminiFX Enterprise Ponzi Scheme, and

- persuade their family and friends to also invest in the EminiFX Enterprise Ponzi Scheme.

428. Utilize the influence held by Defendants over their respective church members to influence them to invest in the EminiFX Enterprise Ponzi Scheme.

429. The Defendants used the mail and interstate wire communications facilities to facilitate and execute the EminiFX Enterprise Ponzi Scheme.

430. At all times relevant, the EminiFX Enterprise Ponzi Scheme was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § § 1961, 1962(a)-(4) and 1964(c), and used instrumentalities of interstate commerce in is daily business activities.

431. Specifically, the Defendants maintained corporate offices in numerous states and used these personnel in those offices to influence investors and potential investors to invest in the EminiFX Enterprise Ponzi Scheme through false material representations and omissions, as detailed supra.

432. Communications between the Defendants and Plaintiff and members of the class were conducted through the internet, interstate mail, telephone calls, wire transfers, and other interstate communications.

### B. Defendants' Pattern of Racketeering Activity through the Enterprise

433.    At all times relevant, beginning on or around January 2020 and continuing through the May 22, 2022 arrest of Alexandre, the Defendants knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of the EminiFX Enterprise Ponzi Scheme, and did so through a pattern of racketeering activity (mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities) in violation of 18 U.S.C. §§ 1341, 1343, 1956 & 1957.

434.    To effectuate the illegal objectives of the EminiFX Enterprise Ponzi Scheme and in furtherance of the scheme to defraud, the Defendants committed numerous acts affecting thousands of investors in violation of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and improper use of proceeds derived from racketeering activities (18 U.S.C. § 1957).

435.    These predicate acts constitute a pattern of criminal racketeering activity because (1) at least two of the acts had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents; (2) as described throughout this Complaint, this series of related acts extended over a substantial period of time; and (3) the last of such related acts occurred within 5 years after a prior incident of criminal activity.

436.    In violation of those laws, from about January 2020 through about May 2022, all Defendants cooperated jointly and severally in the commission of at least two or more of the following RICO predicate acts in violation of 18 U.S.C. § § 1961, 1962(a)-(4) and 1964(c).

### C. PredicateActs

437.    The Defendants wilfully and knowingly devised, and intending to devise, a scheme and artifice to defraud to obtain money and property by means of false and fraudulent pretenses, that is they created and implemented the EminiFX Enterprise Ponzi Scheme to

solicit investments in a cryptocurrency exchange platform by false and fraudulent pretenses and promises to current and prospective investors about, among other things, the manner in which their funds would be invested and the performance of their investments, and misappropriated investor funds for uses inconsistent with their representations to investors and for their own benefit.

438.    The Defendants mailed something or caused other people to mail something through the United States Postal Services or private or commercial interstate carriers for the purpose of carrying out their scheme.

439.    The Defendants used interstate wire communication facilities and caused others to use interstate and foreign wire communication facilities, for the purpose of carrying out their scheme and to conceal their ongoing fraudulent activity. These wire transmissions included, but were not limited to (1) wires to the New York State Department of State used to fraudulently file papers registering EminiFX as a New York Corporation (2) wires transferring funds between accounts in the United States and Europe for the purpose of conducting and promoting the affairs of the Ponzi Scheme (3) wires between Defendants and members of the Class (4) email, telephone and Internet communications between Defendants and members of the Class and (5) payments between EminiFX and the named Defendants and continuing through and between January 2020 and May 2022.

440.    The Defendants transmitted and caused to be transmitted by means of wire, Internet, radio and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of carrying out their scheme and to conceal their ongoing fraudulent activity.

441.    The Defendants employed false material representations to perpetrate their scheme and conceal their ongoing fraudulent activity; to wit, at all times relevant, ALEXANDRE together with the named Defendants, held virtual weekly investor meetings, to

induce investors to invest and stay invested, by making false material representations, as detailed supra.

442.    The Defendants employed false material omissions, as detailed supra, in order to perpetrate their illegal scheme and conceal the unlawfulness of their conduct, which was committed at the instruction of, and through the directions of Alexandre and Defendants John Edvard Maisonneuve, Williams Jean Charles, Phillips Montpremier, and Sophia Maisonneuve.

443.    The Defendants conducted a financial transaction, or caused others to conduct a financial transaction that involved the proceeds of unlawful activity, with the knowledge that funds that were the proceeds of unlawful activity, and with the intent to promote that unlawful activity, that is to continue the EminiFX Enterprise Ponzi Scheme; and

444.    The Defendants conducted a financial transaction, or caused others to conduct a financial transaction that involved the proceeds of unlawful activity, and with the knowledge that funds that were the proceeds of unlawful activity and that the transaction was designed in whole or in part to disguise or conceal the source, ownership, or control of the proceeds.

### D. Continuity

445.    The Defendants committed two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(b).

446.    The EminiFX Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the 206. Defendants to orchestrate the scheme, were executed from at least 2020 through May 22, 2022.

447.    The EminiFX Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

### E. Damages and Causation

448.    As a direct and proximate result of the Defendants' orchestration and operation of the EminiFX Enterprise Ponzi Scheme, Plaintiffs have been injured in their property, causing Plaintiffs to suffer monetary losses in the amount of not less than $ 500,000,000.00, with said damages to be proven at trial.

449.    There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 5% weekly return on their investments using a "Robo-Advisor Assisted account" to conduct trading, and that actual investors had earned, and were continuing to earn, at least 5% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiffs' decision to invest in the EminiFX Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs and the members of the class.

450.    Pursuant to 18 U.S.C. § 1962(c), the Plaintiffs are entitled to three times the actual damages caused by the Defendants plus the cost of the suit, including reasonable attorney's fees, and pre-judgement and post-judgment interest.

**WHEREFORE**, the Plaintiffs requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest

in the maximum amount allowed by law, and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 2
### Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity under 18 U.S.C. §§ 1962(b) & 1964(c)

451.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

452.    Each of the Defendants, at all times relevant, is and has been a "person" within the meaning of 18 U.S..C. § 1962(a)-(d) as defined by 18 U.S..C. § 1961(3). Each of the Defendants, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in or control of an enterprise (specifically the EminiFX Enterprise Ponzi Scheme) which is engaged in, or the activities of which affect, interstate or foreign commerce.

### A. The Enterprise ("the EminiFX Enterprise Ponzi Scheme)

453.    Plaintiffs incorporate the allegations of paragraphs 419-432 as if stated fully herein.

### B. Defendants' Pattern of Racketeering Activity through the Enterprise

454.    Plaintiffs incorporate the allegations of paragraphs 433-436 as if stated fully herein

455.    In committing the acts plead herein, each Defendants received income derived from a pattern of racketeering activity.

456.    Each Defendant used the income or proceeds therefrom to acquire or maintain, directly or indirectly, an interest in or control of an enterprise (i.e., EminiFX Enterprise Ponzi Scheme) which was engaged in, or the activities of which affected interstate and foreign commerce in violation of 18 U.S.C. §§ 1962(b) & 1964(c)

### C. Predicate Acts

457.    Plaintiffs incorporate the allegations of paragraphs 437-444 as if stated fully herein.

### D. Continuity

458.    The Defendants committed two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(a)-(d). 219. The EminiFX Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2020 through May 22, 2022.

459. The EminiFX Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

### E. Damages and Causation

460.    As a direct and proximate result of the Defendants' violation(s) of 18 U.S.C. §1962(b), Plaintiffs have been injured in their property, causing Plaintiffs to suffer monetary losses in the amount of not less than $ 500,000,000.00, with said damages to be proven at trial.

461.    There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 5% weekly return on their investments using a "Robo-Advisor Assisted account" to conduct trading, and that actual

investors had earned, and were continuing to earn, at least 5% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiffs' decision to invest in the EminiFX Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs and members of the class.

462.    Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs are entitled to three times the actual damages caused by the Defendants plus the cost of the suit, including reasonable attorney's fees, and pre-judgement and post-judgment interest.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

### COUNT 3
### Use of Income Derived from a Pattern of Racketeering Activity in the Operation of an Enterprise Engaged in Activities Which Affect Interstate or Foreign Commerce under 18 U.S.C. §§ 1962(a) & 1964(c)

463.    Plaintiffs incorporate the allegations of paragraphs 49-419 as if stated fully herein.

464.    Each of the Defendants, at all times relevant, is and has been a "person" within the meaning of 18 U.S.C. § 1962(a)-(d) as defined by 18 U.S.C. § 1961(3).

465.    Each of the Defendants, received any income derived, directly or indirectly, from a pattern of racketeering activity in which they participated as a principal within the meaning of section 2, title 18, United States Code, and used or invested, directly or indirectly, any part of such income, or the proceeds of such income in the operation of an enterprise which

(specifically, the EminiFX Enterprise Ponzi Scheme) which was engaged in, or the activities of which affected, interstate or foreign commerce.

### A. The Enterprise ("the EminiFX Enterprise Ponzi Scheme)

466.    Plaintiffs incorporate the allegations of paragraphs 419-432 as if stated fully herein.

### B. Defendants' Pattern of Racketeering Activity through the Enterprise

467.    Plaintiffs incorporate the allegations of paragraphs 433-436 as if stated fully herein.

468.    In committing the acts plead herein, each Defendants received income derived, directly or indirectly, from the pattern of racketeering activity.

469.    Each Defendant used or invested, some of the income or proceeds therefrom to operation of an enterprise (i.e., the EminiFX Enterprise Ponzi Scheme), which was engaged in, or the activities of which affected effected interstate and foreign commerce in violation of 18 U.S.C. §§ 1962(a) & 1964(c).

### C. PredicateActs

470.    Plaintiffs incorporate the allegations of paragraphs 437-444 as if stated fully herein.

### D. Continuity

471.    The Defendants committed two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(a)-(d).

472.    The EminiFX Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of

proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2020 through May 22, 2022.

473.    The EminiFX Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

### E. Damages and Causation

474.    As a direct and proximate result of the Defendants' violation(s) of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their property, causing Plaintiffs to suffer monetary losses in the amount of not less than $ 500,000,000.00, with said damages to be proven at trial.

475.    There is a direct relation between the Defendants' conduct and the Plaintiffs' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 5% weekly return on their investments using a "Robo-Advisor Assisted account" to conduct trading, and that actual investors had earned, and were continuing to earn, at least 5% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest in the EminiFX Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs and the members of the class.

476.    Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs are entitled to three times the actual damages caused by the Defendants plus the cost of the suit, including reasonable attorney's fees, and pre-judgement and post-judgment interest.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs compensatory damages,

treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 4
### Conspiracy to Engage in a Pattern of Racketeering Activity
### under 18 U.S.C. §§ 1962(d) & 1964(c)

477.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

478.    Each of the Defendants, at all times relevant, is and has been a "person" within the meaning of 18 U.S..C. § 1962(a)-(d) as defined by 18 U.S..C. § 1961(3).

479.    Upon information and belief, the Defendants knew that they were engaging in a conspiracy to commit the predicate acts identified below, and they knew that the predicate acts were part of the racketeering activity identified below, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. 243. At all times relevant, beginning in or around January 2021 and continuing at least through May 22, 2022, the Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate any of the provisions of 18 U.S.C. §§ 1962(a)-(c) in violation of 18 U.S.C. § 1962(d).

480.    Upon information and belief, the Defendants agreed to the overall objectives of the conspiracy - to defraud the class of Plaintiff of millions of dollars in investments under false pretenses, to illegally funnel the vast portion of the proceeds of their unlawful activity into their personal accounts, assets and property, to conduct financial transactions with the remaining proceeds to promote their Ponzi scheme, and to conceal their ongoing fraud from the Class of Plaintiffs.

481.    Defendants have knowingly, willfully, and intentionally conspired and agreed on multiple occasions to receive income derived from a pattern of racketeering activity (mail

fraud and wire fraud) and launder the proceeds of the illegal acts to promote the continued operation of the EminiFX Enterprise Ponzi Scheme, and to disguise or conceal the source, ownership, or control of the proceeds.

482.    Defendants knew that their actions as alleged above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the conspiratorial scheme described above.

483.    Defendants' conduct constitutes a conspiracy to violate the provisions of 18 U.S.C. §§ 1962(a)-(c) and in violation of 18 U.S.C. §§ 1962(d) and 1964(c).

### A. The Enterprise ("the EminiFX Enterprise Ponzi Scheme)

484.    Plaintiffs incorporate the allegations of paragraphs 419-432 as if stated fully herein.

### B. Defendants' Pattern of Racketeering Activity through the Enterprise

485.    Plaintiffs incorporate the allegations of paragraphs 433-436 as if stated fully herein.

### C. PredicateActs

Plaintiffs incorporate the allegations of paragraphs 437-444 as if stated fully herein.

### D. Continuity

486.    The Defendants conspired to commit two or more of the offenses referred to above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(b).

487.    The EminiFX Enterprise Ponzi Scheme was "close-ended" in that the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, which were the mechanism employed by the Defendants to orchestrate the scheme, were executed from at least 2020 through May 22, 2022.

488.    The EminiFX Enterprise Ponzi Scheme is "open-ended" because the thousands of predicate acts of related mail fraud, wire fraud, money laundering, and improper use of proceeds derived from racketeering activities, were part of the scheme's regular way of doing business, and because the Defendants have continued to engage in related predicate acts through the present day.

### E. Damages and Causation

489.    As a direct and proximate result of the Defendants' violation(s) of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their property, causing Plaintiffs to suffer monetary losses in the amount of not less than $ 500,000,000.00, with said damages to be proven at trial.

490.    There is a direct relation between the Defendants' conduct and the Plaintiffs' and the members of the class' injury. Defendants' fraudulent representations that investor moneys would be invested in cryptocurrency through an automated investment trading platform, that potential investors would double their money within five months of investing by earning 5% weekly return on their investments using a "Robo-Advisor Assisted account" to conduct trading, and that actual investors had earned, and were continuing to earn, at least 5% each week on their investments, together with their fraudulent omissions listed supra, was a substantial factor in each Plaintiff's decision to invest in the EminiFX Enterprise Ponzi Scheme. The direct victims of the Defendants' RICO violations were the Plaintiffs and the members of the class.

491.    Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs are entitled to three times the actual damages caused by the Defendants plus the cost of the suit, including reasonable attorney's fees, and pre-judgement and post-judgment interest.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest

in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 5
## Breach of Contract

492.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

493.    As set forth above, the Defendants solicited and entered into an implied contract by which the Plaintiffs and members of the Class agreed to entrust, pay, transmit, turn over and/or wire not less than $ 500,000,000.00 in investment property and funds to the Defendants, and the Defendants agreed to invest that property and funds in cryptocurrency through an automated investment trading platform which the Defendants guaranteed to earn at least 5% each week**.**

494.    The Plaintiffs and members of the Class did entrust, pay, transmit, turn over and/or wire not less than $ 500,000,000.00 in investment property and funds to the Defendants as agreed, and fully performed all terms and conditions of the implied contract.

495.    Defendants materially breached the express and implied terms of the contract by failing to invest the property and funds as agreed.

496.    The Plaintiffs and members of the class made demands to Defendants that Defendants refund their investment funds and property. Despite those demands, Defendants have refused and continue to refuse to refund the investment funds and property to the members of the Class.

497.    Defendants, through their actions described above, breached their contract with the Plaintiffs and members of the Class in several other material respects, including, but not limited to, engaging in a Ponzi scheme and defrauding and embezzling millions of dollars from the Plaintiffs and members of the Class as well as taking from them for Defendants' own benefit investment opportunities.

498.    As a direct and proximate result of the Defendants' breaches, the Plaintiffs and members of the Class have suffered substantial damages in the amount of not less than $ 500,000,000.00 said damages to be proven at trial.

499.    The Plaintiffs and members of the class have also suffered additional damages in the form of lost profits on their investment and attorneys' fees and costs as a proximate and foreseeable result of Defendants' conduct.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs damages for Defendants' breach of contract, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

### COUNT 6
### Breach of Implied Covenant of Good Faith and Fair Dealing

500.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

501.    As set forth above, the Defendants solicited and entered into an implied contract by which the Plaintiffs and the members of the Class agreed to entrust, pay, transmit, turn over and/or wire not less than $ 500,000,000.00 in investment property and funds to the Defendants, and the Defendants agreed to invest that property and funds in cryptocurrency through an automated investment trading platform which the Defendants guaranteed to earn at least 5% each week.

502.    The Plaintiffs and members of the Class did entrust, pay, transmit, turn over and/or wire not less than $ 500,000,000.00 in investment property and funds to the Defendants as agreed, and fully performed all terms and conditions of the implied contract.

503.    The implied contract, as with all contracts, contains an implied covenant of good faith and fair dealing.

504.    The implied covenant of good faith and fair dealing applies to the parties' performance and rights under the contract.

505.    Defendants materially breached the express and implied terms of the contract by failing to invest the property and funds as agreed.

506.    The Plaintiffs and members of the class made demands to Defendants that Defendants refund their investment funds and property.  Despite those demands, Defendants have refused and continue to refuse to refund the investment funds and property.

507.    Through the conduct described above, Defendants denied the Plaintiffs and members of the Class the benefit of the bargain originally intended by the parties and provided by the contract.

508.    Through the conduct described above, Defendants acted in bad faith and have breached their implied covenant of good faith and fair dealing.

509.    As a direct and proximate result of Defendants' violations of their implied covenant of good faith and fair dealing, the Plaintiffs and members of the Class have and will suffer significant financial harm, including consequential and other damages, in the amount not less than $ 500,000,000.00, said damages to be proven at trial.

510.    The Plaintiffs and members of the class have also suffered additional damages in the form of lost profits on their investment and attorneys' fees and costs as a proximate and foreseeable result of Defendants' conduct.

**WHEREFORE**, the Plaintiffs requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages for Defendants' breach of implied covenant of good faith and fair dealing, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 7
## Unjust Enrichment

511.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

512.    At Defendants' request, and in reliance on their promises -- that (i) investor moneys would be invested in cryptocurrency through an automated investment trading platform (ii) potential investors would earn a 5% weekly return on their investment and would double their money within five months using the "Robo-Advisor Assisted account" to conduct trading (iii) EminiFX would guarantee 5% weekly return on their investments and (iv) actual investors had earned, and were continuing to earn, at least 5% each week on their investments -- the Plaintiffs and members of the Class entrusted, paid, transmitted, turned over and/or wire not less than $ 500,000,000.00 in investment funds to the Defendants.

513.    Only a portion of the investment funds provided to the Defendants were actually invested by the Defendants, and none were invested as represented, and the vast portion of the funds were stolen or converted by the Defendants for the Defendants' own benefit to the great detriment of the Plaintiffs and members of the Class.

514.    Defendants failed to invest the vast portion of the investment funds provided to them by the members of the Class as set forth above.

515.    Defendants received and retained the benefit of the Plaintiff's and members of the class' performance, including their money and property, in direct violation of Defendants' obligations to the Plaintiff and members of the class and without performing in accordance with the Defendants' promises and pretences.

516.    Defendants must be required to return to the Plaintiffs and members of the Class all of their money Defendants wrongfully retained.

517.    Defendants have been unjustly enriched, and the Plaintiffs and members of the class are entitled to be compensated for the benefit they have conferred on the Defendants.

518.    The value of the money and property unjustly retained by Defendants is in excess of $500,000,000.00, the exact amount of which will be proven at trial. The Plaintiffs and members of the class have also suffered additional damages in the form of lost profits on their investment and attorneys' fees and costs as a proximate and foreseeable result of Defendants' conduct.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages for the money and property unjustly retained by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

**COUNT 8**
**Conversion / Theft / Embezzlement**

519.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

520.    The Defendants received the above-referenced investment funds from the Plaintiffs and members of the Class, to be invested in accordance with the Defendants' promises and representations.

521.    The Defendants did not invest the investment funds as promised and have failed and refused to return the investment funds provided to them by the Plaintiffs and members of the Class, despite demand, therefore.

522.    Instead, the Defendants knowingly obtained or used, or endeavored to obtain or to use, the Plaintiff's and the members of the class's property (i.e., the investment funds) with intent to permanently appropriate the property for the Defendants' own use and benefit through fraud and deceit.

523.    As a direct and proximate result of this theft, conversion and/or embezzlement of the Plaintiffs' and members of the class's investment funds, the Plaintiffs and members of the class have suffered substantial damages in the amount of at least $ 500,000,000.00, plus consequential damages consisting of, among other things, attorneys' fees and costs of investigating and discovering Defendants' fraud and pursuing this action.

524.    The Defendants' actions have been wilful and outrageous and undertaken with reckless indifference to the rights of the Plaintiffs and members of the class. Such conduct warrants an award to the Plaintiff of punitive or exemplary damages in an amount sufficient to punish the Defendants and deter similar wrongdoing by others.

**WHEREFORE**, the Plaintiff request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's damages for the money and property unjustly stolen, converted and/or embezzled by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

## COUNT 9
### Fraud

525.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

526.    From January 2020 through May 22, 2022, the Defendants promised and represented to the Plaintiffs and members of the Class that their money would be, and/or had been invested in cryptocurrency through an automated investment trading platform.

527.    From January 2020 through May 22, 2022, the Defendants committed fraud when they intentionally and falsely represented to the Plaintiffs and members of the Class that their money would be, and/or had been invested in cryptocurrency.

528.    From August 2021 through May 22, 2022, the Defendants held virtual weekly investment meetings in which they promised and represented to the Plaintiffs and members of the class that:

- EminiFX had dedicated trading desks, computers and strategies, that gave investors access to investment returns they would not otherwise have access to;

- EminiFX uses a "robo-assisted advisor account" - a "trade secret" technology only available to EminiFX investors;

- Investor moneys would be invested in cryptocurrency through an automated investment trading platform;

- Potential investors would earn a 5% weekly return on their investment and would double their money within five months using the "Robo-Advisor Assisted account" to conduct trading;

- EminiFX would guarantee 5% weekly return on their investments actual investors had earned, and were continuing to earn, at least 5% each week on their investments

529.    The Defendants' above promises and representations were false, and Defendants knew they were false when made, and they made the false promises and representations specifically intending for the Plaintiffs and members of the Class to rely upon the false promises and representations, and to induce them to invest, to send them money and property, and to stay invested, as part of a scheme to defraud the Plaintiffs and members of the Class.

530.    The Defendants purposely and intentionally did not invest, as promised or represented, or at all, the moneys and property provided to them by the Plaintiffs and members of the Class.

531.    The Defendants did not intend to invest, at promised or represented, the moneys and property provided to them by the Plaintiffs and members of the Class.

532.    The Plaintiffs and members of the Class justifiably relied on the Defendants' representations, and based on this reliance, entrusted, paid, transmitted, turned over and/or wire not less than $ 500,000,000.00 in investment funds to the Defendants.

533.    The Plaintiffs and members of the Class have been substantially harmed by the Defendants' conduct.

534.    As a direct and proximate result of Defendants' deliberate, intentional and vile conduct, all done with malice, fraud and/or oppression, the Plaintiffs and members of the Class have incurred and will continue to incur damages in the amount of at least $500,000,000.00, said damages to be proven at trial, plus consequential damages consisting of, among other things, attorneys' fees and costs of investigating and discovering Defendants' fraud and pursuing this action.

536.    Such conduct was done in furtherance of their own private interests, and was wilful, malicious, wanton, and oppressive, and done with conscious and callous indifference to the consequences and with specific intent to harm, and therefore further warrants an award to the members of the Plaintiffs, and members of the Class, of punitive or exemplary damages in an amount to be proven at trial and sufficient to punish the Defendants and deter similar wrongdoing by others.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.


## COUNT 10
## Intentional Misrepresentation

537.    Plaintiff incorporates the allegations of paragraphs 49-414 as if stated fully herein.

538.    The Defendants did not perform as promised and at all times did not intend to perform.

539.    The Defendants intended to enrich themselves at the expense of the Plaintiffs and members of the Class, and to defraud them by falsely claiming that (i) investor moneys would be invested in cryptocurrency through an automated investment trading platform (ii) potential investors would earn a 5% weekly return on their investment and would double their money within five months using the "Robo-Advisor Assisted account" to conduct trading (iii) EminiFX would guarantee 5% weekly return on their investments and (iv) actual investors had earned, and were continuing to earn, at least 5% each week on their investments.

540.    The Defendants false promises and representations were designed to deceive investors such as the Plaintiffs and members of the Class and cause them to send large sums of money to Defendants for investments.

541.    The sophisticated virtual weekly investor meetings) nationwide and worldwide via was intended by the Defendants to defraud investors such as the Plaintiffs and members of the Class and to cause them to reasonably rely on the Defendants' representations and send, wire, transmit, large sums of moneys and property to the Defendants for investment.

542.    The Plaintiffs and members of the Class did reasonably rely on those representations, and they entrusted, paid, transmitted, turned over and/or wire not less than $ 500,000,000.00 in investment funds to the Defendants.

543.    The reliance by the Plaintiffs and members of the Class on the promises of the Defendants was reasonable and a substantial factor in the harm the members sustained

544.    The Defendants did not invest the investment funds as promised and have failed and refused to return the investment funds provided to them by the Plaintiffs and members of the Class, despite their demand therefore.

545.    Instead, the Defendants knowingly obtained or used, or endeavoured to obtain or to use, the Plaintiffs' and members of the class's property (i.e., the investment funds) with intent to permanently appropriate the property for the Defendants' own use and benefit through misrepresentations, deceit and fraud.

546.    As a result of the intentional misrepresentations and fraud by the Defendants, the Plaintiffs and members of the Class suffered damages in the amount of at least $500,000,000.00, plus consequential damages consisting of, among other things, attorneys' fees and costs of investigating and discovering Defendants' fraud and pursuing this action.

547.    Defendants' misconduct was willful, intentional, malicious and fraudulent, entitling the Plaintiffs to an award of exemplary or punitive damages in an amount sufficient to punish the Defendants and deter similar wrongdoing by others.

**WHEREFORE**, the Plaintiff requests that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiff's compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiff may be entitled at law or in equity.

## COUNT 11
## Civil Conspiracy

548.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

549.    Upon information and belief, the Defendants agreed, combined and acted with a common plan and purpose to defraud and embezzle money from the Plaintiffs and members of the Class, and convert the Plaintiff's property to themselves and for their own benefit, by engaging in the unlawful acts described above.

550.    Upon information and belief, the Defendants agreed, combined and acted with a common plan to breach their fiduciary and common law duties owed to the Plaintiffs members of the Class by engaging in the unlawful acts described above.

551.    At all times relevant, the Defendants committed overt acts, as described above, including, but not limited to, engaging in a Ponzi scheme and defrauding and embezzling millions of dollars from the Plaintiffs and members of the Class for their own benefit in pursuance of the common purpose described above.

552.    As a direct and proximate result of the Defendants' acts done in furtherance of the conspiracy, the Plaintiffs and members of the Class have been damaged in their businesses and properties, causing them to suffer monetary damages in an amount not less than $ 500,000,000.00 said damages are to be proven at time of trial.

553.    The Plaintiffs and members of the class have suffered, and will continue to suffer, these injuries.

554.    The Defendants' actions have been wilful, malicious, wanton, and oppressive, and done with conscious and reckless indifference to the rights of the Plaintiffs and members of the class and to the consequences and with specific intent to harm them, warranting an award of exemplary or punitive damages in an amount sufficient to be proven at trial to punish the Defendants and deter similar wrongdoing by others.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

### COUNT 12
### Negligent Hiring, Training and Supervision

**(DEFENDANTS THEODORE NORMAN CLAIR, the GENERAL CONFERENCE CORPORATION of the 7TH DAY ADVENTIST CHURCH, and G. ALEXANDER BRYANT, the NORTH AMERICAN DIVISION of the 7th DAY ADVENTIST CHURCH, ALLEGHENY EAST CONFERENCE, NORTHEASTERN CONFERENCE, FLORIDA CONFERENCE, TEXAS CONFERENCE AND SOUTHEASTERN CONFERENCE)**

555.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

556.    In the hiring and supervising of the pastors named herein, the Defendants have an affirmative duty to train and supervise all of its pastors and to prevent them from engaging in fraud, misrepresentation, theft and or otherwise unlawful conduct against the parishioners under their leadership, and the general public at large.

557.    The Plaintiffs and nearly ninety percent of the class members are parishioners of the Adventist Churches listed in this complaint from the following states: Florida, New York, Texas, Pennsylvania, Massachusetts, New Jersey, Georgia, Connecticut and Rhode Island.

558.    The Pastors were hired by CGC and supervise by their respective conferences of Seventh-Day Adventist Corporation as spiritual leaders of the churches in the above-named states.

559.    The Pastors used their power, influence, and leadership to fraudulently coerced and forced members of the class to invest in EminiFX with the knowledge that EminiFX was a ponzi scheme with a pyramid model designed to take investors' money for their own personal gains.

560.    Defendant GCC owed an affirmative duty to Plaintiff, Defendant GCC breached that duty by failing in the most basic expectation that they train and supervise those pastors to prevent them from engaging in crimes

561.    Defendants have negligently and/or recklessly failed to satisfy that duty of care in hiring, supervising, training, and retaining of the pastors who serve in their several churches. These pastors have been engaging in fraudulent actions or otherwise illegal conduct that caused damages to members of the class.

562.    The Defendants knew or should have known that their pastors were engaging in fraud against the parishioners and the public at large.

563.    Defendants the GCC, and Theodore Norman Clair as president of the GCC knew or should have known that the pastors that they hired have been engaging in fraudulent actions directing at their parishioners and enriching themselves in the process while the Plaintiffs and members of the class sustained severe economic damages.

564.    As a result of Defendants' negligent conduct, Plaintiff and members of the Class have suffered and continue to suffer injuries and damages.

565.    These Defendants are especially liable to all Plaintiffs members of the Class because of their negligence.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' and the members of the class's damages caused to them by the Defendants' negligent hiring, training and supervision, including the money and property unjustly stolen, converted and/or embezzled by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

### COUNT 13
### Negligent Hiring, Training and Supervision

**(DEFENDANTS ADVENTIST CONFERENCE OF FLORIDA, NEW YORK, TEXAS, MASSACHUSETTS, CONNECTICUT, NEW JERSEY, GEORGIA, RHODE ISLAND, PENNSYLVANIA, and the NORTH AMERICAN DIVISION of the 7th DAY ADVENTIST CHURCH)**

565.    Plaintiffs incorporate the allegations of paragraphs 49 - 414 as if stated fully herein.

566.    In the hiring and supervising of the Adventist Pastors named herein, the Defendants consist of the State Conference named herein of the Seventh Day Adventist Church has an affirmative duty to train and supervise the pastors they hire and to prevent them from engaging in fraud, misrepresentation, theft and or otherwise unlawful conduct against the parishioners under their leadership, and the general public at large.

567.    Nearly ninety percent of the class members are parishioners of the Adventist Churches listed in this complaint from the following states: Florida, New York, Texas, Pennsylvania, Massachusetts, New Jersey, Georgia, Connecticut and Rhode Island.

568.    The pastors were hired by CGC, and the local conferencse of the different states as spiritual leaders of the churches in the above-named states.  The pastors used their power, influence, and leadership to fraudulently coerced and forced members of the class to invest in EminiFX with the knowledge that EminiFX was a ponzi scheme with a pyramid model designed to take investors' money for their own personal gains.

569.    Defendant, local conferences of the Seventh Day Adventist church owe an affirmative duty to Plaintiff, Defendants breached that duty by failing in the most basic expectation that they train and supervise those pastors to prevent them from engaging in crimes.

570.    Defendants have negligently and/or recklessly failed to satisfy that duty of care in hiring, supervising, training, and retaining of the pastors who serve in their several churches. These pastors have been engaging in fraudulent actions or otherwise illegal conduct that caused damages to members of the class.

571.    The Defendants knew or should have known that their pastors were engaging in fraud against the parishioners and the public at large.

572.    Defendant, the local conference of the Seventh day Adventist Church knew or should have known that the pastors that they hired have been engaging in fraudulent actions directing at their parishioners and enriching themselves in the process while members of the class sustained severe economic damages.

573.    As a result of Defendants' negligent conduct, Plaintiffs and members of the Class have suffered and continue to suffer injuries and damages.

574.    These Defendants are especially liable to the Plaintiffs and all members of the Class because of their negligence.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' and members of the class damages caused to them by the Defendants' negligent hiring and supervision, including the money and property unjustly stolen, converted and/or embezzled by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

### COUNT 14
### Intentional Infliction of Emotional Distress

575.    Plaintiff incorporates the allegations of paragraphs 49-414 as if stated fully herein.

576.    Defendants' actions toward the Plaintiffs and other members of the Class constituted extreme and outrageous conduct and was done intentionally.

577.    Defendants fraudulently coerced Plaintiffs and members of the class to invest their entire life saving with a false promise of being millionaires in 9 months.

578.    Most of the members of class are not rich and are every-day immigrant who works very hard to save a little bit of money.

579.    The Defendants recklessly with total disregard for their wellbeing took their money for their own personal use.

580.    Defendants' extreme and outrageous conduct subjected the Plaintiffs and class members to emotional trauma, humiliation, severe emotional distress.

581.    Defendants' actions and the ensuing damage to the Plaintiffs and class members were foreseeable. Upon information and belief, some class members committed suicide upon finding out that EminiFX was a Ponzi Scheme.

582.    As a result of Defendants' intentional actions, the Plaintiffs and members of the class sustained injuries and damages for which each Defendant is individually and severally liable to them.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages caused to them by the Defendant's intentional infliction of emotional distress, including reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 15
### Negligent Infliction of Emotional Distress

583.    Plaintiff incorporates the allegations of paragraphs 49-414 as if stated fully herein.

584.    Defendants owe a duty of care to the Plaintiffs and members of the class, that duty is an affirmative duty to tell the truth with regard to the nature of the investment in the EminiFX.

585.    Defendants working together and in concert breach that affirmative duty by repeatedly lying to the Plaintiffs and class members about the nature of the business, the company, the platform, its functionality, and the return on investment.

586.    These lies were material because without them, members of the class would not have invested in EminiFX.

587.    Plaintiffs sustained emotional and economic damages because of the Defendants' actions. Those damages were foreseeable, and they are the direct result of Defendants' actions.

588.    Defendants' actions are the proximate cause of Plaintiffs' injuries, "but for" Defendants actions Plaintiffs would not have sustained the damages.

589.    Each named Defendant is individually and severally liable to Plaintiffs for all their damages.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages caused to them by the Defendant's negligent infliction of emotional distress, including reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

### COUNT 18
### Exemplary Punitive Damages

590.    Plaintiff incorporates the allegations of paragraphs 49-414 as if stated fully herein.

591.    Defendants' actions alleged above were malicious, willful and wanton, and were made with specific intent to harm Plaintiffs.

592.    Defendants' actions alleged above violated 18 U.S.C. § 1343 and Florida Statutes 895.02 and 895.12.

593.    Defendants' actions alleged above constitute fraud and conspiracy to commit fraud.

594.    In order to deter such conduct in the future, Plaintiffs should be awarded exemplary punitive damages in an amount of not less than $50,000,000.

595.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demands a trial by jury of all issues so triable that are raised herein or which hereinafter may be raised in this action.

## COUNT 19
## Statutory Claim for Fraudulent Conveyance

596.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

597.    Upon information and belief, Defendants developed and implemented a scheme to transfer assets to each other and others to place them outside of the reach of their creditors, including each member of the Class.

598.    The aforesaid transfers were made with actual intent to hinder, delay, or defraud the members of the Class and without receiving a reasonable equivalent value in exchange for the transfer or obligation.

## COUNT 20
## Injunctive Relief

599.    Plaintiff incorporates the allegations of paragraphs 49-414 as if stated fully herein.

600.    Unless Defendants are temporarily, preliminarily, and permanently enjoined from improperly and unlawfully depriving the Plaintiffs and members of the Class of their rights under the above-referenced implied contract, and from transferring assets to each other and others to place them outside of the reach of their creditors, the Plaintiffs and members of the Class will be immediately and irreparably harmed by present and/or future economic loss, which is presently incalculable.

601.    The Plaintiffs and members of the Class have no complete or adequate remedy at law.

602.    The Plaintiffs and members of the Class will suffer greater injury if an injunction is not granted than Defendants will incur if the injunction is granted.

603.    The public interest will be served by an injunction against Defendants by the enforcement of the requirements of the contract.

604.    By virtue of the foregoing, the Plaintiffs and members of the Class have demonstrated a likelihood of success on the merits and that the balancing of the equities favors the issuance of an injunction against Defendants.

**COUNT 21**
**Accounting and Insurance**

.

605.    Plaintiffs incorporate the allegations of paragraphs 49-414 as if stated fully herein.

606.    Defendants must account for all transactions regarding their fraudulent scheme

607.    Defendants must also provide the names, policy numbers, and contact information for their insurance companies, including but not limited to policies providing for general liability, professional liability, and errors and omissions, so the Plaintiffs and members of the Class can submit claims against the Defendants.

608.    The Plaintiffs and members of the Class demand that Defendants be required to produce a full and complete accounting of all transactions regarding their fraudulent scheme, including, but not limited to, all transfers of funds to accounts and/or third parties wherever they may be, as well as their insurance companies, insurance contact information, policy numbers, and coverage.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demands a trial by jury of all issues so triable that are raised herein, or which hereinafter may be raised in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1.  Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as the Class representatives.

2.  Finding that all defendants are jointly and severally liable for all damage caused to Plaintiffs.

3.  Awarding Plaintiffs monetary damages in an amount not less than $ 500,000,000,00 said amount to be proven at trial.

4.  Awarding Plaintiffs enhanced (treble) monetary damages pursuant to 18 U.S.C. § 1964(c) and FLA 895(7)(a).

5.  Awarding Plaintiffs their litigation expenses, including reasonable attorneys' fees, costs and disbursements.

6.  Awarding Plaintiffs punitive damages in the sum of not less than $150,000,000.00 or an amount otherwise to be decided by a jury; and

7.  Granting such other relief as the case may require or as may be deemed proper and equitable.

Dated: May 21, 2025

Respectfully Submitted,

/s/ J.Wil Morris
J. Wil Morris, Esquire
Attorney for Plaintiff
2800 Biscayne Blvd, Suite 530
Miami, Florida 33137
Telephone: 305-444-3437
Fax: 305-444-3457
New York Bar No.: 8728/JWM