UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAQUES CHELDER, WILLIAMS PETION, SMITH GANTHIER, ANGE LAZARD, JEAN MARY JEAN MISERE, MARGARETTE DOMINIQUE, ERNST PAUL, PHUCIEN BAPTISTE, and GARRY SYLVAIN, *on behalf of themselves and similarly-situated members of the Seventh Day Adventist Church and Investors of Eminifx*,

Plaintiffs,

v.

GENERAL CONFERENCE CORPORATION, NORTHEASTERN CONFERENCE, TEXAS CONFERENCE, NORTH AMERICAN DIVISION, SOUTHERN NEW ENGLAND CONFERENCE, ALLEGHENY EAST CONFERENCE, FLORIDA CONFERENCE, SOUTHEASTERN CONFERENCE, THEODORE NORMAN CLAIR WILSON (CEO of the Seventh-Day Adventist Church), FRANTZ D'HAITI, SMITH OLIVIER YVELANDE D'HAITI, JOHN EDVARD MAISONNEUVE, PHILIP MONPREMIER, WILLIAM JEAN CHARLES, AGUY CALERBE, ESTEB PIERRE, MOISE BERTRESSE, JEAN PARISIEN, JOSEPH DORIVAL, JEAN CLAUDE LOUIS JEUNE, FREDO IGNACE, CARL BERHMAN, PAUL DONALD, SOPHIA MAISONNEUVE, KELNY HYPOLITE, EDDY ALEXANDRE, VIRGO BELIZAIRE, LEE MAYORS MEZIL, WILNICK PRINCIVIL, RACHELLE O. PRINCIVIL, CLARELLE DIEUVEUIL a/k/a MARIE DIEUVEUIL a/k/a CLARELLE ALEXANDRE, and EMILE DUVIVIER,

Defendants.

25-CV-4313 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

This case arises from the collapse of a Ponzi scheme alleged to have been operated by pastors affiliated with the Seventh-Day Adventist Church (the "Church"). Plaintiffs bring a putative class action, representing the investors in this scheme, and assert a host of claims to recoup the money alleged to have been stolen from them, including civil RICO claims. Defendants move to dismiss the Complaint arguing in part that because Plaintiffs' claims are barred by the so-called "RICO Amendment" in the Private Securities Litigation Reform Act ("PSLRA")—and because their only basis for this Court to assert jurisdiction over this action arises from the RICO statute— the Court should dismiss this action in its entirety. For the reasons that follow, the Court agrees and dismisses Plaintiffs' claims.

## BACKGROUND[1]

Plaintiffs in this case are individual investors in an alleged Ponzi scheme run by individual pastors of the Seventh-Day Adventist Church, and affiliates of the scheme (the "Individual Defendants").[2] Dkt. 46 ("Compl.") ¶¶ 18–48. Plaintiffs also bring claims against corporate entities and executives affiliated with the Seventh-Day Adventist Church who are alleged to have "enabled" and "facilitated" the scheme (the "Organizational Defendants" and collectively, the "Defendants").[3] *Id.* ¶¶ 365–406. As alleged, Defendants used their positions in the Church to

---

[1] The Court draws the following facts from the Complaint, *see* Dkt. 46, and accepts them as true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

[2] The Individual Defendants are Frantz D'Haiti, Yvelande D'Haiti, John Edvard Maisonneuve, Smith Oliver, Philip Monpremier, Lydie Bastien, William Jean Charles, Calerbe Aguy, Esteb Pierre, Moise Bertresse, Jean Parisien, Joseph Dorival, Jean Claude Louis Jeune, Fredo Ignace, Carl Berhmann, Donald Paul, Sophia Maisonneuve, Virgo Belizaire, Lee Mayors Mezil, Eddy Alexandre, Clarelle Dieuveuil. Emile Duvivier, and Kelny Hypolite. Dkt. 46 ("Compl.") ¶¶ 18–39. The case caption also individually names Wilnick Princivil and Rachelle O. Princivil, but Plaintiffs include no allegations related to those Defendants in the Complaint.

[3] The Organizational Defendants are the General Conference Corporation ("GCC") and its affiliates, including the North American Division, the Texas Conference, the Allegheny East Conference, the Texas Conference, the Southeastern Conference, the Florida Conference, the Southern New England Conference, and the Northeastern Conference. Compl. ¶¶ 40–48. Defendant Theodore Norman Clair Wilson is the President of the GCC. Compl. ¶ 365.

endorse, promote, and coerce investments by Church members in an enterprise called "EminiFX." *Id.* ¶¶ 50–52.

Investors were told that EminiFX had "dedicated trading desks" and proprietary, automated cryptocurrency trading strategies which would earn them an up to 9.8% weekly return on their investment, with a guaranteed 5% weekly return (which, when annualized, is equivalent to a yearly return of approximately 242%). *Id.* ¶¶ 4, 74. Some of the Individual Defendants also represented that the Seventh Day Adventist Church would "guarantee their investment" and insure against any losses they may sustain. *Id.* Certain Defendants even went so far as to say that the cryptocurrency trading strategy had been "blessed and vetted by church leaders," and that EminiFX was "capable of delivering divine wealth to investors." *E.g. id.* ¶¶ 102, 127. Defendants allegedly took many steps to recruit investors to this scheme: they exhorted their religious congregations to invest during church services, they held weekly "investor meetings" and "financial seminars" in "church sanctuaries" as recruiting events, and "lauch[ed] [an online] cryptocurrency platform through which investors were induced to contribute funds." *Id.* ¶¶ 49–73, 101.

Beyond the promise of a risk-free, eye-wateringly-large weekly return, individual investors were also compensated for recruiting new investors to the scheme. Each investor was "promised a percentage of the funds invested by individuals they personally recruited, as well as a share of funds invested by subsequent recruits in their downline." *Id.* ¶ 70. Individual pastors, for example, received 10% of the capital invested by individuals they recruited to invest in EminiFX. *Id.* ¶ 60.

Church leaders are alleged, in essence, to have knowingly touted a Ponzi scheme as a God-given, sure bet for their parishioners and community members, as well as a pathway to life-changing sums of money. Defendant William Jean Charles, a pastor serving congregations in Texas and Florida, succinctly summarized the recruiting pitch by allegedly telling a meeting of

prospective investors that "[t]here are two things [he's] most proud of—marrying my wife and joining EminiFX," that EminiFX was "blessed by God," and that EminiFX was their "chance to become a millionaire." *Id.* ¶¶ 143, 148.

What investors were not told, however, was what is at the heart of the Complaint:  that EminiFX was a classic Ponzi scheme.  No divinely-inspired cryptocurrency trading strategy actually existed. *Id.* ¶ 75.  Most of the investors' money was "diverted for the personal use and benefit of the defendants," and the "limited funds that were invested had actually sustained large losses." *Id.*  In fact, the returns received by some individual investors are alleged to have been "fraudulent disbursements" paid out from new money invested in the scheme. *Id.*  EminiFX did not, as its sponsors promised, set its investors on a path to "faith-based financial freedom." *Id.* ¶ 104.  All told, over 62,000 investors lost over two hundred million dollars by investing in the EminiFX scheme, much of which was stolen by the individual defendants for their personal use. *Id.* ¶¶ 1, 63.  Although the scheme "started within the Seventh Day Adventist Church," it ultimately counted many individuals from other religious denominations in the Haitian-American community among its victims. *Id.* ¶ 64.

Defendant Eddy Alexandre, a pastor and one of the main architects of the scheme, was arrested by the Federal Bureau of Investigation on May 22, 2022 and pled guilty to commodities fraud on February 12, 2023. *Id.* ¶ 2–3.  On May 21, 2025, Plaintiffs filed a putative class action on behalf of "all those who invested in EminiFX between January 2019 and May 2022" who were "financially damaged when the [P]onzi scheme collapsed." *Id.* ¶ 407.  They bring a host of claims against Defendants, including several civil RICO claims, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, fraud, intentional misrepresentation, civil conspiracy, negligent hiring, training and supervision, intentional

4

infliction of emotional distress, negligent infliction of emotional distress, and fraudulent conveyance. *Id.* ¶¶ 415–608. Plaintiffs seek compensatory damages of over $500,000,000, punitive damages of $150,000,000, a treble damages award under RICO, an equitable accounting, injunctive relief, and fees and costs. *Id.* at 108.

On August 14, 2025, a subset of the Organizational Defendants, Defendants General Conference Corporation of Seventh-Day Adventists, North American Division Corporation of Seventh-Day Adventists, and Theodore Norman Clair Wilson (the "Corporate Defendants") filed the instant motion to dismiss. Dkt. 129, 130 ("Defs. Mot."). Plaintiffs timely opposed, Dkt. 148 ("Pls. Opp'n"), to which the Moving Defendants replied. Dkt. 155 ("Defs. Repl."). The Corporate Defendants argue, in brief, that (1) the Complaint fails to satisfy Federal Rule of Civil Procedure 8(a)(2), (2) Plaintiffs' civil RICO claims are barred because they are based on predicate acts of securities fraud, and (3) that the remaining state-law claims are insufficiently pled or otherwise do not state a cause of action. Defs. Mot. at 1-2.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[4] Courts must therefore accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). At this stage, "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

---

[4] Unless otherwise indicated, quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

**DISCUSSION**

The Corporate Defendants move to dismiss all of the claims against them. In particular, they argue that the civil RICO claims in Counts 1-4 of the Complaint should be dismissed, in part because those claims are barred by 18 U.S.C. § 1964(c), which provides that securities fraud cannot serve as a predicate act for a RICO claim. Defs. Mot. at 5–7; Defs. Repl. at 2. The Court agrees, and will dismiss those claims. Furthermore, because Plaintiffs do not allege any basis for personal jurisdiction over Defendants beyond the nationwide personal jurisdiction conferred by the RICO Act, their remaining claims are dismissed as well.

## I.     RICO Claims

"To plead a viable RICO claim under 18 U.S.C. § 1962(b), a plaintiff must sufficiently allege (1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an enterprise, (7) the activities of which affects interstate or foreign commerce." *Stevenson v. Thornburgh*, 2024 WL 645187, at *8 (S.D.N.Y. Feb. 14, 2024); *see Moss v. Morgan Stanley*, 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025 (1984). A plaintiff must also allege that he was "injured in his business or property by reason of a violation of [S]ection 1962." *Moss*, 719 F.2d at 17. "Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Stevenson*, 2024 WL 645187, at *9.

**A. The PSLRA's RICO Amendment**

The Corporate Defendants first allege that Count 1-4 of the Complaint—the four RICO claims—should be dismissed because they are barred by the so-called "RICO Amendment" set forth in the PSLRA.  Section 1964(c) provides, in relevant part, that:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964(c).  The Second Circuit has construed this language to bar civil RICO claims, including claims for wire and mail fraud, which allege "predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant."  *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 277 (2d Cir. 2011).  Courts in this Circuit have thus held that "if a complaint alleges that a RICO enterprise is engaged in a single scheme of racketeering activity, then when any predicate act is barred by" the RICO Amendment, "it is fatal to the entire RICO claim."  *Zanghi v. Ritella*, 2021 WL 4392756, at *16 (S.D.N.Y. Sept. 24, 2021) (collecting cases).

"Courts consult Section 10(b) of the Securities Exchange Act of 1934 for guidance on what conduct is actionable as securities fraud for purposes of the RICO Amendment."  *Stevenson*, 2024 WL 645187, at *19.  The crux of this analysis is that any fraudulent conduct "in connection with the purchase or sale of any security" may not be the subject of a RICO claim.  *Id.*  The "in connection with" element is generally met when "the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value," *Stechler v. Sidley, Austin Brown & Wood, LLP*, 382 F. Supp. 2d 580, 594 (S.D.N.Y. 2005).  The Second Circuit has recently cautioned that "the actual purchase or sale of securities [must be] fraudulent; it is not enough for

7

securities to be an incidental feature of an overall scheme." *D'Addario v. D'Addario*, 75 F.4th 86, 93 (2d Cir. 2023).   Courts have also found, however, conduct keeping securities-fraud Ponzi schemes "alive," such as "attracting investors to the Ponzi scheme or aiding the scheme with market-making to facilitate the sale of securities," to fall within the RICO Amendment.  *B & T Supplies, Inc. v. GemJ Chehebar Grat, LLC*, 2025 WL 831110, at *14 (S.D.N.Y. Mar. 17, 2025) (collecting cases).  The Second Circuit," in *MLSMK Investment Co. v. J.P. Morgan Chase & Co.*, "quoted with approval the Third Circuit's holding that the RICO Amendment bars RICO claims based on conduct that perpetuates a Ponzi scheme," and other courts in this District have similarly applied *MLSMK* to bar RICO claims arising out of such schemes.  *Picard v. Kohn*, 907 F. Supp. 2d 392, 398 (S.D.N.Y. 2012); *MLSMK*, 651 F.3d at 277 n.11; *see, e.g.*, *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 460–61 (S.D.N.Y. 2019).

### B. Plaintiffs' RICO Claim Is Barred by the RICO Amendment

Ponzi schemes of the type alleged by Plaintiffs can trigger the RICO Amendment in at least two ways.  The sponsors of the scheme itself could use investor money to actually invest in securities. *See, e.g.*, *MLSMK*, 651 F.3d at 277.  Alternatively, the relationships between investors and scheme sponsors could constitute "investment contracts," which themselves constitute securities. *See, e.g.*, *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 248–250 (S.D.N.Y. 2002); *see also* 15 U.S.C. § 77b(a)(1) ("The term 'security' means any . . . investment contract."); *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–299 (1946) (noting that an "investment contract" is a "contract or scheme for the placing of capital or laying out of money in a way intended to secure income or profit from its employment").

The parties dispute whether the "implied contract[s]," Compl. ¶ 493, between the putative class and the promoters of EminiFX, constituted investment contracts, and thus transactions

involving the purchase or sale of securities.[5]  Defs. Mot. at 5–7; Pls. Opp'n at 5–7; Defs. Repl. at

2–5. Plaintiffs allege, as the predicate acts of their RICO claims, that the sponsors of EminiFX

fraudulently induced investors to enter into these contracts.  Compl. ¶¶ 437–444, 457, 470, 485.

If these contracts constitute securities, then Plaintiffs' RICO claims are barred because they are

predicated on fraud in the "actual purchase or sale of securities." *D'Addario*, 75 F.4th at 93.  While

viewing the allegations in the Complaint in the light most favorable to Plaintiffs, the Court

nonetheless concludes that the implied contracts between the putative class and the promoters of

EminiFX are securities, and that Plaintiffs' RICO claims are thus barred by the RICO Amendment.

"The *Howey* test," articulated by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S.

at 298–99, "provides the mode of analysis for [whether] an unconventional scheme or contract"

constitutes a "security." *S.E.C. v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020).

It outlines "three criteria for determining an investment contract . . . (1) an investment of money,

(2) in a common enterprise, (3) on an expectation of profit to be derived solely from the efforts of

the promoter or third parties." *S.E.C. v. Aqua-Sonic Prods. Corp.*, 524 F. Supp. 866, 877 (S.D.N.Y.

1981).[6]  Only the third prong is seriously in dispute.  *See* Pls. Opp'n at 5–6.  Plaintiffs contend that

the Complaint "suggests that each of the investors' own efforts played a primary role in his or her

own anticipated success and profitability, and these allegations cut sharply against the conclusion

---

[5] As an initial matter, Plaintiffs argue that the Court may not resolve whether investments in EminiFX constitute investment contracts on a motion to dismiss.  Pls. Opp'n at 7.  As Defendants note, however, courts routinely consider, as a matter of law, whether RICO claims fall within the scope of the PSLRA's RICO Amendment on a motion to dismiss based solely on an examination of the facts alleged in a complaint, viewed in the light most favorable to plaintiffs.  Defs. Repl. at 4–5; *see, e.g.*, *Picard*, 907 F. Supp. 2d at 398.

[6] Whether the relationship between the sponsors of EminiFX and investors actually constitutes an "implied contract," Compl. ¶ 493, is immaterial to the "investment contract" analysis under *Howey*.  "[A] contract is not a prerequisite to an 'investment contract,'" and "[a] reading to the contrary would be in direct tension with *Howey*'s intentionally broad interpretation of 'investment contract' to encompass the sale and offer of securities in whatever form or manner they may take."  *S.E.C. v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 295 n.11 (S.D.N.Y. 2024); *see Howey*, 328 U.S. at 298–99.  As Judge Castel noted in *S.E.C. v. Telegram Group, Inc.*, "[c]ourts have found . . . schemes and contracts governing a range of intangible and tangible assets to be securities," including "whiskey casks" and "chinchillas."  448 F. Supp. 3d at 365 (collecting cases).

that the alleged scheme satisfies the 'profits from others' element of the *Howey* test." *Id.* (footnote omitted). Defendants respond that Plaintiffs "did not engage in any essential management efforts" and were merely "passive investors," satisfying this prong. Defs. Mot. at 4.

The Second Circuit has held that the word "solely" in the phrase "an expectation of profit to be derived solely from the profits of others" in the third prong of the *Howey* test should "not be construed as a literal limitation. Instead, a court should "consider whether, under all the circumstances, the scheme was being promoted primarily as an investment," rather than "a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008). The focus of the Second Circuit's analysis has therefore been to distinguish between schemes which "seek the passive investor," which constitute securities, and schemes in which "there is a reasonable expectation of significant investor control," which do not. *Id.*; *see S.E.C. v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 585 (2d Cir. 1982). Other Circuits have held—and courts in this District have agreed—that "the third prong of the *Howey* test is satisfied when the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354–55 (S.D.N.Y. 2019); *S.E.C. v. Glenn W. Turner Ents*, 474 F.2d 476, 482 (9th Cir. 1973), *cert. denied*, 414 U.S. 821 (1973) (same); *see, e.g.*, *Donovan v. GMO-Z.com Tr. Co.*, 779 F. Supp. 3d 372, 389 (S.D.N.Y. 2025) ("[T]he efforts of others must be the 'undeniably significant ones,' . . . [and] must involve exercising entrepreneurial or managerial control over the investment vehicle with an eye toward enhancing its value or generating return.").

As alleged by Plaintiffs, the EminiFX scheme combines elements of Ponzi schemes and other varieties of pyramid schemes, both of which have been found by courts, in circumstances

10

similar to those at hand, to constitute investment contracts under the *Howey* test.  In brief, the victims of the EminiFX scheme could earn money in two ways.  First, as in many Ponzi schemes, Defendants guaranteed a 5% weekly return, allegedly from investing in cryptocurrency, which was paid out to existing investors from money paid in by new investors.  Compl. ¶¶ 4, 493.  Second, as in many pyramid schemes, the investors received additional money by recruiting new victims; each investor was promised a percentage of the funds invested by new investors they recruited, as well as funds invested by "subsequent recruits in their downline."  Compl ¶ 70.

Plaintiffs argue that the money earned through an investor's "individualized efforts" to recruit new victims lead this scheme to fall outside of the third prong of the *Howey* test.  Pls. Opp'n at 6 & n.1.  The Court disagrees.  The Fifth, Eighth, Ninth and D.C. Circuits, applying a similarly broad understanding of *Howey*'s third prong as the Second Circuit, have held that investments in schemes in which an individual investor may increase their return by recruiting new investors may properly be considered investment contracts.  *See S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 485 (5th Cir. 1974); *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414, 418 (8th Cir. 1974); *Webster v. Omnitriton Int'l, Inc.*, 79 F.3d 776, 784 (9th Cir. 1996); *S.E.C. v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992).  Here, profits for EminiFX investors are expected to accrue "at least predominantly from the efforts of others, namely of the downline members" who contribute new money to the scheme, and from the Individual Defendants alleged to have "created, promote[d] and operate[d]" the EminiFX scheme.  *Int'l Loan Network*, 968 F.2d at 1308; *see also Webster* 79 F.3d at 784 ("By the very structure of a pyramid scheme, participants' efforts are focused not on selling products but on recruiting others to join the scheme . . . . [T]his is enough to bring investments in the program within the definition of 'investment contracts.'"); *Koscot Interplanetary*, 497 F.2d at 485 (finding a pyramid scheme, where individual investors sold

products and were compensated for recruiting new investors, to be an investment contract where the promoters of the scheme retained control over the essential managerial conduct of the enterprise, and because investor profits were tied to the success of that promotional scheme).

As alleged in the Complaint, EminiFX was undeniably promoted as an investment. *See, e.g.*, Compl. ¶ 437 ("Defendants . . . created and implemented the EminiFX Enterprise Ponzi Scheme to solicit investments in a cryptocurrency exchange platform by false and fraudulent pretenses and promises to current and prospective investors about, among other things, the manner in which their funds would be invested and the performance of their investments."). Furthermore, the Individual Defendants' efforts in structuring the operations of EminiFX and promoting its business were clearly the "significant," "essential managerial efforts which affect[ed] the failure and success of the enterprise." *ATBCOIN LLC*, 380 F. Supp. 3d at 355. They "launch[ed] a cryptocurrency platform," "coordinate[d] recruitment strategies and align[ed] on false messaging," "operated a website to disseminate false and materially misleading representations about . . . EminiFX," and "recruit[ed] members to attend weekly investor meetings." Compl. ¶¶ 52–66. As the Corporate Defendants note, when considering a similar pyramid scheme, the Ninth Circuit held that efforts by individual investors to "find prospects," "persuade them to attend" marking meetings, and potentially convince those prospects to buy into the pyramid scheme does not negate a finding that a transaction constitutes an investment contract under *Howey*. *Glenn W. Turner Ents.*, 474 F. 2d. at 480–82.

Plaintiffs do not allege that the Individual Defendants used EminiFX money to fraudulently trade in an underlying security, which would be sufficient to bar their RICO claims pursuant to the RICO Amendment. *Cf. MLSMK*, 651 F.3d at 277 (barring a RICO claim against sponsors of a Ponzi scheme because the sponsors fraudulently traded in an underlying security); *In re Platinum-*

*Beechwood Sec. Litig.*, 427 F. Supp. 3d at 460 & n.20 (similar).  Rather, the Court holds that, based on Plaintiffs' allegations, the implied contracts between investors in and promoters of EminiFX constitute securities, whose sale was procured through fraudulent misrepresentations.  This is also sufficient to trigger the RICO Amendment's bar.  *Cf. Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 595–96 (E.D. Mich. 2015) (analyzing whether agreements to participate in a pyramid scheme constituted investment contracts triggering the PSLRA's RICO Amendment); *Hunter Green Invs.*, 205 F. Supp. 2d at 248–250 (similar); *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 713–15 (N.D. Tex. 2018) (similar).

### C. The Conviction Exception to the RICO Amendment Does Not Apply

Finally, the Court notes that Plaintiffs' claims may not proceed under the so-called "conviction exception" to the RICO Amendment, which permits certain RICO claims sounding in securities fraud against defendants who have been convicted in connection with that fraud.

Section 1964(c) provides that "[t]he exception contained in the preceding sentence," which details the RICO Amendment, "does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final."  18 U.S.C. § 1964(c).  Section 1964(c)'s securities fraud bar thus contains a "conviction exception," permitting civil RICO claims predicated on securities fraud "against those who are 'criminally convicted in connection with' that fraud."  *Estate of Gottdiener v. Sater*, 35 F. Supp. 3d 386, 394 (S.D.N.Y. 2014).  Although Defendant Eddy Alexandre pled guilty to commodities fraud in connection with his role in the EminiFX scheme, *see* Compl. ¶ 2; *C.F.T.C. v. Alexandre*, 801 F. Supp. 3d 185, 194 (S.D.N.Y. 2025), Plaintiffs do not argue that a RICO claim against Alexandre or any other Defendant may proceed under this exception.  That may be because this "exception must be interpreted as narrowly

as possible;" courts in this district have held that this exception is "only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud." *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 104 F. Supp. 3d 384, 389 (S.D.N.Y. 2015).  In particular, courts have held that, to avail themselves of this exception, plaintiffs must be "specifically named in the plea allocution if there is one," if a defendant pled guilty to fraud, *id.*, or specifically named in a defendant's charging documents if he or she was convicted at trial.  *See Sater*, 35 F. Supp. 3d at 395 (declining to permit a RICO claim to proceed against defendants convicted of securities fraud where "their criminal Informations do not mention" the plaintiffs).  A line of cases in this District, therefore, "suggest[] that courts should avoid allowing" essentially "anyone who purchased shares during the relevant period to bring a substantive RICO claim" pursuant to the conviction exception. *Gruber v. Gilbertson*, 2019 WL 4458956, at *6 (S.D.N.Y. Sept. 17, 2019); *see also EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*, 2020 WL 2319127, at *8 (S.D.N.Y. May 11, 2020) (adopting *Kaplan*'s approach).

Because Plaintiffs do not allege that Alexandre or any other Defendant was "in fact found guilty of specifically defrauding them" or each of the putative class members, they may not avail themselves of the conviction exception.  *Kaplan*, 104 F. Supp. at 389.

Accordingly, the Court finds that investments in the EminiFX scheme constituted investment contracts, and that a RICO claim predicated on those investments is therefore barred. *Accord S.E.C. v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 429–30, 442, 450 (E.D.N.Y. 2016) (applying *International Loan Network* and *Omnitriton* to conclude that investments in a pyramid scheme, which provided "commissions" for recruiting new investors, constituted an investment contract).  The civil RICO claims in Counts 1–4 of the Complaint are, therefore, dismissed.

## II.    Personal Jurisdiction

As the Corporate Defendants note, Plaintiffs have only alleged personal jurisdiction over them pursuant to 18 U.S.C. § 1965(b), which confers nationwide personal jurisdiction in RICO cases.  Compl. ¶ 8; *see* Defs. Mot. at 1–2.  Because Plaintiffs' RICO claims have been dismissed, and the Complaint lacks any other allegations that a basis for personal jurisdiction exists over any Defendant beyond Section 1965(b), "personal jurisdiction over [all] defendants is, necessarily, lacking, and all claims against them must be dismissed."  *Cont'l Petrol. Corp. v. Corp. Funding Partners, LLC*, 2012 WL 1231775, at *8 (S.D.N.Y. Apr. 12, 2012); *see Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*, 331 F. Supp. 3d 130, 147 (S.D.N.Y. 2018) (similar).

## III.    Leave to Amend

Finally, Plaintiffs request leave to amend, Pls. Opp'n at 30, which the Corporate Defendants oppose.  Defs. Repl. at 14.  Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to amend a complaint "when justice so requires."  The Supreme Court has further instructed that it would be an abuse of discretion for a district court to deny leave to amend without some justification.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  One such justification is that amendment would be futile.  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Where the possibility exists," however, that defects in a complaint "can be cured, leave to amend at least once should normally be granted unless doing so would prejudice the defendant."  *Laborers Local 17 Health & Ben. Fund v. Phillip Morris, Inc.*, 26 F. Supp. 2d 593, 605 (S.D.N.Y. 1998); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015) (noting that plaintiffs should ordinarily be given leave to replead with "the benefit of a ruling" on a motion to dismiss).

Because the Corporate Defendants have not demonstrated that any amendment would be futile or prejudicial, the Court will grant Plaintiffs leave to amend, so long as they have a good-faith basis to do so.

**CONCLUSION**

Because Plaintiffs' RICO claims are founded on "predicate acts of securities fraud," they are not actionable under the RICO Amendment contained in the PSLRA. *MLSMK*, 651 F.3d at 277; 18 U.S.C. § 1964(c). Accordingly, the Court dismisses Counts 1–4. Furthermore, because Plaintiffs allege no alternative grounds for personal jurisdiction over any Defendant beyond Section 1965(b)'s conferral of nationwide personal jurisdiction in RICO cases, the remaining claims against all Defendants are dismissed. Plaintiffs shall have 30 days to file an Amended Complaint, to the extent they have a good-faith basis to do so. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 129.

SO ORDERED.

Dated:    March 12, 2026
          New York, New York

                                     Ronnie Abrams
                                     United States District Judge