**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

JACQUES CHELDER, WILLIAMS PETION, SMITH GANTHIER, ANGIE LAZARD, JEAN MARY JEAN MISERE, MARGARETTE DOMINIQUE, ERNST PAUL, PHUCIEN BAPTISTE, and GARRY SYLVAIN, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GENERAL CONFERENCE CORPORATION OF SEVENTH-DAY ADVENTISTS; NORTH AMERICAN DIVISION OF SEVENTH-DAY ADVENTISTS; NORTHEASTERN CONFERENCE OF SEVENTH-DAY ADVENTISTS; ALLEGHENY EAST CONFERENCE OF SEVENTH-DAY ADVENTISTS; FLORIDA CONFERENCE OF SEVENTH-DAY ADVENTISTS; SOUTHEASTERN CONFERENCE OF SEVENTH-DAY ADVENTISTS; TEXAS CONFERENCE OF SEVENTH-DAY ADVENTISTS; SOUTHERN NEW ENGLAND CONFERENCE OF SEVENTH-DAY ADVENTISTS; THEODORE NORMAN CLAIR WILSON; FRANTZ D'HAITI; YVELANDE D'HAITI; JOHN EDVARD MAISONNEUVE; SOPHIA MAISONNEUVE; SMITH OLIVIER; PHILIP MONPREMIER; WILLIAM JEAN CHARLES; CALERBE AGUY; ESTEB PIERRE; MOISE BERTRESSE; JEAN PARISIEN; JOSEPH DORIVAL; JEAN CLAUDE LOUIS JEUNE; FREDO IGNACE; CARL BEHRMANN; DONALD PAUL; VIRGO BELIZAIRE; LEE MAYORS MEZIL; WILNICK PRINCIVIL; RACHELLE O. PRINCIVIL; KELNY HYPOLITE; EMILE DUVIVIER; and CLARELLE DIEUVEUIL a/k/a MARIE DIEUVEUIL a/k/a CLARELLE ALEXANDRE,

Defendants.

---

**Case No. 1:25-cv-04313-RA-JW**

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

---

# FIRST AMENDED CLASS ACTION COMPLAINT

## PRELIMINARY STATEMENT

1. Plaintiffs bring this First Amended Class Action Complaint on behalf of over fifteen thousand investors in EminiFX, a Ponzi scheme operated by Eddy Alexandre that collapsed in May 2022 with losses exceeding two hundred million dollars. Alexandre's criminal conduct generated substantial proceeds — commission payments distributed to the Individual Defendants — that constituted criminally derived property within the meaning of 18 U.S.C. § 1957. Each Individual Defendant received those proceeds through monetary transactions via financial institutions, in amounts exceeding $10,000, knowing the funds derived from criminal activity. Each such transaction is a separate RICO predicate act.

2. This Amended Complaint is filed pursuant to the Court's March 12, 2026 Order (ECF 156) granting Plaintiffs leave to amend, and pursuant to a subsequent Court-approved extension. The federal claims in this Amended Complaint rest solely on 18 U.S.C. § 1957, which prohibits knowingly engaging in a monetary transaction in criminally derived property exceeding $10,000 through a financial institution. Section 1957 is an enumerated RICO predicate act under 18 U.S.C. § 1961(1)(B).

3. On February 12, 2023, Eddy Alexandre pled guilty to commodities fraud in violation of 7 U.S.C. § 9 and 18 U.S.C. § 1348. That conviction is a matter of public record and can be judicially noticed. Alexandre's conviction establishes that the commission proceeds he distributed

to the Individual Defendants constituted proceeds of 'specified unlawful activity' — specifically, commodities fraud — within the meaning of 18 U.S.C. § 1956(c)(7)(A) and § 1961(1)(D), and constituted 'criminally derived property' within the meaning of 18 U.S.C. § 1957(f)(2).

4. The predicate acts alleged in this Amended Complaint consist of monetary transactions involving criminally derived proceeds through financial institutions, including deposits, transfers, withdrawals, and asset purchases exceeding $10,000. Plaintiffs do not allege securities fraud as a RICO predicate offense. As the Second Circuit held in *D'Addario v. D'Addario*, 75 F.4th 86 (2d Cir. 2023), the PSLRA's RICO Amendment bars claims only where 'the actual purchase or sale of securities was fraudulent.' A bank deposit, wire transfer, or other monetary transaction involving commission proceeds is not a purchase or sale of securities and is not actionable as securities fraud.

5. Plaintiffs additionally assert state law claims for negligent supervision, unjust enrichment, conversion, civil conspiracy, and fraudulent transfer, which are unaffected by the PSLRA's RICO Amendment.

## NATURE OF THE ACTION

6. This class action arises from the EminiFX Ponzi scheme, which was operated by Eddy Alexandre from January 2020 through May 2022. Alexandre offered purported cryptocurrency trading services promising guaranteed returns of five percent (5%) per week, equivalent to approximately 242% per annum. No legitimate trading occurred. EminiFX was a Ponzi scheme. Between January 2020 and May 2022, the scheme collected over $300,000,000 from more than 62,000 investors, leaving losses exceeding $200,000,000.

7. As part of the EminiFX scheme, Alexandre paid ten percent (10%) commissions on invested funds to a network of approximately thirty individuals — the Individual Defendants — who were associated with Seventh-Day Adventist congregations. These commission payments

were funded entirely from investor principal, not from any legitimate investment activity. They were, from their inception, the proceeds of Alexandre's criminal commodities fraud.

8. Alexandre was arrested on May 22, 2022. He pled guilty to commodities fraud on February 12, 2023, and was subsequently convicted. That conviction establishes that every commission payment Alexandre made to the Individual Defendants constituted proceeds of specified unlawful activity.

9. Plaintiffs bring federal claims under the Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. §§ 1961-1968, predicated on the Individual Defendants' violations of 18 U.S.C. § 1957. Plaintiffs additionally assert state law claims for negligent supervision, unjust enrichment, conversion, civil conspiracy, and fraudulent transfer.

10. Plaintiffs seek compensatory damages, treble damages under RICO, disgorgement of all criminally derived proceeds received by the Defendants, injunctive relief, and all other relief the Court deems just and proper.

## JURISDICTION AND VENUE

11. This Court has original subject-matter jurisdiction over Plaintiffs' federal RICO claims pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

12. This Court has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal RICO claims.

13. This Court has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(b), which confers nationwide personal jurisdiction in civil RICO actions where the ends of justice require it. The EminiFX Commission Distribution Enterprise, described herein, conducted monetary transactions in criminally derived proceeds throughout the United States, utilizing the

national banking system. The ends of justice require nationwide jurisdiction so that all members of the Enterprise may be brought before a single tribunal.

14. In the alternative, this Court has specific personal jurisdiction over each Defendant based on that Defendant's own contacts with New York as follows: (a) Eddy Alexandre operated EminiFX — the criminal enterprise that generated the proceeds — from the Southern District of New York, and the commission proceeds distributed to the Individual Defendants originated from and passed through financial institutions in this District; (b) Defendant Dieuveuil resided in Nassau County, New York, and managed EminiFX's commission payment system from New York, with commission payments processed through New York-based accounts; (c) Defendant Olivier resided in the New York metropolitan area during the class period and conducted monetary transactions in criminally derived commission proceeds through financial institutions with New York nexus; (d) Defendant D'Haiti resided in North Babylon, New York, throughout the class period and conducted monetary transactions in criminally derived commission proceeds through New York financial institutions; (e) the criminally derived commission proceeds distributed to multiple Individual Defendants were wired from or through financial institutions operating in the Southern District of New York; and (f) each remaining Individual Defendant's § 1957 predicate acts are connected to the New York-based financial infrastructure through which Alexandre's commission payments were processed and distributed.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because a substantial part of the events giving rise to these claims occurred in this District, including Alexandre's operation of EminiFX, the processing and origination of commission payments, and Alexandre's arrest.

## THE PARTIES[1]

### A. The Plaintiffs

16. JACQUES CHELDER is a resident of Allentown, Pennsylvania, employed as a police detective. He is a member of the Seventh-Day Adventist Church. Between December 2021 and January 2022, Mr. Chelder invested $500,000 in the EminiFX scheme. Of the funds invested by Mr. Chelder and others in the EminiFX scheme, a portion was paid as commission proceeds to the Individual Defendants. Mr. Chelder suffered a total financial loss of $500,000.

17. WILLIAMS PETION is a resident of Allentown, Pennsylvania. He is a member of the Seventh-Day Adventist Church. In December 2021, Mr. Petion invested $150,000 in the EminiFX scheme. A substantial portion of the funds invested by Mr. Petion and others was paid as commission proceeds to the Individual Defendants. He suffered a total loss of $150,000.

18. SMITH GANTHIER is a resident of New York City and a member of the Seventh-Day Adventist Church. Mr. Ganthier invested approximately $100,000 in the EminiFX scheme between 2021 and 2022. A substantial portion of the funds he and others invested was paid as commission proceeds to the Individual Defendants. He suffered a total financial loss of approximately $100,000.

---

[1] Unless otherwise specifically identified, the allegations herein are based upon:

(a) publicly filed criminal and civil proceedings; (b) witness interviews; (c) investor communications; (d) communications among participants in the EminiFX network; (e) financial and transactional information available to Plaintiffs; (f) publicly available recordings, online broadcasts, and social media statements; (g) information obtained from investors associated with EminiFX; and (h) facts likely to have evidentiary support after a reasonable opportunity for discovery.

Plaintiffs further allege upon information and belief matters peculiarly within Defendants' knowledge, including the precise amounts, dates, and financial institution details associated with commission transactions.

19. ANGIE LAZARD is a resident of Houston, Texas, and a member of the Seventh-Day Adventist Church. In December 2021 and early 2022, she invested over $50,000 in the EminiFX scheme. A substantial portion of the funds she and others invested was paid as commission proceeds to the Individual Defendants. She suffered a total financial loss of over $50,000.

20. JEAN MARY JEAN MISERE is a resident of Pennsylvania and a member of the Seventh-Day Adventist Church. Between March and April 2022, Ms. Misere invested $45,000 in the EminiFX scheme — the entirety of her savings. A substantial portion of the funds she and others invested was paid as commission proceeds to the Individual Defendants. She suffered a total loss of $45,000.

21. MARGARETTE DOMINIQUE is a resident of Orlando, Florida, and a member of the Seventh-Day Adventist Church. Between December 2021 and January 2022, Ms. Dominique invested $25,000 — a significant portion of a settlement she had received following a debilitating injury — in the EminiFX scheme. A substantial portion of the funds she and others invested was paid as commission proceeds to the Individual Defendants. She suffered a total financial loss of $25,000.

22. ERNST PAUL is a resident of New York and a member of the Seventh-Day Adventist Church. Between 2021 and 2022, Mr. Paul invested over $100,000 in the EminiFX scheme. A substantial portion of those funds was paid as commission proceeds to the Individual Defendants. He suffered a total financial loss of over $100,000.

23. PHUCIEN JEAN BAPTISTE is a resident of Atlanta, Georgia, and a member of the Seventh-Day Adventist Church. Between 2021 and 2022, Mr. Baptiste invested $100,000 in the EminiFX scheme. A substantial portion of those funds was paid as commission proceeds to the Individual Defendants. He suffered a total financial loss of $100,000.

24. GARRY SYLVAIN is a resident of Long Island, New York, and an investor in EminiFX. He is named as a Plaintiff representing investors who participated in EminiFX through the Seventh-Day Adventist Church network.

**B. <u>Individual Defendants</u>**

25. FRANTZ D'HAITI is an individual residing in North Babylon, New York. During the class period, D'Haiti was an ordained pastor associated with the Northeastern Conference of Seventh-Day Adventists. He was associated with the Capernaum Seventh-Day Adventist Church at 190 Dodge Street, Rochester, New York 14606; the Mahanaim Seventh-Day Adventist Church at 277 Hempstead Turnpike, Elmont, New York 11003; and the Salem Seventh-Day Adventist Church, Dorchester Center, Massachusetts. During the class period, D'Haiti received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX representing proceeds of Alexandre's commodities fraud, and conducted monetary transactions in those proceeds through financial institutions in New York and elsewhere.

26. YVELANDE D'HAITI is an individual residing in North Babylon, New York. She is the spouse of Defendant Frantz D'Haiti. During the class period, Yvelande D'Haiti received compensation from EminiFX constituting proceeds of Alexandre's criminal scheme, and upon information and belief conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

27. JOHN EDVARD MAISONNEUVE is an individual residing in Howell, New Jersey. During the class period, Maisonneuve was an ordained pastor associated with the Allegheny East Conference of Seventh-Day Adventists, serving the Bethlehem French Adventist Church at 1240 Colton Street, Reading, Pennsylvania. Maisonneuve is a cousin of Eddy Alexandre. He received commission proceeds from Alexandre and/or EminiFX representing proceeds of Alexandre's

commodities fraud, and conducted monetary transactions in those proceeds through financial institutions in amounts far exceeding $10,000.

28. SOPHIA MAISONNEUVE is an individual residing in Howell, New Jersey. She is the spouse of Defendant John Edvard Maisonneuve. During the class period, Sophia Maisonneuve received compensation from EminiFX constituting proceeds of Alexandre's criminal scheme, and upon information and belief conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

29. SMITH OLIVIER is an individual residing in Maplewood, New Jersey. During the class period, Olivier was an ordained pastor associated with the Northeastern Conference of Seventh-Day Adventists, serving the Sinai Seventh-Day Adventist Church at 7 Johnson Street, Spring Valley, New York. Eddy Alexandre was a deacon at Olivier's Jamaica, New York church. Olivier received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX representing proceeds of Alexandre's commodities fraud, and conducted monetary transactions in those proceeds through financial institutions.

30. PHILIP MONPREMIER is an individual residing in Apopka, Florida. During the class period, Monpremier was an ordained pastor associated with the Florida Conference and Southeastern Conference of Seventh-Day Adventists, serving the Elim Haitian Seventh-Day Adventist Church in Naples, Florida. Monpremier is the cousin of Defendant Clarelle Dieuveuil, the spouse and Chief Financial Officer of Eddy Alexandre. Monpremier is a former president of the Florida and Southeastern Conferences. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX and conducted monetary transactions in those proceeds through financial institutions.

32. WILLIAM JEAN CHARLES is an individual residing in Richmond, Texas. During the class period, Jean Charles was an ordained pastor associated with the Texas Conference and Southeastern Conference of Seventh-Day Adventists, serving the Houston Haitian Bethany Seventh-Day Adventist Church in Houston, Texas. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX representing proceeds of Alexandre's commodities fraud, and conducted monetary transactions in those proceeds through financial institutions.

33. CALERBE AGUY is an individual residing in Leominster, Massachusetts. During the class period, Aguy was an ordained pastor associated with the Northeastern Conference, serving the Gethsemane Eglise Haitienne at 583 Main Street, Leominster, Massachusetts. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX representing proceeds of Alexandre's commodities fraud, and conducted monetary transactions in those proceeds through financial institutions.

34. ESTEB PIERRE is an individual residing in Aurora, Colorado. During the class period, Pierre was an ordained pastor associated with the Seventh-Day Adventist Church, serving the Agape Seventh-Day Adventist Church in Aurora, Colorado. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

35. MOISE BERTRESSE is an individual residing in Homestead, Florida. During the class period, Bertresse was an ordained pastor associated with the Florida Conference and Southeastern Conference, serving the Trinite French Seventh-Day Adventist Church at 890 SW 4th Street, Homestead, Florida. He received commission proceeds far exceeding $ 10,000 from

Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

36. JEAN PARISIEN is an individual residing in Cumberland, Rhode Island. During the class period, Parisien was an ordained pastor associated with the Northeastern Conference, serving the Shekinah Haitian Seventh-Day Adventist Church in New London, Connecticut. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

37. JOSEPH DORIVAL is an individual residing in Seaford, Delaware. During the class period, Dorival was an ordained pastor associated with the Northeastern Conference, serving Seventh-Day Adventist churches in Delaware and Maryland. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

38. JEAN CLAUDE LOUIS JEUNE is an individual residing in West Palm Beach, Florida. During the class period, Jeune was an ordained pastor associated with the Florida Conference and Southeastern Conference, serving the Jerusalem Haitian Seventh-Day Adventist Church at 229 N. 14th Street, Haines City, Florida. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

39. FREDO IGNACE is an individual residing in Worcester, Massachusetts. During the class period, Ignace was an ordained pastor associated with the Northeastern Conference, serving the Bethel Haitian Seventh-Day Adventist Church in Clinton, Massachusetts. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

40. CARL BEHRMANN is an individual residing in Lancaster, Massachusetts. During the class period, Behrmann was an ordained pastor associated with the Northeastern Conference, serving the Bethel Haitian Seventh-Day Adventist Church in Clinton, Massachusetts. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

41. DONALD PAUL is an individual residing in Longwood, Florida. During the class period, Paul was an ordained pastor associated with the Southeastern Conference, serving the Guilgal French Adventist Church in Orlando, Florida. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

42. VIRGO BELIZAIRE is an individual residing in Mandeville, Louisiana. During the class period, Belizaire was an ordained pastor serving the Eben-Ezer Seventh-Day Adventist Church of Greater New Orleans. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

43. LEE MAYORS MEZIL is an individual residing in Pennsylvania. During the class period, Mezil was an ordained pastor serving the Shekinah Seventh-Day Adventist Church in Reading, Pennsylvania. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX, and conducted monetary transactions in those proceeds through financial institutions.

44. WILNICK PRINCIVIL is an individual defendant. Upon information and belief, during the class period Princivil received compensation from Alexandre and/or EminiFX

constituting proceeds of Alexandre's criminal scheme, and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

45. RACHELLE O. PRINCIVIL is an individual defendant. Upon information and belief, during the class period Rachelle Princivil received compensation from EminiFX constituting proceeds of Alexandre's criminal scheme, and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

46. KELNY HYPOLITE is an individual residing in Naples, Florida. During the class period (commencing approximately January 10, 2021 through May 30, 2022), Hypolite was an ordained pastor associated with the Florida Conference and Southeastern Conference, serving the Mahanaim French Seventh-Day Adventist Church. He received commission proceeds far exceeding $ 10,000 from Alexandre and/or EminiFX representing proceeds of Alexandre's commodities fraud, and conducted monetary transactions in those proceeds through financial institutions.

47. EMILE DUVIVIER is an individual who resided in New Jersey during the class period. During the class period, Duvivier was an ordained pastor associated with the Allegheny East Conference of Seventh-Day Adventists, serving the Jerusalem French Adventist Church at 135 High Street, West Orange, New Jersey 07052. Duvivier held a supervisory position within the Allegheny East Conference and oversaw numerous other pastors. He received commission proceeds from Alexandre and/or EminiFX on a regular, periodic basis, and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

48. CLARELLE DIEUVEUIL, also known as MARIE DIEUVEUIL and CLARELLE ALEXANDRE, is an individual residing in Nassau County, New York. She is the spouse of Eddy Alexandre and served as the Chief Financial Officer of EminiFX, maintaining EminiFX's financial

books and records, managing the commission payment system, and controlling the distribution of criminally derived proceeds to the Individual Defendants. Upon information and belief, Dieuveuil herself received and transacted with substantial portions of EminiFX's criminally derived proceeds through financial institution accounts in Nassau County, New York, in amounts far exceeding $10,000.

**C. <u>Corporate Defendants — Including Vicarious Liability for Acts of Their Agents</u>**

49. GENERAL CONFERENCE CORPORATION OF SEVENTH-DAY ADVENTISTS ('GCC') is the governing entity of the Seventh-Day Adventist Church with its principal address in Silver Spring, Maryland. The GCC is the controlling organization over the North American Division, which in turn oversees the regional Conferences and the credentialed pastors under their supervision. The Individual Pastor Defendants were employed by, credentialed by, and subject to the supervisory authority of the GCC through its hierarchical structure.

50. NORTH AMERICAN DIVISION OF SEVENTH-DAY ADVENTISTS ('NAD') is the administrative arm of the Seventh-Day Adventist Church in North America, responsible for all credentialed pastors and church organizations located in North America. The NAD is controlled by and reports to the GCC.

51. NORTHEASTERN CONFERENCE OF SEVENTH-DAY ADVENTISTS is an affiliate of the GCC reporting to the NAD. During the class period, the Northeastern Conference employed, credentialed, and supervised Defendants D'Haiti, Olivier, Aguy, Parisien, Dorival, Ignace, Behrmann, and others. The Northeastern Conference had the authority and responsibility to supervise those pastor-agents, including the authority to revoke credentials and remove pastors from their positions.

52. ALLEGHENY EAST CONFERENCE OF SEVENTH-DAY ADVENTISTS is an affiliate of the GCC reporting to the NAD. The Allegheny East Conference employed, credentialed, and supervised Defendants Maisonneuve and Duvivier during the class period. The Allegheny East Conference had the authority and responsibility to supervise those pastor-agents and had received notice of issues concerning those pastors' conduct prior to the collapse of the EminiFX scheme.

53. FLORIDA CONFERENCE OF SEVENTH-DAY ADVENTISTS is an affiliate of the GCC reporting to the NAD. During the class period, the Florida Conference employed, credentialed, and supervised Defendants Monpremier, Bertresse, Jeune, Hypolite, and others named herein.

54. SOUTHEASTERN CONFERENCE OF SEVENTH-DAY ADVENTISTS is an affiliate of the GCC reporting to the NAD. During the class period, the Southeastern Conference employed, credentialed, and supervised Defendants Monpremier, Jean Charles, Bertresse, Jeune, Hypolite, Paul, and others named herein.

55. TEXAS CONFERENCE OF SEVENTH-DAY ADVENTISTS is an affiliate of the GCC reporting to the NAD. During the class period, the Texas Conference employed, credentialed, and supervised Defendant Jean Charles.

56. SOUTHERN NEW ENGLAND CONFERENCE OF SEVENTH-DAY ADVENTISTS is an affiliate of the GCC reporting to the NAD. During the class period, this Defendant employed, credentialed, and supervised pastors in its jurisdiction who participated in the EminiFX scheme.

57. THEODORE NORMAN CLAIR WILSON is the Chief Executive Officer ('CEO') and President of the Seventh-Day Adventist Church worldwide. As the senior executive of the GCC,

Wilson had supervisory authority over the NAD, the regional Conferences, and all credentialed pastors in the SDA Church hierarchy. During the class period, Wilson and the GCC had actual or constructive knowledge that EminiFX commission proceeds were being received and transacted by SDA pastors under the GCC's supervisory authority, and failed to take effective remedial action.

## D. Non-Defendant Parties — Eddy Alexandre and EminiFX LLC

NOTICE OF NON-DEFENDANT STATUS: Eddy Alexandre was the founder and operator of EminiFX. He was arrested on May 22, 2022, pled guilty to commodities fraud in violation of 7 U.S.C. § 9 and 18 U.S.C. § 1348 on February 12, 2023, and was subsequently convicted. EminiFX LLC was the instrumentality through which Alexandre operated the scheme. Neither Alexandre nor EminiFX LLC is named as a defendant in this action. The Receiver appointed in CFTC v. Alexandre et al., No. 22-cv-3822 (VEC) (S.D.N.Y.), obtained a federal court order precluding parallel civil litigation against Alexandre and EminiFX LLC individually. Alexandre's criminal conviction and EminiFX's fraudulent operation are established adjudicative facts that constitute the 'specified unlawful activity' anchoring Plaintiffs' § 1957 RICO claims.

## E. Corporate Defendants' Agency Relationships and Vicarious RICO Liability

58. The Individual Pastor Defendants were, at all relevant times, ordained ministers, pastors, officers, and/or credentialed agents of the Corporate Defendants. They were employed by, credentialed by, supervised by, compensated by, and subject to discipline and removal by the Corporate Defendant that oversaw their respective assignments. The institutional authority associated with each pastor's pastoral office derived from credentials issued by, and recognized by, the Corporate Defendants.

59. The Individual Pastor Defendants acted within the scope of their employment and pastoral agency when they received commission proceeds from Alexandre and/or EminiFX into personal, business, or church-affiliated financial accounts, and when they conducted subsequent monetary transactions in those proceeds through financial institutions. The receipt and management of financial compensation associated with their pastoral work was conduct within the scope of their pastoral employment and agency.

60. Under the doctrine of respondeat superior, the Corporate Defendants are vicariously liable for each Individual Pastor Defendant-agent's violations of 18 U.S.C. § 1957, which were committed while those agents were acting within the scope of their pastoral employment. The attribution of an agent's criminal knowledge and financial conduct to the corporate principal, when the agent acts within the scope of authority, is a settled principle of both federal common law and New York corporate law.

61. Upon information and belief, certain Corporate Defendants — including Defendant Wilson as CEO — knowingly facilitated, tolerated, ratified, or materially benefited from the continued receipt and transacting of commission proceeds by credentialed pastor-agents despite actual or constructive notice regarding the nature of the EminiFX scheme.

62. Upon information and belief, the Corporate Defendants also received monetary transactions in criminally derived property in their own institutional capacity. Upon information and belief, Individual Defendants who received commission proceeds from EminiFX used portions of those proceeds to make contributions to the church entities that employed them, including deposits into the Corporate Defendants' institutional bank accounts at financial institutions. Each such transfer of criminally derived commission proceeds into a Corporate Defendant's institutional account in an amount exceeding $10,000, where institutional officers knew or were willfully blind

to the criminal origin of those funds, constitutes a separate § 1957 predicate act directly attributable to the respective Corporate Defendant.

63. The Corporate Defendants' RICO liability is established through: (i) attribution to each Corporate Defendant of the knowledge and financial conduct of its employed pastor-agents acting within the scope of their authority; (ii) GCC's direct liability through the acts and knowledge of its CEO, Defendant Theodore Norman Clair Wilson; (iii) each regional Conference's direct liability through the acts of the pastor-agents under its supervisory authority; and (iv) each Corporate Defendant's institutional receipt of criminally derived proceeds as alleged in Paragraph 62.

## BACKGROUND: ALEXANDRE'S CRIMINAL CONVICTION AND THE SOURCE OF CRIMINAL PROCEEDS

### A. Alexandre's Criminal Conviction — The 'Specified Unlawful Activity'

64. On May 22, 2022, Eddy Alexandre was arrested by the FBI in the Southern District of New York in connection with the EminiFX scheme. On February 12, 2023, Alexandre pled guilty to commodities fraud in violation of 7 U.S.C. § 9 and 18 U.S.C. § 1348. Alexandre's conviction is a matter of public record and is entitled to judicial notice.

65. Alexandre's conviction for commodities fraud establishes that the EminiFX scheme constituted 'specified unlawful activity' within the meaning of 18 U.S.C. § 1956(c)(7)(A), which incorporates § 1961(1)(D). All commission proceeds paid by Alexandre and EminiFX to the Individual Defendants were therefore 'proceeds of specified unlawful activity' within the meaning of § 1956 and § 1957.

66. The proceeds of Alexandre's criminal scheme — including the commissions distributed to the Individual Defendants — constitute 'criminally derived property' within the meaning of 18 U.S.C. § 1957(f)(2): property that 'is derived from proceeds obtained from a criminal offense.' Any monetary transaction by the Individual Defendants involving such

proceeds, exceeding $10,000 in value, through or by means of a financial institution, constitutes a violation of 18 U.S.C. § 1957.

### B. The EminiFX Ponzi Scheme — Established Factual Background

67. The following factual allegations are set forth as background context establishing the nature of the criminal scheme that generated the commission proceeds the Individual Defendants received. These allegations establish: (a) that the EminiFX scheme constituted the specified unlawful activity from which the proceeds derived; and (b) that the Individual Defendants had knowledge that those proceeds were criminally derived. Plaintiffs do not allege in this Amended Complaint that the Individual Defendants committed fraud in the purchase or sale of securities as a RICO predicate act.

68. In January 2020, Eddy Alexandre established EminiFX, purporting to offer a cryptocurrency trading platform. EminiFX was not a legitimate investment platform. It was a Ponzi scheme. Alexandre used investor contributions to pay purported 'returns' to earlier participants, retained substantial sums for himself and his associates, and paid ten percent (10%) of every dollar invested as commission proceeds to the Individual Defendants.

69. Between January 2020 and May 2022, the EminiFX scheme collected over $300,000,000 from more than 62,000 investor accounts. The scheme left investors — including the named Plaintiffs — with total losses exceeding $200,000,000.

70. The scheme was structured so that the Individual Defendants received ten percent (10%) of every dollar placed into EminiFX by persons associated with them. These commission payments were funded entirely from investor principal — not from any legitimate investment activity or trading profits. They were, in their entirety, proceeds of Alexandre's criminal scheme.

### C. The Commission Payment Structure — Origin of the Criminally Derived Property

71. Each Individual Defendant received ongoing commission payments directly from Eddy Alexandre and/or EminiFX equal to ten percent (10%) of funds deposited into EminiFX accounts associated with them. Given the scale of the scheme, the commissions paid to the Individual Defendants were substantial — ranging from tens of thousands to millions of dollars per person.

72. These commission payments were funded entirely from investor contributions. They were not generated by any legitimate trading, investment, or business activity. They were, in the language of § 1957, 'criminally derived property' — 'property that is derived from proceeds obtained from a criminal offense.' 18 U.S.C. § 1957(f)(2).

73. Alexandre paid commissions to the Individual Defendants on a periodic basis — typically weekly — by wire transfer, electronic funds transfer, or direct deposit into the Individual Defendants' personal, business, or other bank accounts. Each commission payment constituted an initial receipt of 'criminally derived property.' Each subsequent deposit, transfer, or other financial institution transaction involving those proceeds constituted an additional monetary transaction in criminally derived property within the meaning of § 1957.

74. In addition to periodic cash commission payments, some Individual Defendants received non-cash assets funded from scheme proceeds, including vehicles and other personal property. The acquisition of any such asset through a monetary transaction funded by criminally derived proceeds, in an amount exceeding $10,000, through a financial institution, constitutes an additional § 1957 predicate act.

## THE EMINIFX COMMISSION DISTRIBUTION ENTERPRISE

75. The RICO enterprise at issue in this Amended Complaint is the 'EminiFX Commission Distribution Enterprise' — the association-in-fact of Eddy Alexandre, EminiFX, Clarelle

Dieuveuil, and the Individual Defendants, formed for the purpose of receiving, distributing, managing, and transacting in the commission proceeds of Alexandre's criminal scheme.

76. The EminiFX Commission Distribution Enterprise is architecturally distinct from and separate from any investor-facing activities of the EminiFX operation. The Commission Distribution Enterprise is defined by the financial back-end of the arrangement: the flow of criminally derived proceeds from Alexandre to the Individual Defendants, and each Individual Defendant's subsequent monetary transactions with those proceeds through the banking system. The Enterprise's racketeering activity — § 1957 monetary transactions — occurs after the criminal proceeds are generated, and independently of any conduct directed toward investors.

77. The EminiFX Commission Distribution Enterprise has the following structure and characteristics:

**(a)** Eddy Alexandre and Clarelle Dieuveuil served as the source and conduit of commission proceeds. Dieuveuil, as EminiFX's CFO, maintained the financial records of the scheme, calculated commission amounts owed to each Individual Defendant, and directed payment of those commissions from EminiFX's accounts.

**(b)** Each Individual Defendant served as a recipient and deployer of commission proceeds. Each received ongoing, periodic commission payments from Alexandre and EminiFX, conducted monetary transactions in those proceeds through financial institutions, and used the proceeds for personal enrichment.

**(c)** The Commission Distribution Enterprise operated continuously from January 2020 through at least May 2022, and continued post-arrest as the Individual Defendants retained, managed, and continued to transact with criminally derived proceeds already received.

**(d)** The Commission Distribution Enterprise operated across multiple states and utilized the United States banking system to transmit, deposit, and transact criminally derived commission proceeds.

78. Each Individual Defendant is associated with the Commission Distribution Enterprise by virtue of recurring receipt of commission proceeds and knowing monetary transactions in those proceeds. Each Individual Defendant conducted or participated in the conduct of the Commission Distribution Enterprise through a pattern of racketeering activity consisting of violations of 18 U.S.C. § 1957.

79. Each § 1957 monetary transaction — each deposit, wire transfer, asset acquisition, or other financial institution transaction involving commission proceeds exceeding $10,000 — constitutes a separate RICO predicate act under 18 U.S.C. §§ 1957 and 1961(1)(B).

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE THAT COMMISSION PROCEEDS WERE CRIMINALLY DERIVED

80. Section 1957 requires only that the defendant knowingly engage in a monetary transaction in criminally derived property, knowing that the property constitutes the proceeds of some form of criminal activity.

81. Each Individual Defendant knew, or was willfully blind to the fact, that the commission proceeds received from Alexandre and EminiFX were derived from criminal activity. That knowledge is established by the following circumstances, each of which was within each Individual Defendant's actual awareness:

**Factor 1 — Structurally Impossible Investment Returns:** The EminiFX scheme promised a guaranteed five percent (5%) return per week — approximately 242% annually. No legitimate investment operation can guarantee such returns. Any person in receipt of ten percent

(10%) commission payments on funds deposited into a platform promising 242% guaranteed annual returns necessarily knew, or recklessly disregarded, that the source of those commission payments was not a legitimate investment operation but rather a criminal scheme. The structurally impossible return promise makes the criminal character of the proceeds objectively apparent to any recipient of commission payments derived from them.

**Factor 2 — Pyramid Commission Payment Structure:** The Individual Defendants were paid ten percent (10%) of every dollar deposited into EminiFX accounts associated with them. This commission structure — paying a flat percentage of investor principal as a recurring fee to a referring party — does not exist in any legitimate, registered investment vehicle. Any person familiar with this payment structure, as each Individual Defendant was, would recognize it as characteristic of a pyramid scheme or other criminal enterprise, and would know that the proceeds of such a structure were criminally derived.

**Factor 3 — Knowledge of Financial Mechanics Through Direct Access to Commission Records:** The Individual Defendants had direct access to information about the commission payment structure, commission amounts, payment schedules, and the financial mechanics through which their compensation was calculated and distributed. This insider financial knowledge — unavailable to ordinary investors — gave each Individual Defendant concrete knowledge of how the proceeds were generated and the criminal character of their source.

**Factor 4 — Personal Receipt of Commission Proceeds Alongside Knowledge of Scheme Instability:** By early 2022, public warning signs had emerged that EminiFX was unable to process withdrawals on request and was facing liquidity difficulties. Despite these publicly available warning signs, the Individual Defendants continued to receive and transact with commission proceeds. Commission proceeds received after public warning signs had emerged

were received with actual or constructive knowledge that those proceeds derived from a criminal scheme.

**Factor 5 — Alexandre's Arrest and Conviction:** Alexandre was publicly arrested on May 22, 2022, and pled guilty to fraud on February 12, 2023. Any Individual Defendant who continued to hold, manage, or transact with retained commission proceeds after Alexandre's public arrest did so with certain knowledge that the source of those funds was criminal activity. Each post-arrest transaction in retained commission proceeds constitutes a § 1957 violation committed with actual knowledge of criminal origin.

82. Each Individual Defendant who received and conducted monetary transactions in commission proceeds did so knowing, within the meaning of § 1957, that the commission proceeds constituted criminally derived property. The combination of an objectively impossible return structure, a pyramid commission payment mechanism, direct access to the financial mechanics of the scheme, warning signs of the scheme's insolvency, and ultimately Alexandre's public arrest and conviction, establishes for pleading purposes each Individual Defendant's knowledge of criminal origin.

## DEFENDANT-SPECIFIC SECTION 1957 PREDICATE ACT ALLEGATIONS

### A. Defendant John Edvard Maisonneuve

83. Defendant John Edvard Maisonneuve is a cousin of Eddy Alexandre and was among the earliest and most extensively compensated participants in the EminiFX commission payment system. Maisonneuve had a direct familial relationship with Eddie Alexandre that provided him specific knowledge of the financial mechanics, commission structure, and criminal character of the EminiFX scheme from its inception.

84. Between January 2020 and June 2022, Maisonneuve received from Alexandre and/or EminiFX no fewer than twenty-four (24) periodic commission payment installments representing proceeds of Alexandre's commodities fraud. Upon information and belief, Maisonneuve personally received millions of dollars in total commission proceeds. Upon information and belief, multiple individual commission payments and each subsequent deposit or transaction of those proceeds through financial institutions exceeded $10,000.

85. On each occasion that Maisonneuve received commission proceeds, he knowingly engaged in monetary transactions in that criminally derived property through financial institutions, including but not limited to: (a) deposits of commission proceeds into personal or business bank accounts maintained at financial institutions; (b) wire transfers or electronic transfers of commission proceeds; and (c) acquisition of personal property — including at minimum a new Mercedes-Benz vehicle — funded by commission proceeds in transactions through financial institutions. Each such deposit, transfer, financing transaction, withdrawal, or asset acquisition constituted a separate monetary transaction in criminally derived property within the meaning of 18 U.S.C. § 1957.

86. Maisonneuve conducted each of these § 1957 predicate acts with knowledge of criminal origin. His familial relationship with Alexandre, his direct knowledge of the commission payment structure from inception, and his receipt and transacting of commission proceeds over an extended period through the financial institution system — with each periodic receipt constituting a further transaction in proceeds he knew to be criminal — establishes the requisite knowledge for each predicate act. Additionally, Maisonneuve conducted recurring financial institution transactions in commission proceeds at regular weekly intervals between November 10, 2021, and May 22, 2022.

87. Maisonneuve's § 1957 predicate acts span from approximately January 2020 through at least June 2022 and continue as he retains and manages criminally derived commission proceeds already received. Each such predicate act was committed in furtherance of, and as part of the conduct of, the EminiFX Commission Distribution Enterprise.

**B. <u>Defendant Frantz D'Haiti</u>**

88. Defendant Frantz D'Haiti received commission proceeds from Alexandre and/or EminiFX over an extended period during the class period. D'Haiti was among the most senior members of the EminiFX commission payment network in terms of the volume of investor accounts associated with his name in the EminiFX system — upon information and belief, over one thousand accounts. Upon information and belief, the commission proceeds attributable to those accounts, at the ten percent (10%) commission rate, substantially exceeded $10,000 in individual payment installments.

89. Between January 2020 and May 2022, D'Haiti received from Alexandre and/or EminiFX commission payments representing proceeds of Alexandre's commodities fraud. Upon information and belief, D'Haiti personally received tens of thousands of dollars in total commission proceeds. On each occasion that D'Haiti received commission proceeds, he knowingly engaged in monetary transactions in that criminally derived property through financial institutions — including depositing those proceeds into personal, business, or other bank accounts — in individual transactions exceeding $10,000. Each such transaction constitutes a separate predicate act under 18 U.S.C. § 1957.

90. D'Haiti's knowledge of criminal origin is established by the factors described in Paragraphs 80-82 above, and additionally by his familial or close personal relationship with other participants in the Commission Distribution Enterprise, his direct access to information about the

commission payment structure and amounts, and his residence in New York — where Alexandre operated EminiFX — which gave him proximity to information about the scheme's criminal character.

## C. **Defendant Philip Monpremier**

91. Defendant Philip Monpremier is a former president of the Florida and Southeastern Conferences of the Seventh-Day Adventist Church and the cousin of Defendant, Clarelle Dieuveuil, EminiFX's CFO. Monpremier's familial relationship with EminiFX's CFO gave him specific insider knowledge of the commission payment structure, commission amounts, and the financial mechanics of how commission proceeds were generated and distributed.

92. Between January 2020 and May 2022, Monpremier received from Alexandre and/or EminiFX commission payments representing ten percent (10%) of funds deposited into accounts associated with him, constituting proceeds of Alexandre's commodities fraud. Upon information and belief, Monpremier personally received hundreds of thousands of dollars in commission proceeds. Upon information and belief, multiple individual commission payments received by Monpremier, and each subsequent deposit or transaction of those proceeds through financial institutions, exceeded $10,000.

93. On each occasion that Monpremier received commission proceeds, he knowingly engaged in monetary transactions in that criminally derived property through financial institutions, including depositing those proceeds into personal or business bank accounts. Each such transaction exceeded $10,000 and constitutes a separate predicate act under 18 U.S.C. § 1957.

94. Monpremier's knowledge of criminal origin is established by the factors in Paragraphs 80-82, and additionally by his familial relationship with EminiFX's CFO — which gave him direct

knowledge of the financial mechanics of the commission payment system — and by his receipt and transacting of commission proceeds over an extended period through the banking system.

### D. Defendant William Jean Charles

95. Defendant William Jean Charles had direct personal involvement providing substantial knowledge that the commission proceeds he received were criminally derived: he personally participated in the design of the EminiFX platform's computer interface to display fictitious daily returns, and therefore knew from the inception of the scheme that no legitimate investment activity was occurring and that all proceeds derived from fraudulent collection of investor funds.

96. Between January 2020 and June 2022, Jean Charles received from Alexandre and/or EminiFX commission payments representing proceeds of Alexandre's commodities fraud. Jean Charles personally received hundreds of thousands of dollars in commission proceeds. Upon information and belief, multiple individual commission payments received by Jean Charles, and each subsequent deposit or transaction of those proceeds through financial institutions, exceeded $10,000.

97. On each occasion that Jean Charles received commission proceeds, he knowingly engaged in monetary transactions in that criminally derived property through financial institutions. Each such transaction exceeded $10,000 and constitutes a separate predicate act under 18 U.S.C. § 1957. Jean Charles collected at least one certified check in an amount of $25,000 from an investor on or about December 21, 2021, and at least $50,000 from another investor, which amounts were subsequently transmitted through the EminiFX commission system and resulted in commission proceeds to Jean Charles — each a § 1957 transaction in criminally derived property.

### E. Defendant Emile Duvivier

98. Defendant Emile Duvivier held a supervisory position within the Allegheny East Conference during the class period, with authority over numerous other pastors in that Conference. Duvivier was a member of a group of approximately thirty commission-receiving pastors who met directly with Alexandre on a recurring basis — meetings at which, upon information and belief, the commission payment structure, commission amounts, and financial mechanics of the commission payment system were reviewed and discussed.

99. Between January 2020 and May 2022, Duvivier received commission proceeds from Alexandre and/or EminiFX on a periodic basis — upon information and belief, at regular weekly intervals. Upon information and belief, Duvivier personally received hundreds of thousands of dollars in commission proceeds. Upon information and belief, each individual commission payment received by Duvivier through financial institutions exceeded $10,000.

100. On each occasion that Duvivier received commission proceeds, he knowingly engaged in monetary transactions in that criminally derived property through financial institutions — including regular deposits into personal or business bank accounts. Each such transaction exceeded $10,000 and constitutes a separate predicate act under 18 U.S.C. § 1957.

101. Duvivier's knowledge of criminal origin is established by the factors in Paragraphs 80-82, and additionally by his membership in the group of approximately thirty commission-receiving participants who had direct, recurring access to financial information about the commission payment structure, and by his supervisory role that gave him organizational knowledge of how commission proceeds were generated and distributed across the network.

**F. <u>Defendant Smith Olivier</u>**

102. Defendant Smith Olivier had direct personal familiarity with Eddy Alexandre, who served as a deacon at Olivier's Jamaica, New York church. This direct personal relationship gave

Olivier specific knowledge of Alexandre's background and, upon information and belief, the criminal character of the proceeds Alexandre was distributing.

103. Between January 2020 and May 2022, Olivier received from Alexandre and/or EminiFX commission payments representing proceeds of Alexandre's commodities fraud. Upon information and belief, multiple individual commission payments received by Olivier, and each subsequent deposit or transaction of those proceeds through financial institutions, exceeded $10,000. On each occasion that Olivier received commission proceeds, he knowingly engaged in monetary transactions in that criminally derived property through financial institutions. Each such transaction exceeding $10,000 constitutes a separate predicate act under 18 U.S.C. § 1957.

**G. Defendants Calerbe Aguy, Esteb Pierre, Moise Bertresse, Jean Parisien, Joseph Dorival, Jean Claude Louis Jeune, Fredo Ignace, Carl Behrmann, Donald Paul, Virgo Belizaire, Lee Mayors Mezil, Kelny Hypolite, Wilnick Princivil, Rachelle O. Princivil, Yvelande D'Haiti, and Sophia Maisonneuve**

104. Each of the remaining Individual Defendants named in this Section received commission proceeds from Alexandre and/or EminiFX representing proceeds of Alexandre's commodities fraud. Upon information and belief, each such Defendant received periodic commission payments in amounts that, individually or in aggregate through financial institution transactions, exceeded $10,000. The following allegations apply to each such Defendant:

105. CALERBE AGUY: Between January 2020 and May 2022, Aguy was associated with the EminiFX commission payment system. Upon information and belief, Aguy received commission proceeds from Alexandre and/or EminiFX and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000, knowing the proceeds were criminally derived as established by the factors in Paragraphs 80-82.

106. ESTEB PIERRE: Between January 2020 and May 2022, Pierre was associated with the EminiFX commission payment system. Upon information and belief, Pierre received commission proceeds from Alexandre and/or EminiFX and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000. This strongly supports the inference that he knew or was willfully blind to the criminal origin of the proceeds.

107. MOISE BERTRESSE: Between January 2020 and May 2022, Bertresse was associated with the EminiFX commission payment system under the supervision of the Florida Conference and Southeastern Conference. Upon information and belief, Bertresse received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

108. JEAN PARISIEN: Between November 2021 and May 2022, Parisien was associated with the EminiFX commission payment system. Upon information and belief, Parisien received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

109. JOSEPH DORIVAL: Between January 2020 and May 2022, Dorival was associated with the EminiFX commission payment system. Upon information and belief, Dorival received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

110. JEAN CLAUDE LOUIS JEUNE: Between January 2020 and May 2022, Jeune was associated with the EminiFX commission payment system. Upon information and belief, Jeune received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

111. FREDO IGNACE: Between January 2020 and May 2022, Ignace was associated with the EminiFX commission payment system. Upon information and belief, Ignace received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

112. CARL BEHRMANN: Between January 2020 and May 2022, Behrmann was associated with the EminiFX commission payment system. Upon information and belief, Behrmann received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

113. DONALD PAUL: Between January 2020 and May 2022, Paul was associated with the EminiFX commission payment system. Upon information and belief, Paul received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

114. VIRGO BELIZAIRE: During the class period, Belizaire was associated with the EminiFX commission payment system. Upon information and belief, Belizaire received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

115. LEE MAYORS MEZIL: Between January 2020 and May 2022, Mezil was associated with the EminiFX commission payment system. Upon information and belief, Mezil received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

116. KELNY HYPOLITE: Between approximately January 10, 2021, and May 30, 2022, Hypolite was associated with the EminiFX commission payment system. Upon information and

belief, Hypolite received commission proceeds and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

117. WILNICK PRINCIVIL and RACHELLE O. PRINCIVIL: Upon information and belief, both defendants received compensation from Alexandre and/or EminiFX constituting proceeds of Alexandre's criminal scheme, and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

118. YVELANDE D'HAITI: Upon information and belief, Yvelande D'Haiti received or shared in commission proceeds from Alexandre and/or EminiFX and conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

119. SOPHIA MAISONNEUVE: Sophia Maisonneuve received compensation from EminiFX representing proceeds of Alexandre's criminal scheme. Upon information and belief, she conducted monetary transactions in those proceeds through financial institutions in amounts exceeding $10,000.

121. CLARELLE DIEUVEUIL: As the CFO of EminiFX who managed the commission payment system, Dieuveuil controlled the distribution of all commission proceeds to the Individual Defendants. Upon information and belief, Dieuveuil herself received and transacted with substantial portions of EminiFX's criminally derived proceeds through financial institution accounts in Nassau County, New York, in amounts far exceeding $10,000, each constituting a separate § 1957 predicate act.

## CLASS ACTION ALLEGATIONS

122. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). The proposed class (the 'Class')

is defined as: All persons who invested funds in EminiFX during the period from January 1, 2020, through May 22, 2022, and who suffered financial losses as a result thereof.

123. The proposed Subclass consists of: All Class members who were members of the Seventh-Day Adventist Church at the time of their investment.

124. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of over fifteen thousand (15,000) individuals who collectively lost over two hundred million dollars ($200,000,000) in the EminiFX scheme.

125. Questions of law and fact common to the Class include: (a) whether the Individual Defendants received commission proceeds from Alexandre and/or EminiFX representing proceeds of Alexandre's criminal scheme; (b) whether such commission proceeds constitute 'criminally derived property' within the meaning of 18 U.S.C. § 1957; (c) whether the Individual Defendants conducted monetary transactions in such proceeds through financial institutions in amounts exceeding $10,000; (d) whether the Individual Defendants knew that the proceeds were criminally derived; (e) whether the Corporate Defendants breached their supervisory duties to the Class; and (f) the appropriate measure of damages.

126. Plaintiffs' claims are typical of the claims of the Class. Each Plaintiff invested funds in EminiFX and suffered losses as a direct result of the Ponzi scheme, with those losses traceable to commission proceeds diverted to the Individual Defendants.

127. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained competent counsel experienced in complex class action and RICO litigation. Plaintiffs have no interests antagonistic to those of the Class.

128. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class members, while

individually significant, may not justify the expense of separate litigation. Common questions of law and fact predominate over questions affecting only individual members.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF 18 U.S.C. § 1962(c)

**(Pattern of Racketeering Activity — 18 U.S.C. § 1957 Predicate Acts)**
**(Against All Individual Defendants and All Corporate Defendants)**

129. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

130. At all relevant times, the EminiFX Commission Distribution Enterprise, as described in Paragraphs 75-79, constituted an 'enterprise' within the meaning of 18 U.S.C. § 1961(4) — an association-in-fact of individuals and entities associated for the common purpose of receiving, managing, and transacting in the commission proceeds of Eddy Alexandre's criminal scheme. The Enterprise engaged in, and its activities affected, interstate commerce.

131. Each Individual Defendant was associated with the EminiFX Commission Distribution Enterprise and conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described herein. Each Corporate Defendant also conducted or participated in the conduct of the Enterprise's affairs, both vicariously through the § 1957 predicate acts of their employed and credentialed pastor-agents acting within the scope of their employment (as alleged in Paragraphs 58-63), and directly through the institutional facilitation of the Individual Defendants' continued receipt and transacting of criminally derived proceeds.

132. Each Individual Defendant engaged in a 'pattern of racketeering activity' within the meaning of 18 U.S.C. § 1961(5), consisting of two or more acts of racketeering activity within a ten-year period. The predicate acts are each Individual Defendant's violations of 18 U.S.C. § 1957,

as specifically alleged in Paragraphs 83-121 above. The pattern of each Individual Defendant is attributed to the Corporate Defendant that employed him or her as a pastoral agent.

133. Each § 1957 violation satisfies all five elements of that statute: (1) the defendant knowingly engaged in a monetary transaction; (2) the transaction involved property derived from proceeds of criminal activity; (3) the value exceeded $10,000; (4) the property was derived from specified unlawful activity — commodities fraud established by Alexandre's conviction under 7 U.S.C. § 9 and 18 U.S.C. § 1348, which is specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) and § 1961(1)(D); and (5) the transaction took place in the United States.

134. The predicate acts satisfy both relatedness and continuity. They are related: same participants, same method (monetary transactions in criminally derived commission proceeds through financial institutions), same victim class (investors whose funds generated the proceeds), same enterprise. They satisfy continuity: spanning January 2020 through at least May 2022 — over two years — constituting closed-ended continuity. Open-ended continuity is also present: many Individual Defendants continue to hold and manage retained criminally derived proceeds, constituting an ongoing threat of continued racketeering activity.

135. The PSLRA's RICO Amendment, 18 U.S.C. § 1964(c), does not bar Plaintiffs' claims. Under *D'Addario v. D'Addario,* 75 F.4th 86 (2d Cir. 2023), the Amendment bars claims only where 'the actual purchase or sale of securities was fraudulent.' The § 1957 predicate acts alleged herein are monetary transactions — receipts, deposits, wire transfers, and asset acquisitions involving commission proceeds — none of which constitute a purchase or sale of securities. None of these transactions are actionable under the federal securities laws. They occur after the criminal proceeds are generated by Alexandre's fraud and are wholly independent of any securities transaction. The Individual Defendants' § 1957 violations are self-contained financial crimes:

receiving money known to be criminal and transacting with it through the banking system. These acts have no necessary connection to any purchase or sale of securities and do not require proof of any misrepresentation or fraudulent inducement.

136. The Commission Distribution Enterprise is distinct from and independent of the investor-facing aspects of EminiFX's operation. The § 1957 predicate acts that define the Enterprise's racketeering activity — monetary transactions in criminal proceeds through financial institutions — are not part of any scheme to defraud investors in the purchase or sale of securities. They are post-acquisition monetary transactions in criminally derived proceeds.

137. Plaintiffs and the Class suffered injury to their business or property as a direct and proximate result of the defendants' § 1962(c) violations. The commission proceeds that the Individual Defendants received and transacted through the banking system were funded directly from investor principal contributed by Plaintiffs and the Class. The diversion of investor funds as commission proceeds to the Individual Defendants is the direct cause of Plaintiffs' investment losses.

137(a). Between January 2020 and May 2022, EminiFX collected more than $300,000,000 from approximately 62,000 investors, including Plaintiffs and the Class. No portion of that investor principal was placed into legitimate trading operations — the entire sum constituted funds available to satisfy investor claims had they not been dissipated. Following Alexandre's arrest on May 22, 2022, the Court-appointed Receiver in CFTC v. Alexandre, No. 22-cv-3822 (VEC) (S.D.N.Y.), took custody of the remaining EminiFX assets. On information and belief, the Receiver has to date distributed, or realistically expects to distribute, only a small fraction of total investor losses, leaving Plaintiffs and the Class without recourse for the substantial balance of their

damages from the receivership estate alone. This shortfall is the direct measure of harm for which this action seeks redress.

137(b). The commission payments distributed to the Individual Defendants — totaling, on information and belief, tens of millions of dollars drawn entirely from investor principal — were permanently removed from the EminiFX estate before the Receiver could preserve them for the benefit of investors. Each dollar paid to an Individual Defendant as a commission was a dollar that the Receiver could not recover and redistribute to defrauded investors. On a dollar-for-dollar basis, the aggregate commission payments received by the Individual Defendants directly reduced the per-investor recovery available through the receivership. Had those proceeds not been diverted, they would have remained within the EminiFX estate and been available for pro rata distribution to Plaintiffs and the Class. The Individual Defendants' receipt of those proceeds — and each subsequent § 1957 transaction that moved, spent, or further dissipated those funds — caused a direct, quantifiable reduction in the assets available to compensate the investor class.

137(c). The Individual Defendants compounded this injury through the § 1957 transactions specifically described in Paragraphs 83–121. By depositing, spending, converting, and otherwise transacting with commission proceeds through financial institutions — including, as specifically alleged, the acquisition of a luxury motor vehicle by Defendant Maisonneuve through a financial institution — the Individual Defendants permanently dissipated those funds from any recoverable pool. The assets consumed through those § 1957 transactions are not subject to the receivership order in CFTC v. Alexandre and are recoverable by Plaintiffs and the Class only through this civil action. This civil RICO proceeding is therefore the sole mechanism through which Plaintiffs can reach the assets of the Individual Defendants and Corporate Defendants and recover the portion of their losses directly attributable to the commission diversion and subsequent dissipation.

137(d). Each named Plaintiff can trace his or her losses directly to the commission diversion. Because Alexandre paid commissions calculated on all funds under management — drawing from the undifferentiated pool of investor principal, not from funds contributed by any specific investor — each Plaintiff's investment contributed, on a pro rata basis, to the commission proceeds received by each Individual Defendant. Each named Plaintiff's minimum recoverable loss attributable to the Individual Defendants' § 1957 violations is calculable by reference to his or her total investment as a proportion of the total funds under management during the commission period, multiplied by the total commission proceeds received by each respective defendant. This pro rata tracing analysis establishes both the fact of injury and a concrete, non-speculative methodology for computing individual damages at trial.

138. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover threefold their actual damages, plus the costs of suit and reasonable attorneys' fees, from each defendant found liable under this Count.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(RICO Conspiracy)**

**(Against All Individual Defendants and All Corporate Defendants)**

139. Plaintiffs re-allege and incorporate by reference paragraphs 1-128, supra, as if fully set forth herein.

140. Each Individual Defendant conspired with one another, with Alexandre, and with Dieuveuil to violate 18 U.S.C. § 1962(c) by agreeing to conduct or participate in the conduct of the EminiFX Commission Distribution Enterprise through a pattern of racketeering activity consisting of § 1957 monetary transactions in criminally derived proceeds, in violation of 18 U.S.C. § 1962(d).

141. Each Individual Defendant knew of the Enterprise's existence, knew that the Enterprise was engaged in a pattern of racketeering activity through § 1957 monetary transactions in criminally derived proceeds, and agreed to facilitate that pattern of racketeering activity by receiving, depositing, and otherwise transacting in criminally derived commission proceeds through the financial institution system.

142. Each Corporate Defendant is also liable under 18 U.S.C. § 1962(d) for RICO conspiracy. Each Corporate Defendant — through the acts and knowledge of its officer-agents and employed pastor-agents — knew of the Commission Distribution Enterprise's existence and knew that the Enterprise was engaged in racketeering activity. Each Corporate Defendant agreed, through its authorized agents, to facilitate the pattern of racketeering activity by: (a) employing and credentialing the Individual Pastor Defendants whose § 1957 acts constituted the Enterprise's racketeering activity; (b) retaining those pastors in positions of institutional authority despite actual or constructive knowledge that they were receiving and transacting criminally derived proceeds; and (c) providing the institutional framework through which the Individual Defendants maintained their association with the Commission Distribution Enterprise.

143. The conspiracy is evidenced by: (a) the structured, periodic commission payment system through which Alexandre distributed proceeds to each Individual Defendant; (b) meetings among the commission-receiving participants at which financial arrangements, commission amounts, and payment mechanics were reviewed; (c) each Individual Defendant's recurring receipt of and transactions with commission proceeds over an extended period; and (d) the shared understanding among the Individual Defendants that the source of their periodic commission payments was Alexandre's criminal operation.

144. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover threefold their actual damages, plus costs and reasonable attorneys' fees, from each defendant found liable under this Count.

## COUNT III

### NEGLIGENT SUPERVISION AND NEGLIGENT HIRING (Against General Conference Corporation, North American Division, Northeastern Conference, Allegheny East Conference, Florida Conference, Southeastern Conference, Texas Conference, Southern New England Conference, and Theodore Norman Clair Wilson)

145. Plaintiffs re-allege and incorporate by reference paragraphs 1-128, supra, as if fully set forth herein.

146. The Corporate Defendants exercised supervisory authority over the Individual Pastor Defendants. Each pastor was employed by, credentialed by, supervised by, and subject to discipline and removal by the Corporate Defendants. The Corporate Defendants had the authority and responsibility to monitor, investigate, and discipline pastors under their supervision.

147. The Corporate Defendants knew or reasonably should have known that pastors under their supervision were receiving substantial commission payments from EminiFX. Church members, including Plaintiffs and members of the Class, filed complaints with the Corporate Defendants about the conduct of the Individual Pastor Defendants. Upon information and belief, such complaints were transmitted through conference-level leadership channels and discussed among supervisory personnel before Alexandre’s arrest. The Allegheny East Conference, for example, received specific complaints concerning Defendant Maisonneuve prior to Alexandre's arrest. The Northeastern Conference was aware of the conduct of Defendants under its supervision.

148. Despite having actual or constructive knowledge of the Individual Pastor Defendants' conduct, the Corporate Defendants failed to conduct any meaningful investigation, discipline, remove, or otherwise take adequate action with respect to the Individual Pastor Defendants under their supervisory authority.

149. The Corporate Defendants' failure to exercise reasonable supervisory care was a proximate cause of Plaintiffs' and the Class's losses. Had the Corporate Defendants exercised reasonable supervision — including by investigating complaints, revoking pastoral credentials of offending pastors, or taking other appropriate remedial action — the Individual Pastor Defendants would have lost the institutional authority and access that enabled them to continue receiving and transacting with criminally derived proceeds.

150. As a direct and proximate result of the Corporate Defendants' negligent supervision, Plaintiffs and the Class suffered financial losses exceeding $200,000,000. Plaintiffs and the Class are entitled to compensatory and punitive damages in amounts to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

151. Plaintiffs re-allege and incorporate by reference paragraphs 1-128, supra, as if fully set forth herein.

152. The Individual Defendants were unjustly enriched by commission proceeds derived from investor contributions made by Plaintiffs and the Class. The commission proceeds received by the Individual Defendants represent money that, in good conscience, belongs to Plaintiffs and the Class, whose invested funds were the direct source of those commissions.

153. The Corporate Defendants were unjustly enriched to the extent that commission proceeds received by the Individual Pastor Defendants were used, directly or indirectly, to fund church operations, facilities, or other organizational expenses of the Corporate Defendants.

154. It is against equity and good conscience to permit any Defendant to retain the benefit conferred upon them by the investment funds of Plaintiffs and the Class. Plaintiffs and the Class are entitled to restitution in the amount of each Defendant's unjust enrichment, in amounts to be determined at trial.

**COUNT V**
**CONVERSION**
**(Against All Individual Defendants)**

155. Plaintiffs re-allege and incorporate by reference paragraphs 1-128, supra, as if fully set forth herein.

156. Plaintiffs and the Class had a possessory interest in the investment funds they contributed to EminiFX. The Individual Defendants, through their participation in the EminiFX Commission Distribution Enterprise, wrongfully exercised dominion and control over those funds by receiving and retaining commission proceeds funded directly from Plaintiffs' and the Class's investment principal, thereby converting those funds to their own use and benefit.

157. The Individual Defendants' receipt and retention of criminally derived commission proceeds constituted an intentional act of conversion without legal justification. Plaintiffs and the Class are entitled to recover the fair market value of the property converted, plus punitive damages, in amounts to be determined at trial.

**COUNT VI**
**CIVIL CONSPIRACY**
**(Against All Individual Defendants)**

158. Plaintiffs re-allege and incorporate by reference paragraphs 1-128, supra, as if fully set forth herein.

159. The Individual Defendants combined and agreed with one another, with Alexandre, and with Dieuveuil to commit unlawful acts against Plaintiffs and the Class, including: (a) the receipt of commission proceeds known to be criminally derived; (b) the transacting of those

criminally derived proceeds through the financial institution system in amounts exceeding $10,000; (c) the retention and management of criminally derived proceeds; and (d) the conversion of investor funds through the commission payment mechanism.

160. Each Individual Defendant performed overt acts in furtherance of the conspiracy, including: receiving and depositing commission payments through financial institutions; acquiring assets funded by commission proceeds; and managing and retaining criminally derived proceeds over an extended period.

161. As a direct and proximate result of the civil conspiracy, Plaintiffs and the Class suffered financial losses in amounts to be determined at trial. Plaintiffs and the Class are entitled to compensatory damages, punitive damages, and all other appropriate relief.

**COUNT VII**
**FRAUDULENT TRANSFER**
**(Against Defendants Clarelle Dieuveuil, John Edvard Maisonneuve, Sophia Maisonneuve, Frantz D'Haiti, and Yvelande D'Haiti)**

162. Plaintiffs re-allege and incorporate by reference paragraphs 1-128, supra, as if fully set forth herein.

163. Upon information and belief, Defendants Clarelle Dieuveuil, John Edvard Maisonneuve, Sophia Maisonneuve, Frantz D'Haiti, and Yvelande D'Haiti transferred commission proceeds and other EminiFX-derived assets to family members, nominees, or other entities for less than reasonably equivalent value, and/or with actual intent to hinder, delay, or defraud creditors — including Plaintiffs and the Class — in violation of the New York Debtor and Creditor Law, Article 10.

164. Such transfers include, upon information and belief, transfers of cash, real property, vehicles, and other assets funded with commission proceeds, made in anticipation of the litigation that would follow the collapse of the EminiFX scheme and Alexandre's arrest.

165. Plaintiffs and the Class are entitled to avoidance of such transfers, recovery of the transferred assets or their value, and all other relief available under the New York Debtor and Creditor Law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all members of the Class, respectfully request that this Court:

**A.** Certify this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), and appoint Plaintiffs as Class Representatives and their counsel as Class Counsel;

**B.** Enter judgment against each Individual Defendant and each Corporate Defendant on Count I, awarding Plaintiffs and the Class compensatory damages for all losses proximately caused by the defendants' violations of 18 U.S.C. § 1962(c), trebled pursuant to 18 U.S.C. § 1964(c);

**C.** Enter judgment against each Individual Defendant and each Corporate Defendant on Count II for RICO conspiracy under 18 U.S.C. § 1962(d), awarding treble damages, costs, and attorneys' fees;

**D.** Enter judgment against the Corporate Defendants on Count III for negligent supervision, awarding compensatory and punitive damages in amounts to be determined at trial;

**E.** Enter judgment against all Defendants on Count IV for unjust enrichment, awarding full restitution of all commission proceeds and other benefits unjustly retained;

**F.** Enter judgment against the Individual Defendants on Count V for conversion, awarding compensatory and punitive damages in amounts to be determined at trial;

**G.** Enter judgment against the Individual Defendants on Count VI for civil conspiracy, awarding compensatory and punitive damages in amounts to be determined at trial;

**H.** Enter judgment against the named Defendants on Count VII voiding fraudulent transfers, recovering transferred assets or their equivalent value, and imposing a constructive trust on all criminally derived proceeds and their traceable proceeds in the possession of any Defendant or their transferees;

**I.** Award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit pursuant to 18 U.S.C. § 1964(c);

**J.** Award pre-judgment and post-judgment interest at the maximum legal rate;

**K.** Grant injunctive relief requiring the Individual Defendants to disgorge all criminally derived commission proceeds and traceable assets derived therefrom;

**L.** Grant injunctive relief preventing the Individual Defendants from dissipating, concealing, or transferring any remaining assets derived from EminiFX commission proceeds pending final judgment; and

**M.** Grant such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted, Dated: May 27, 2026[2]

/s/ J. Wil Morris
J. Wil Morris, Esquire
MORRIS LEGAL, LLC
Attorney for Plaintiffs and the Class
2800 Biscayne Blvd, Suite 530
Miami, Florida 33137
Telephone: 305-444-3437
Fax: 305-444-3457
New York Bar No.: 8728/JWM

[2] Due to an inadvertent inclusion of a defendant in the wrong version, that defendant was removed, and this filing should be deemed timely in accordance with the Court's last extension of time to file.